# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br>378 N. Main Avenue<br>Tucson, AZ 85701;<br><br>DEFENDERS OF WILDLIFE,<br>1130 17th Street N.W.<br>Washington, D.C. 20036; and<br><br>ANIMAL LEGAL DEFENSE FUND,<br>525 East Cotati Avenue<br>Cotati, CA 94931,<br><br>       Plaintiffs,<br>v.<br><br>KEVIN McALEENAN,<br>in his official capacity as Acting Secretary of<br>the U.S. Department of Homeland Security,<br>245 Murray Lane S.W.<br>Washington, D.C. 20528; and<br><br>U.S. DEPARTMENT OF HOMELAND<br>SECURITY,<br>245 Murray Lane S.W.<br>Washington, D.C. 20528,<br><br>       Defendants. | **COMPLAINT**<br>**FOR DECLARATORY AND**<br>**INJUNCTIVE RELIEF**<br><br><br>Case No.: _____ |

## INTRODUCTION

1.　　In this action, Plaintiffs Center for Biological Diversity, Defenders of Wildlife,

and Animal Legal Defense Fund challenge three determinations made on May 15, 2019 by

Defendant Kevin McAleenan, Acting Secretary of the U.S. Department of Homeland Security

("DHS"), waiving the application of the National Environmental Policy Act ("NEPA"), 42

U.S.C. § 4321 *et seq.*, the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, and numerous other statutory requirements in order to expedite construction of approximately 78 miles of border wall, lighting, and roads in California and Arizona ("Border Wall Projects"). *See* 84 Fed. Reg. 21,798 (Arizona Waiver); 84 Fed. Reg. 21,800 (El Centro, California Waiver); 84 Fed. Reg. 21,801 (Tecate, California Waiver).

2.      In issuing the three Waivers, Secretary McAleenan invoked the authority purportedly contained in Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 104-208, Div. C, 110 Stat. 3009-546 (codified at 8 U.S.C. § 1103 note), as amended.  As detailed below, the three Waivers are *ultra vires* and unlawful because they exceed the limited grant of authority for such waivers contained in IIRIRA Section 102.  Moreover, any interpretation of Section 102 that would sanction the issuance of the three Waivers would render this statutory provision so broad and unbounded in scope that it would run afoul of the Constitutional principles of Separation of Powers, the Non-Delegation Doctrine, and the Presentment Clause.

3.      Section 102 of IIRIRA directed the DHS Secretary to "install additional physical barriers and roads . . . in areas of high illegal entry."  Section 102(a).  Specifically, "in carrying out" this mandate, the DHS Secretary was required to identify and construct a total of not less than 700 miles of "reinforced fencing" where it would be "most practical and effective," as well as to complete construction of 370 miles of these border barriers within "priority areas" by December 31, 2008.  Section 102(b).  By DHS's own admission, the projects required by Section 102 have long since been completed.

4.      In addition to IIRIRA Section 102(b)'s mandate to build certain barriers by certain dates, Section 102(c) provides that "the DHS Secretary shall have the authority to waive

all legal requirements to ensure expeditious construction of the barriers and roads *under this Section*." (Emphasis added). Invoking this provision, the three Waivers purport to exempt approximately 78 miles of border wall construction in California and Arizona from numerous otherwise applicable environmental laws. However, because these projects do not fall within the scope of projects mandated by Section 102, the proposed construction squarely does not fall "under this section"—and, consequently, the waiver authority under Section 102(c) is inapplicable.

5. Plaintiffs seek a judicial declaration that DHS Acting Secretary McAleenan's issuance of the three waivers was *ultra vires* agency action that is invalid and ineffective. Specifically, the waiver provision under Section 102(c) only applies to the measures mandated by Section 102(b), which have already been completed because DHS has met its duty to identify and construct 370 miles of border barriers within "priority areas" by December 31, 2008, as required by Section 102(b)(1)(B), as well as its overlapping duty to construct a total of not less than 700 miles of border barriers as required by IIRIRA Section 102(b)(1)(A). As such, because the scope of the IIRIRA Section 102(c) waiver provision is limited to the border barriers and road requirements specified by IIRIRA Section 102(b), the requirements of which have already been fulfilled, the purported waiver of NEPA, the ESA, and numerous additional laws under the three waivers are unlawful *ultra vires* acts.

6. In the alternative, even were the Court to determine that the 78 miles of border wall construction in California and Arizona covered by the three Waivers fall within the particular "barriers and roads" authorized under IIRIRA Section 102 and are subject to the waiver of legal requirements under IIRIRA Section 102(c), the three Waivers are invalid because

the Secretary failed to comply with IIRIRA Section 102(b)(1)(C), which mandates that the DHS
Secretary consult with stakeholders prior to their issuance.

7.     Additionally or in the alternative, Plaintiffs seek declaratory relief that the three
Waivers, and the waiver authority provided by IIRIRA Section 102(c) generally, violate the U.S.
Constitution in several respects, including the Take Care Clause, the Separation of Powers
Doctrine, the Non-Delegation Doctrine, and the Presentment Clause.

## JURISDICTION

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and
1346, 5 U.S.C. §§ 701 to 706, and 8 U.S.C. § 1103 note.  The causes of action arise under the
laws of the United States and the U.S. Constitution.  The relief requested is authorized pursuant
to 28 U.S.C. §§ 1651 and 2201 to 2202, and 5 U.S.C. §§ 701 to 706.

## VENUE

9.     Venue properly vests in this Court pursuant to 28 U.S.C. § 1391(b) and (e),
because the violations are occurring in this district, and a substantial part of the events or
omissions giving rise to the claims have occurred in this district due to decisions made by the
Defendants, and/or failure(s) to act by the Defendants.

## PARTIES

10.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-
profit environmental organization dedicated to the protection of native species and their habitats
through science, policy, and environmental law.  The Center has more than 1.5 million members
and online activists.  The Center is headquartered in Tucson, Arizona, and has offices in New
Mexico and Washington, D.C., as well as numerous additional regional offices located
throughout the country, and an international office in Baja California Sur, Mexico.

11.     The Center's members and staff live in or regularly visit the U.S.-Mexico borderlands region in California and Arizona.  The Center's members and staff regularly use the myriad federal, state, and local protected lands along the U.S.-Mexico border in California and Arizona, including areas impacted by and/or adjacent to the location of the border wall projects, for hiking, camping, viewing and studying wildlife, photography, and other scientific, vocational and recreational activities.  These areas including protected federal lands including the Yuha Basin Area of Critical Environmental Concern, Cabeza Prieta National Wildlife Refuge, Organ Pipe Cactus National Monument, Coronado National Forest, Coronado National Memorial, San Pedro Riparian National Conservation Area, and San Bernardino National Wildlife Refuge.  The Center's members and staff derive recreational, spiritual, professional, scientific, educational, and aesthetic benefit from their activities in these areas.  The Center has a long history of environmental advocacy within the borderlands region generally and California and Arizona borderlands region specifically.  The Center's members and staff have specific intentions to continue to use and enjoy these areas frequently and on an ongoing basis in the future.

12.     The Center has worked for nearly two decades to oppose environmentally harmful border fencing and other injurious border security projects along the U.S.-Mexico border generally, and the border wall project areas specifically.  The Center also has a long history of advocating for the protection of rare wildlife habitat and specific species that would be impacted by the proposed 78 miles of border wall construction in California and Arizona, including jaguar, ocelot, flat-tailed horned lizard, and Sonoran pronghorn.

13.     The Center and its members' interests are harmed by DHS's violations of law and the U.S. Constitution.  The proposed border wall construction in California and Arizona will primarily replace existing "vehicle barriers" that currently allows wildlife movement with 30-

foot border barriers that completely block movement.  Cross-border movement of wildlife on

both sides of the U.S.-Mexico border is essential for numerous species, including highly

endangered species such as jaguar.  Moreover, the projects will entail the construction of roads

as well as associated noise, lighting, and other impacts, which will all likely necessitate new land

clearing, grading, staging, and other associated activities impacting the surrounding environment.

The construction—which will occur without the benefit of compliance with NEPA, the ESA and

other laws—will negatively impact the protected federal lands, wildlife habitat and imperiled

species described above, which will injure the Center and its members' aesthetic, conservation,

recreational, scientific, educational, and wildlife preservation interests in those protected federal

lands, wildlife habitats and species.  These injuries would be redressed by the requested relief, as

absent the three California and Arizona Waivers, the harmful construction either would not occur

or would only occur after compliance with the requirements of NEPA, the ESA and other laws,

which are designed to eliminate, reduce and/or mitigate the negative environmental

consequences of federal agency actions.

14.     Plaintiff DEFENDERS OF WILDLIFE ("Defenders") is a nonprofit organization

with hundreds of thousands of members across the nation, including thousands of members in

California and Arizona.  Defenders' mission is to preserve wildlife and emphasize appreciation

and protection for all species in their ecological role.  Through advocacy, litigation, and other

efforts, Defenders works to preserve species and the habitats upon which they depend.

Defenders has been closely involved in policy and litigation matters associated with border wall

construction along the United States-Mexico border for more than a decade.  Defenders has field

offices across the country, including in Santa Fe, New Mexico.

15.     Defenders has organizational and membership-based interests in the preservation and conservation of the borderlands of the Southwestern United States that will be harmed by the construction of barriers and roads at issue in this case.  For more than two decades, Defenders has worked for the protection of borderland wildlife and ecosystems.  Defenders has played a leading role in efforts to educate the public and advocate for better integration of environmental considerations into immigration policy generally, and into border security efforts specifically.

16.     Defenders' members live near and regularly visit the borderlands near California and Arizona for wildlife observation, recreation, and other uses.  Defenders' members also live in other areas along the California and Arizona border adversely impacted by the border wall projects being constructed throughout the area.  These members have aesthetic, educational, professional, health, and spiritual interests that will be harmed by the environmental impacts that will result from the DHS Secretary's decision to waive multiple laws, and consequently eliminate the procedural and substantive protections that would have otherwise been provided by these laws.

17.     Plaintiff ANIMAL LEGAL DEFENSE FUND ("ALDF") is a nonprofit 501(c)(3) organization with more than 200,000 members and supporters, thousands of whom live in California or Arizona.  ALDF represents its members interests by working to protect the lives of animals, including wildlife, through the legal system. ALDF is headquartered on Cotati, California, with regional offices in Los Angeles and Portland, Oregon.

18.     ALDF has an organizational and membership-based interest in ensuring the letter and spirit of wildlife- and wildland-protection statutes are fully upheld and the constitutional principles enabling these laws' implementation are respected.  ALDF pursues its purpose of safeguarding animal welfare in part by persistently advocating for government adherence to

wildlife-protection laws such as NEPA, the ESA and the Migratory Bird Treaty Act (to name a few)—each of which has been waived by the DHS Secretary in conjunction under the three Waivers.  ALDF has expended significant organizational resources on advocacy and public education efforts to improve environmental protections for wildlife living on protected lands such as the borderlands at issue here, and will continue to do so if the border wall is built without adherence to the laws the DHS Secretary is attempting to waive.

19.     ALDF's members live in or regularly visit the U.S.-Mexico borderlands in California and Arizona.  ALDF's members regularly use the myriad federal, state, and local protected lands along the U.S.-Mexico border in California and Arizona—including areas impacted by and/or adjacent to the location of the proposed 78 miles of border wall construction—for hiking, camping, wildlife viewing and photography, and other vocational and recreational activities.  ALDF's members derive recreational, educational, and aesthetic benefit from their activities in these areas.  ALDF's members have specific intentions to continue to use and enjoy these areas frequently and on an ongoing basis in the future.

20.     ALDF has an established track record of active participation in the oversight of government activities and decision-making, particularly with regard to laws and policies affecting wildlife.  ALDF expends considerable organizational resources in doing so, including costs associated with litigation and educating the public.  ALDF regularly represents its members' interests in this regard by filing lawsuits, training law students and professionals, and publishing and disseminating informational materials to its members.

21.     ALDF and its members are harmed by DHS's issuance of the three Waivers, in that the DHS Secretary's decision to waive the procedural and substantive protections of multiple laws in order to expedite the construction of barriers and roads associated with the

California and Arizona border wall projects pose an imminent impact on the local ecosystems, including wildlife populations.  These impacts will directly harm ALDF's members' aesthetic and recreational interests in their continued enjoyment of the California and Arizona borderlands, and will additionally harm ALDF as an organization due to the forced diversion of ALDF resources to protect the wild animals affected by the illegal border wall construction in fulfillment of its mission.

22.     Defendant KEVIN McALEENAN, Acting Secretary of the U.S. Department of Homeland Security, is sued in his official capacity.  Acting Secretary McAleenan is the official ultimately responsible under federal law for ensuring that the actions and management decisions of the Department, including its component agency the U.S. Customs and Border Protection ("CBP") comply with all applicable laws and regulations.  On May 15, 2019, Acting Secretary McAleenan invoked the IIRIRA Section 102(c) waiver authority to issue three Waivers Determinations authorizing approximately 78 miles of border wall construction in California and Arizona.

23.     Defendant U.S. DEPARTMENT OF HOMELAND SECURITY is an agency within the executive branch of the U.S. government.  The Department is responsible for ensuring border security along the U.S.-Mexico border consistent with applicable legal requirements.

## STATUTORY BACKGROUND

**A.     Section 102 of The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA")**

24.     Congress initially enacted IIRIRA in 1996 to, for the first time, provide federal agencies with specific direction regarding the location and extent of specific border barriers to be constructed.  P.L. 104-208, div. C., codified at 8 U.S.C. § 1103 note.  Prior to IIRIRA's enactment, the authority to construct border barriers derived from the general statutory

responsibility of the Attorney General (now the DHS Secretary) to "guard the boundaries and borders of the United States against the illegal entry of aliens."  Immigration and Nationality Act, §103(a)(5), 8 U.S.C. §1103(a)(5).  That authority continues to exist independent of IIRIRA.

25.     While it has been amended several times, IIRIRA Section 102 remains the primary federal statutory provision addressing border barriers.  Section 102(a) remains substantively the same as originally enacted in 1996, providing the U.S. Attorney General (now the DHS Secretary) with the general policy direction to "take such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States."

26.     At the time Section 102(a) was enacted, Congress also provided that "to the extent the Attorney General determines necessary to ensure *expeditious construction of the barriers and roads under this Section*" (emphasis added), the requirements of the ESA and NEPA may be waived.

27.     As originally enacted, IIRIRA Section 102(b) "carr[ied] out subsection (a)" by identifying specific border barriers to be constructed, establishing specific deadlines for the construction of such barriers, and other requirements.  The only border fence segment initially mandated by Congress under IIRIRA Section 102(b) was the construction of fencing in San Diego, California—specifically, the fortification of a 14-mile long "primary" border fence that was completed in 1993.  As originally enacted, IIRIRA did not mention construction related to the California and Arizona border wall projects.

28.     The modifier "under this Section" in IIRIRA Section 102(c) refers solely to the specific border fencing required under IIRIRA Section 102(b), which by its plain language

"carries out" DHS's general authority to ensure the "expeditious construction" of "additional physical barriers and roads" under IIRIRA Section 102(a).

**B.      The 2005 REAL ID Act Amendments to IIRIRA Section 102(c)**

29.     Enacted in 2005, Section 102 of the REAL ID Act amended the Section 102(c) IIRIRA waiver provision in two primary ways.   P.L. 109-13, div. B.

30.     First, the REAL ID Act amendment expanded the IIRIRA Section 102(c) waiver authority beyond NEPA and the ESA to permit the DHS Secretary "to waive *all legal requirements* [that] such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this Section" (emphasis added). This amendment did not specify the laws that Congress authorized the Secretary to waive.

31.     Second, Section 102 of the REAL ID Act amended the waiver authority under IIRIRA Section 102(c) to restrict judicial review concerning any waiver decision in the following respects: (i) purporting to limit "all causes or claims" arising from any waiver determination made by the DHS Secretary to alleged constitutional violations only; (ii) requiring any such constitutional challenge to be filed not later than 60 days after the Secretary's determination, effective upon being published in the Federal Register; and (iii) eliminating appellate court review of the district court's decision on the alleged constitutional violations and instead only permitting review upon a writ of certiorari to the U.S. Supreme Court.

32.     Congress intended the REAL ID Act's amendment and expansion of the 102(c) waiver authority, like the IIRIRA Section 102(c) waiver authority as originally enacted in 1996, to apply to the specific border barrier and road requirements at IIRIRA Section 102(b), which "carries out" the general border barrier policy direction at IIRIRA Section 102(a).  At that time, the only specific border barriers required under Section 102(b) remained the 14-mile San Diego,

California fence proposals, with no mention of other fencing.  Congress's intent—that the

expansion of the IIRIRA Section 102(c) waiver authority under Section 102 of the REAL ID Act

be limited to the specific San Diego border barriers mandated by IIRIRA Section 102(b)—is

evidenced by the bill's plain language, as well as statements by the bill's author and co-sponsors

during the limited House Floor debate.

33.     Indeed, the bill's official title made clear that Congress's intent in expanding the

IIRIRA Section 102(c) waiver authority was specific to the border barrier segments identified

under Section 102(b): "To establish and rapidly implement regulations for State driver's license

and identification document security standards, to prevent terrorists from abusing the asylum

laws of the United States, to unify terrorism-related grounds for inadmissibility and removal, *and*

*to ensure expeditious construction of the San Diego border fence*." (Emphasis added).

34.     The intended limitation of the IIRIRA Section 102(c) waiver authority to the San

Diego double and triple layered fence specified under IIRIRA Section 102(b) was also

repeatedly emphasized by the bill's supporters on the House Floor.  As stated by the bill's

author:

> [T]he REAL ID Act will waive Federal laws *to the extent necessary to*
> *complete gaps in the San Diego border security fence*, which is still
> stymied 8 years after congressional authorization.

151 Cong. Rec. H454 (daily ed., Feb. 9, 2005)(Statement of Rep. Sensenbrenner)(emphasis

added); *see also* Cong. Rec. H471 ("H.R. 418 provides the Secretary of Homeland Security with

authority to waive environmental laws, *so that the border fence running 14 miles east from the*

*Pacific Ocean at San Diego may finally be completed*.")(daily ed., Feb. 9, 2005)(Statement of

Rep. Hoekstra)(emphasis added).  No legislation or legislative history mentions the application

of IIRIRA Section 102(c) waiver authority to apply to any border wall construction in the

California and Arizona border wall projects.

**C.      The 2006 Secure Fence Act Amendments to IIRIRA Section 102(b)**

35.      President George W. Bush signed the Secure Fence Act on October 26, 2006.
P.L. 109-367.

36.      Section 3 of the Secure Fence Act ("Construction of Fencing and Security
Improvements in Border Area from Pacific Ocean to Gulf of Mexico") significantly expanded
upon IIRIRA Section 102(b).  Under the Secure Fence Act amendments to IIRIRA Section
102(b), Congress removed the provisions referring specifically to the 14-miles of fencing in San
Diego and instead directed DHS to "provide for at least 2 layers of reinforced fencing [and] the
installation of additional physical barriers, roads, lighting, cameras, and sensors" in five specific
segments along the U.S.-Mexico border totaling approximately 850 miles.  Former IIRIRA
§102(b)(1)(A)(i)-(v).

37.      Congress did not specifically address the impact of the Secure Fence Act
amendments on the scope of the IIRIRA Section 102(c) waiver.

**D.      The 2008 Consolidated Appropriations Act Amendments to IIRIRA Section 102(b)**

38.      Just over a year after enactment of the Secure Fence Act, President George W.
Bush signed the 2008 Consolidated Appropriations Act on December 26, 2007.  P.L. 110-161,
div. E.

39.      In a third and final amendment to date, Section 564 of the 2008 Consolidated
Appropriations Act amended Section 102(b) of the IIRIRA to scale back DHS's duties with
respect to border barriers and roads as defined under the 2006 Secure Fence Act amendments.
These modifications—which remain the law to date—include: (i) eliminating the requirement
that border barriers be built in any specific locations, and instead specifying that such barriers be

placed "along not less than 700 miles of the southwest border where fencing would be most

practical and effective"; (ii) eliminating the requirement of double-layered fencing; (iii)

amending the "priority areas" requirement to direct that DHS identify and construct 370 miles of

border barriers by December 31, 2008.  IIRIRA § 102(b)(1)(A)-(B).

40.     The 2008 Appropriations Act also added a new consultation requirement to

IIRIRA Section 102(b), mandating the DHS Secretary to consult with the Secretary of the

Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property

owners in the United States to minimize the impact on the environment, culture, commerce, and

quality of life for the communities and residents located near the sites where" border barriers are

constructed.  IIRIRA § 102(b)(1)(C).

41.     There have been no amendments to IIRIRA Section 102 since the 2008

Appropriations Act amendment was signed into law.

**E.     IIRIRA Section 102, As Amended**

42.     The relevant Sections of IIRIRA Section 102, codified at 8 U.S.C. § 1103 note, in

its current version to date provide:

> **(a)  In general.--**The Secretary of Homeland Security shall take such actions as
> may be necessary to install additional physical barriers and roads (including
> the removal of obstacles to detection of illegal entrants) in the vicinity of the
> United States border to deter illegal crossings in areas of high illegal entry
> into the United States.
> **(b)  Construction of fencing and road improvements along the border.—**
> **(1)  Additional fencing along southwest border.—**
> **(A)  Reinforced fencing.--**In carrying out subsection (a) [of this note], the
> Secretary of Homeland Security shall construct reinforced fencing
> along not less than 700 miles of the southwest border where fencing
> would be most practical and effective and provide for the installation
> of additional physical barriers, roads, lighting, cameras, and sensors
> to gain operational control of the southwest border.
> **(B)  Priority areas**.--In carrying out this Section [Pub. L. 104-208, Div.
> C, Title I, § 102, Sept. 30, 1996, 110 Stat. 3009-554, which amended

this Section and enacted this note], the Secretary of Homeland Security shall—

   (i)   identify the 370 miles, or other mileage determined by the Secretary, whose authority to determine other mileage shall expire on December 31, 2008, along the southwest border where fencing would be most practical and effective in deterring smugglers and aliens attempting to gain illegal entry into the United States; and

   **(ii)**   not later than December 31, 2008, complete construction of reinforced fencing along the miles identified under clause (i).

**(C) Consultation.**

   (i)   **In general.--**In carrying out this Section, the Secretary of Homeland Security shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed

   **(ii)**   **Savings provision.--**Nothing in this subparagraph may be construed to—

      **(I)**   create or negate any right of action for a State, local government, or other person or entity affected by this subsection; or

      **(II)**   affect the eminent domain laws of the United States or of any State.

**(D) Limitation on requirements.--**Notwithstanding subparagraph (A), nothing in this paragraph shall require the Secretary of Homeland Security to install fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location along an international border of the United States, if the Secretary determines that the use or placement of such resources is not the most appropriate means to achieve and maintain operational control over the international border at such location.

     *       *       *

**(c) Waiver.—**

**(1) In general.--**Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this Section. Any such decision by the Secretary shall be effective upon being published in the Federal Register.

**(2) Federal court review.—**

**(A) In general.--**The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any

action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

(B) **Time for filing of complaint.--**Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security. A claim shall be barred unless it is filed within the time specified.

(C) **Ability to seek appellate review.--**An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States.

## FACTUAL BACKGROUND

A.    **Past Construction of Border Barriers and Use of the Waiver Authority Under IIRIRA**

43.    From 2005 to 2008, DHS waived numerous laws that otherwise would have applied to approximately a total of 624.5 miles of border barrier and related road construction. As of February 2017, DHS has constructed 654 miles of "primary" border barriers and approximately 5,000 miles of roads along the U.S.-Mexico border.

44.    Consequently, DHS has fulfilled its statutory responsibilities to construct the specific "fencing and road improvements along the border" as currently defined by IIRIRA Section 102(b).

45.    In particular, DHS has met its specific mandate to identify and construct 370 miles of border fencing in "priority areas . . . where fencing would be most practical and effective."  IIRIRA § 102(b)(1)(B).

46.    Separately, DHS has also met its specific mandate to "construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective."  IIRIRA § 102(b)(1)(A).  In addition to the 654 miles of primary fencing

constructed by DHS, the agency has constructed an additional 37 miles of double-layered fencing and 14 miles of triple-layered fencing, totaling 705 miles of reinforced border fencing, exceeding the 700-mile minimum under IIRIRA Section 102(b)(1)(A).

47.     As summarized recently by the GAO:

> From fiscal years 2005 through 2015, CBP increased the total miles of primary border fencing on the southwest border from *119 miles to 654 miles*—including 354 miles of primary pedestrian fencing and 300 miles of primary vehicle fencing.  With 654 miles of primary fencing currently deployed, CBP officials have stated that CBP is in compliance with its legal requirements for the construction of the southwest border fencing on the substantial discretion provided to the Secretary of Homeland Security to determine the appropriate placement of fencing.

GAO Report, at p. 8.  (Emphasis added)

48.     Further, there have been no amendments to IIRIRA Section 102 since the 2008 Amendment was signed into law authorizing any legal waivers for additional construction projects outside those projects specifically authorized and contemplated when it was enacted.

**B.     The May 15, 2019 IIRIRA Section 102(c) Waiver Determinations**

49.     On January 25, 2017, President Donald J. Trump issued Executive Order No. 13767, entitled "Border Security and Immigration Enforcement Improvement" ("Executive Order"), which directed DHS to construct a "secure, contiguous, and impassable physical barrier" along the entirety of the nearly 2,000 mile-long U.S.-Mexico border.  Prior to the Executive Order, *all* previous waivers invoked under Section 102(c) of IIRIRA were for projects *required* under Section 102(b).  Subsequent to the Executive Order, DHS Secretaries under President Trump have now issued thirteen waivers—all for projects *outside* the scope of Section 102(b).

50.     On May 15, 2019, Acting Secretary McAleenan issued three Determinations in the Federal Register purporting to invoke IIRIRA Section 102(c) in order to waive the application of NEPA, the ESA and numerous additional laws otherwise applicable to "the construction of roads and physical barriers," as they would otherwise apply to border wall construction.

## C.     The California and Arizona Border Wall Projects

51.     Acting Secretary McAleenan's three Waivers purport to waive the application of NEPA, the ESA and numerous other laws to the proposed construction of approximately 78 miles of border wall construction, which will involve the replacement of existing fencing, the majority being vehicle barriers, generally compatible with wildlife movement, with bollard-style walls, which are an almost complete obstructive barrier to wildlife movement, in California and Arizona.  *See* 84 Fed. Reg. 21,798 ("Tucson Waiver"); 84 Fed. Reg. 21,800 ("El Centro Waiver"); 84 Fed. Reg. 21,801 ("Tecate Waiver").

52.     Nearly all of the border wall construction under the three Waivers would be conducted on protected federal lands, including the Yuha Basin Area of Critical Environmental Concern, Cabeza Prieta National Wildlife Refuge, Organ Pipe Cactus National Monument, Coronado National Forest, San Pedro Riparian National Conservation Area, and San Bernardino National Wildlife Refuge.

53.     These federal lands protect a wide variety of desert, mountain, and riparian habitats, which harbor an extraordinary diversity of wildlife, including crucial cross-border "corridors" for endangered jaguars.

54.     The construction of bollard-style walls, associated roads, and ligthing, will cause the permanent destruction of federally protected lands, prevent cross-border movement of

jaguars and other endangered species, and have numerous other impacts.  By failing to conduct

any NEPA or ESA review, DHS has not and will not properly consider these myriad negative

environmental impacts of the proposed border wall construction in California and Arizona,

including considering whether there are reasonable alternatives that might mitigate such impacts.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### *Ultra Vires* Violations under IIRIRA Section 102(c)

55.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

56.     Acting Secretary McAleenan's three Waivers cite Section 102 of IIRIRA as

authority for approximately 78 miles of border wall construction in California and Arizona.

57.     IIRIRA Section 102(c) provides the DHS Secretary with "the authority to waive

all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to

ensure expeditious construction of the barriers and roads under this Section." 8 U.S.C. § 1103

note.

58.     The scope of the IIRIRA Section 102(c) authority, granted to the DHS Secretary,

to waive laws "under this Section" is limited to the specific border barriers and roads required to

be constructed pursuant to IIRIRA Section 102(b).  While IIRIRA Section 102(a) provides

general policy direction to the DHS Secretary to construct border barriers and roads in "areas of

high illegal entry" into the United States, IIRIRA Section 102(b) identifies the specific

"construction of fencing and road improvements along the border" necessary to "carry[] out

subsection (a)."

59.     At the time of the original 1996 enactment of IIRIRA, as well as its 2005

amendment by Section 102 of the REAL ID Act, the specific border barrier construction required

under IIRIRA Section 102(b) was limited solely to the San Diego 14-mile double and triple layer border fence.

60.     Congress subsequently amended IIRIRA Section 102(b) under the 2006 Secure Fence Act and 2008 Consolidated Appropriations Act. The 2006 Secure Fence Act amended IIRIRA Section 102(b) to require DHS to construct five specific segments of double-layered border fencing totaling approximately 850 miles. One year later, with the enactment of the 2008 Consolidated Appropriations Act, Congress again amended IIRIRA Section 102(b) to its current version, which requires that DHS identify and construct 370 miles of border barriers *by December 31, 2008*, and that the agency construct border barriers "along not less than 700 miles of the southwest border where fencing would be most practical and effective."

61.     DHS has met its duty to identify and construct 370 miles of border barriers within "priority areas" by December 31, 2008 as required by IIRIRA Section 102(b)(1)(B), as well as its duty to construct a total of not less than 700 miles of border barriers as required by IIRIRA Section 102(b)(1)(A).

62.     Because the scope of the IIRIRA Section 102(c) waiver provision is limited to the border barriers and road requirements specified by IIRIRA Section 102(b), the requirements of which have already been fulfilled, the purported waiver of NEPA, the ESA, and numerous additional laws under the three Waivers is an unlawful *ultra vires* act.

**SECOND CLAIM FOR RELIEF**
**In the Alternative, Violation of IIRIRA Section 102(b)(1)(C)**
**as a Requirement to Using Waiver Authority under IIRIRA Section 102(c)**

63.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

64.     In the alternative, to the degree the Court finds that the three Waivers apply to "barriers and roads" under IIRIRA Section 102, and are thus subject to waiver of legal

requirements under IIRIRA Section 102(c), Plaintiffs challenge those three Waivers as invalid because the Acting Secretary failed to conduct necessary prerequisites for exercising the waiver authority for expedited construction as set forth in provision IIRIRA Section 102(b)(1)(C).

65.     IIRIRA Section 102(b)(1)(C) requires the DHS Secretary, prior to taking actions to carry out IIRIRA, to:

> consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed.

66.     IIRIRA Section 102 itself is not included among the statutes waived by the Acting Secretary in the three Waivers.  Rather, Section 102(c)(1) authorizes the DHS Secretary to waive all legal requirements "[n]otwithstanding any *other* provision of law" (emphasis added).  IIRIRA Sections 102(b) is not an "other provision[s] of law" but rather part of the same law as the Section 102(c) waiver authority.

67.     The restriction on judicial review in IIRIRA Section 102(c)(2)(A) also only applies to "any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph [102(c)](1)."

68.     The requirements of IIRIRA Section 102(b), in fact, are *prerequisites* to the DHS Secretary using the waiver authority of Section 102(c).  The requirement that the DHS Secretary must undergo consultation with key stakeholders regarding the effects of the waiver demonstrate that such a requirement must be satisfied *prior* to the waiver issuance—and not after.

69.     The three Waivers are invalid because the Acting Secretary has failed to fulfill the consultation requirement under IIRIRA Section 102(b)(1)(C).  On information and belief, the DHS Secretary has not consulted with any or all of the entities required by Section 102(b)(1)(C) prior to issuing the three Waivers.

70.     The Acting Secretary's May 15, 2019 three Waiver Determinations facially

violate the requirements under IIRIRA Section 102 and are thus *ultra vires* because the three

Waivers were issued in excess of the Acting Secretary's delegated powers by approving the

waiver prior to completing at least the prerequisite consultation mandated in Section

102(b)(1)(C).  In addition or in the alternative, DHS's failure to comply with the requirements of

Section 102(b)(1)(C) is arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law, or without observance of procedure required by law, in violation of the

Administrative Procedure Act, and is actionable thereunder.  5 U.S.C. §§ 701-706.

### THIRD CLAIM FOR RELIEF
### Constitutional Violation
### Violation of the Take Care Clause of the U.S. Constitution
### Article II, Section 3

71.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

72.     Under IIRIRA Section 102(c), and subject to the *ultra vires* restrictions described

in the First Claim for Relief, once the DHS Secretary invokes the waiver authority, the "only

cause or claim" that may be brought arising from the waiver is one "alleging a violation of the

Constitution of the United States."  IIRIRA Section 102(c) further  provides that "[t]he district

courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising

from any" such action, which "shall be filed not later than 60 days after the date of action or

decision" at issue.  IIRIRA § 102(c)(2)(A)-(C).

73.     Article II of the U.S. Constitution provides that "The executive Power shall be

vested in a President," and that he or she "shall take Care that the Laws be faithfully executed."

U.S. Constitution Article II, § 3.

74.     Among the laws that the Take Care Clause mandates be "faithfully executed" are

the conditions and limitations of IIRIRA Section 102 itself.  Among the conditions and

limitations of IIRIRA Section 102 are the geographical and temporal restrictions for barrier construction, along with the requirements for consultation with affected entities under Section 102(b), and the restriction on waiver authority under Section 102(c) to the "expeditious construction of the barriers and roads" otherwise authorized by the statute under Section 102(b).

75.     DHS Acting Secretary McAleenan's purported waiver of NEPA, the ESA and numerous additional laws under the three Waivers failed to comply with the requirements and limitations of IIRIRA Section 102, a law that the Executive Branch is required to "faithfully execute."  Accordingly, the three Waiver Determinations violate the U.S. Constitution.  U.S. Constitution Article II, § 3.

**FOURTH CLAIM FOR RELIEF**
**Constitutional Violation**
**Violation of the Non-Delegation and Separation of Powers Doctrine**
**Article I, Section 1**

76.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

77.     "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989).

78.     Article I, Section 1 of the U.S. Constitution directs that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."

79.     Article II, Section 1 of the U.S. Constitution directs that "[t]he executive Power shall be vested in a President of the United States of America."

80.     Under these constitutional provisions, Congress may not delegate legislative authority to an executive branch agency, or in the case of IIRIRA Section 102(c), may not delegate legislative authority to an individual executive branch official.  *Loving v. U.S.*, 517 U.S. 748, 758 (1996).

81.     As part of the fundamental doctrine of the Separation of Powers, the Supreme

Court "has invalidated attempts by Congress to exercise the responsibilities of other Branches or

to reassign powers vested by the Constitution in either the Judicial Branch or the Executive

Branch."  *Mistretta*, 488 U.S. at 380.

82.     IIRIRA Section 102(c) unconstitutionally delegates to the Executive Branch,

namely the DHS Secretary, the legislative power to waive the application of any

Congressionally-enacted law to construction on the U.S.-Mexico border.

83.     The only guidance Congress provided to the Executive Branch was that the

waiver should be exercised to the extent the DHS Secretary "determines necessary to ensure

expeditious construction of the barriers and roads under this Section."  Thus, Section 102(c)

permits the DHS Secretary to make legislative decisions without an intelligible general policy to

guide her decision-making.

84.     Therefore, IIRIRA violates Article I, Section 1 of the U.S. Constitution and the

Non-delegation Doctrine and Separation of Powers Doctrine, thereby rendering DHS's reliance

on IIRIRA to support its three Waiver Determinations unconstitutional.

### FIFTH CLAIM FOR RELIEF
### Constitutional Violation
### Violation of the Presentment Clause
### Article I, Section 7

85.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

86.     Article I, § 7 of the Constitution provides that any federal statute must pass both

houses of Congress, and "before it become a Law, be presented to the President of the United

States: If he[/she] approve he shall sign it, but if not he shall return it, with his Objections to that

House it which it shall have originated, who shall enter the Objections at large on their Journal,

and proceed to reconsider it."

87.    The "[a]mendment and repeal of statutes, no less than enactment," must conform with the presentment and bicameralism requirements of Article I. *INS v. Chadha*, 462 U.S. 919, 954 (1983). Specifically, the Supreme Court has stated that the Executive Branch cannot void any law without Congress passing a law voiding the previous law and presenting it to the President for signature. *Clinton v. City of New York*, 524 U.S. 417 (1998).

88.    IIRIRA Section 102(c), as written, is facially invalid because it vests unilateral power in the DHS Secretary to waive the application of any laws in areas along the border for purposes of building border walls without Congress passing a law to void the specific laws at issue or limit their application, and presenting it to the President, as required by Article I, Section 7 of the U.S. Constitution.

89.    Separately, the statute is also invalid as applied to this case. The three Waivers purported to waive NEPA, the ESA and numerous other laws that would otherwise apply to approximately 78 miles of border wall construction in California and Arizona. In so doing, the Acting Secretary chose which laws to waive and which laws to obey, without an act of Congress specifying which particular law or set of laws could be waived and without the presentation of said Congressional act to the President.

90.    The IIRIRA Section 102(c) waiver authority generally, and the Acting DHS Secretary's three Waiver Determinations specifically, are unconstitutional infringements upon the lawmaking procedures required under Article I, § 7 of the Constitution.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Center for Biological Diversity, Defenders of Wildlife, and Animal Legal Defense Fund pray that this Court:

1. Declare that the Acting DHS Secretary's three May 15, 2019 Waiver Determinations are *ultra* vires;

2. Declare that the Acting DHS Secretary lacked the authority under IIRIRA Section 102(c) to waive NEPA, the ESA, and other laws in the three Waiver Determinations;

3. Declare that the three Waiver Determinations specifically, and the IIRIRA Section 102(c) waiver authority generally, violate the U.S. Constitution's Take Care Clause;

4. Declare that the three Waiver Determinations specifically, and the IIRIRA Section 102(c) waiver authority generally, violate the U.S. Constitution's fundamental Separation of Powers and Non-Delegation Doctrine principles;

5. Declare that the three Waiver Determinations specifically, and the IIRIRA Section 102(c) waiver authority generally, violate the U.S. Constitution's Presentment Clause;

6. Set aside and vacate the three Waiver Determinations;

7. Enjoin DHS from implementing approximately 78 miles of border wall construction in California and Arizona authorized under the three Waiver Determinations unless and until it complies with all laws that would apply absent the unlawful waivers;

8. Retain jurisdiction to ensure compliance with the Court's Orders;

9. Award Plaintiffs their reasonable costs of litigation, including reasonable attorneys' fees, expert fees, and costs; and

10. Grant such other and further relief as the Court may deem just and proper.


DATED: July 14, 2019                    Respectfully submitted,

                                        */s/ Anchun Jean Su*
                                        ANCHUN JEAN SU (DC Bar No. CA285167)
                                        HOWARD M. CRYSTAL (DC Bar No. 446189)
                                        CENTER FOR BIOLOGICAL DIVERSITY
                                        1411 K Street N.W., Suite 1300

Washington, D.C. 20005
Telephone: (202) 849-8399
Email:  jsu@biologicaldiversity.org
hcrystal@biologicaldiversity.org

*/s/ Brian Segee*
BRIAN SEGEE (CA Bar 200795)*
CENTER FOR BIOLOGICAL DIVERSITY
660 S. Figueroa St., Suite 1000
Los Angeles, CA  90017
Telephone: (805) 750-8852
Email:  bsegee@biologicaldiversity.org

*Attorneys for Plaintiff Center for Biological Diversity*

JASON RYLANDER (DC Bar No. 474995)
DEFENDERS OF WILDLIFE
1130 Seventeenth Street, NW
Washington, D.C. 20036
Telephone: (202) 682-9400
Email: jrylander@defenders.org

*Attorney for Plaintiff Defenders of Wildlife*

ANTHONY T. ELISEUSON (IL Bar No. 6277427)*
ANIMAL LEGAL DEFENSE FUND
150 South Wacker Drive, Suite 2400
Chicago, IL 60606
Telephone: (707) 795-2533
Email: aeliseuson@aldf.org

*Attorney for Plaintiff Animal Legal Defense Fund*

*(application *for pro hac vice* admission pursuant to L.R. 83.2 pending)