**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,　　　　　　） ）　 ） ）　 Plaintiffs,　） ）　 v.　　　　　　） ）　 KEVIN McALEENAN, *et al.*,　） ）　 Defendants.　） ） | Civil Action No. 1:19-cv-02085 (KBJ) |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR**
**PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... i

TABLE OF EXHIBITS ............................................................................................... ii

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 1

I.     Statutory Framework ......................................................................................... 1

II.    The Secretary's Exercise of Waiver Authority ................................................ 4

III.   Procedural History ........................................................................................... 8

LEGAL STANDARD ................................................................................................... 9

ARGUMENT ............................................................................................................... 10

I.     Plaintiffs Are Not Likely to Succeed on the Merits ....................................... 10

    A.    The Court Lacks Jurisdiction to Review Plaintiffs' *Ultra Vires* Claims .............. 11

    B.    Plaintiffs' Ultra Vires Claims Fail As a Matter of Law ....................................... 18

        1.    Plaintiffs Have Not Established That They Have Statutory Rights to Vindicate Through Litigation ..................................................... 18

        2.    DHS Has Not Violated A Clear Statutory Prohibition ........................... 19

            a.    Section 102(a) is a mandate not a general purpose clause. ........... 19

            b.    Section 102(b)(1)(A) encompasses new infrastructure construction "to gain operational control of the southwest border." ....................................................................................... 23

            c.    Section 102(c)(1) permits waivers to expedite construction of any "barriers and roads under this section." ........................... 26

    C.    Plaintiffs' Constitutional Claims Are Meritless .................................................... 27

        1.    The Statute Does Not Violate the Non-Delegation Doctrine ................... 28

        2.    The Statute Does Not Violate the Presentment Clauses ......................... 32

II.    Plaintiffs Have Failed to Establish Irreparable Harm ................................... 33

III.   The Balance of Equities Weighs Strongly Against an Injunction ................... 42

CONCLUSION ............................................................................................................ 46

APPENDIX: 8 U.S.C. § 1103 Note ............................................................................ 47

**TABLE OF EXHIBITS**

Legislative History Documents..............................................................................................A

      1.      H.R. Rep. 109-72 (May 3, 2005) (Conf. Rep.) (excerpt)

      2.      151 Cong. Rec. H553-559 (Feb. 10, 2005)

      3.      153 Cong. Rec. S9871-9981 (July 25, 2007) (excerpts)

      4.      153 Cong. Rec. S10059-10103 (July 26, 2007) (excerpts)

      5.      H.R. Rep. 114-840 (Nov. 30, 2016) (Conf. Rep.) (excerpt)

Declaration of Paul Enriquez (August 13, 2019)...........................................................B

      1.      Map of Tucson Projects 1 & 2

      2.      Map of Tucson Project 3

      3.      Map of Tucson Project 2 & Quitobaquito Springs

      4.      Map of Existing and Planned Fencing in Arizona

      5.      CBP, Final Environmental Assessment for Primary Pedestrian Fence Near Lukeville, Arizona, U.S. Border Patrol, Tucson Sector (February 2008) (appendices excluded)

      6.      Barrier Construction Contract, Best Management Practices

Declaration of Jerry Martin (August 12, 2019) ............................................................C

DHS Request for Assistance Pursuant to 10 U.S.C. § 284 (Feb. 25, 2019) ................................D

Acting Secretary of Defense, Additional Support to the Department of Homeland Security (May 9, 2019) ...........................................................................................E

Acting Secretary of Homeland Security, Testimony Before the U.S. Senate Judiciary Committee (June 11, 2019)...........................................................................F

Defs.' Motion to Dismiss, Doc. No. 36, *Sierra Club, et al. v. Ashcroft, et al.*, No. 04-0272 (S.D. Cal. Nov. 11, 2005) ...................................................................G

# TABLE OF AUTHORITIES

**CASES**                                                                        Pages

*Aamer v. Obama*,
   742 F.3d 1023 (D.C. Cir. 2014) ........................................................ 10

*Acree v. Republic of Iraq*,
   370 F.3d 41 (D.C. Cir. 2004) ........................................................... 33

*AFL-CIO, Local 3669 v. Shinseki*,
   709 F.3d 29 (D.C. Cir. 2013) ...................................................... 22, 26

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
   271 F. Supp. 2d 230 (D.D.C. 2003) ................................................. 43

*Amgen v. Smith*,
   357 F. 3d 103 (D.C. Cir. 2004) ................................................... 14, 17

*Amoco Production Co. v. Village of Gambell*,
   480 U.S. 531 (1987) ................................................................. 35, 43

*Barnhart v. Peabody Coal Co.*,
   537 U.S. 149 (2003) ........................................................................ 21

*Bear Valley Mut. Water Co. v. Jewell*,
   790 F.3d 977 (9th Cir. 2015) .......................................................... 21

**Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin. Inc.*,
   502 U.S. 32 (1991) ................................................... 11, 13, 15, 18

*BHM Healthcare Sols., Inc. v. URAC, Inc.*,
   320 F. Supp. 3d 1 (D.D.C. 2018) ................................................... 10

*Bowen v. Michigan Acad. of Family Physicians*,
   476 U.S. 667 (1986) ...................................................................... 12

*Calif. Sportfishing Protection Alliance v. U.S. Bureau of Reclamation*,
   No. 15-912, 2015 WL 6167521 (E.D. Cal. Oct. 20, 2015) .................. 18

*Canal Authority of State of Fla. v. Callaway*,
   489 F.2d 567, 573 (5th Cir. 1974) ................................................... 42

*Center for Biological Diversity v. McAleenan* (*Center for Biological Diversity I*),
   No. 1:18-00655-KBJ (D.D.C.) ................................................. passim

*Center for Biological Diversity, v. Trump* (*Center for Biological Diversity II*),
    No. 1:19-cv-00408-TNM (D.D.C.) ............................................................ 8, 9, 45

*Chamber of Commerce v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ....................................................................... 11

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ................................................................... 33, 34

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ................................................................................... 32, 33

*Commonwealth of the N. Mariana Islands v. United States*,
    670 F. Supp. 2d 65 (D.D.C. 2009) .................................................................. 44

*COMSAT Corp. v. FCC*,
    114 F.3d 223 (D.C. Cir. 1997) ................................................................... 15, 16

*Connecticut Nat'l Bank v. Germain*,
    503 U.S. 249 (1992) .......................................................................................... 23

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*,
    447 U.S. 102 (1980) .......................................................................................... 25

*County of El Paso v. Chertoff*,
    No. 08-196, 2008 WL 4372693 (W.D. Tex. 2008) ..................................... 4, 28

**DCH Regional Med. Ctr. v. Azar*,
    925 F.3d 503 (D.C. Cir. 2019) ................................................... 11, 13, 16, 19

**Defenders of Wildlife v. Chertoff*
    527 F. Supp. 2d 119 (D.D.C. 2007) ........................................................ passim

*Defenders of Wildlife v. Salazar*,
    812 F. Supp. 2d 1205 (D. Mont. 2009) ........................................................... 35

*Estep v. United States*,
    327 U.S. 114 (1946) ................................................................................... 12, 31

*FCC v. ITT World Communications, Inc.*
    466 U.S. 462 (1984) ................................................................................ 13, 15-17

*FTC v. Tarriff*,
    584 F.3d 1088 (D.C. Cir. 2009) ...................................................................... 21

*Fund for Animals v. Espy*,
    814 F. Supp. 142 (D.D.C. 1993) ........................................................................ 35

*Fund for Animals v. Frizzell*, 5
    30 F.2d 982 (D.C. Cir. 1975) ............................................................................ 34

*Fund for Animals v. Norton*,
    281 F. Supp. 2d 209 (D.D.C. 2003) .................................................................. 35

*Gonzaga Univ. v. Doe*,
    536 U.S. 273 (2002) .......................................................................................... 18

*Greater New Orleans Fair Hous. Action Ctr. v. HUD*,
    639 F.3d 1078 (D.C. Cir. 2011) .................................................................. 10, 33

*Griffith v. FLRA*,
    842 F.2d 487 (D.C. Cir. 1988) .................................................................... 20, 23

*Idaho Rivers United v. U.S. Army Corps of Eng'rs*,
    156 F. Supp. 3d 1252 (W.D. Wash. 2015) ........................................................ 35

*In re Border Infrastructure Envtl. Litig.*,
    284 F. Supp. 3d 1092 (S.D. Cal. 2018) ..................................................... passim

*In re Border Infrastructure Envtl. Litig.*,
    915 F.3d 1213 (9th Cir. 2019) .................................................. 4, 12-13, 20

*In re NSA Telecomm. Records Litig.*,
    671 F.3d 881 (9th Cir. 2011) ............................................................................ 32

*John Doe, Inc. v. Gonzalez*,
    No. 06-966, 2006 WL 1805685 (D.D.C. June 29, 2006) .............................. 14-17

*Johnson v. Quander*,
    370 F. Supp. 2d 79 (D.D.C. 2005) .................................................................... 25

*Kucana v. Holder*,
    558 U.S. 233 (2010) .......................................................................................... 11

*Landon v. Plasencia*,
    459 U.S. 21 (1982) ............................................................................................ 44

*Leedom v. Kyne*,
    358 U.S. 184 (1958) .............................................................................. 11, 13, 18

*Lindahl v. OPM*,
   470 U.S. 768 (1985) ........................................................................ 16, 17

*Loving v. United States*,
   517 U.S. 748 (1996) ............................................................................ 30

*Mistretta v. United States*,
   488 U.S. 361 (1989) ............................................................................ 28

*Molly-Butcher v. U.S. Dep't of Commerce*,
   12 F.3d 249 (D.C. Cir. 1994) .............................................................. 11

*Munaf v. Geren*,
   553 U.S. 674 (2008) .............................................................................. 9

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*,
   437 F.3d 1256 (D.C. Cir. 2006) .......................................................... 18

*Nat'l Broadcasting Co. v. United States*,
   319 U.S. 190 (1943) ............................................................................ 30

*Nat'l Treasury Employees Union v. Von Raab*,
   489 U.S. 656 (1989) ............................................................................ 44

*New Mexico Dept. of Game & Fish v. U.S. Dept. of Interior*,
   854 F.3d 1236 (10th Cir. 2017) .......................................................... 34

*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................................ 43

*NLRB v. SW General, Inc.*,
   137 S. Ct. 929 (2017) .......................................................................... 26

*NLRB v. United Food & Commercial Workers Union*,
   484 U.S. 112 (1988) ............................................................................ 17

*N. Am. Butterfly Ass'n v. Nielsen*,
   368 F. Supp. 3d 1 (D.D.C. 2019) ............................................... 4, 11, 27

*Humane Soc'y of the United States v. Kempthorne*,
   481 F. Supp. 2d 53 (D.D.C. 2006) ...................................................... 35

*Nyunt v. Broad. Bd. of Governors*,
   589 F.3d 445 (D.C. Cir. 2009) ............................................................ 19

*Oregon v. Ashcroft*,
    368 F.3d 1118 (9th Cir. 2004) ................................................................ 15

*Public Citizen, Inc. v. Rubber Mfrs. Ass'n*,
    533 F.3d 810 (D.C. Cir. 2008) ............................................................... 23

*Railway Labor Executives' Ass'n v. Nat'l Mediation Bd.*,
    29 F.3d 655 (D.C. Cir. 1994) ................................................................ 15

*Ralpho v. Bell*,
    569 F.2d 607 & n.101 (D.C. Cir. 1977) ............................................... 12

**Republic of Iraq v. Beaty*,
    556 U.S. 848 (2009) .............................................................................. 32

*Rubin v. Islamic Republic of Iran*,
    138 S. Ct. 816 (2018) ............................................................................ 26

*Save Jobs USA v. Dep't of Homeland Security*,
    105 F. Supp. 3d 108 (D.D.C. 2015) ...................................................... 33

*Save Our Heritage Org. v. Gonzalez*,
    533 F. Supp. 2d 58 (D.D.C. 2008) ............................................... 4, 20, 28

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ............................................................. 10

*Sierra Club v. Ashcroft*,
    2005 WL 8153059 (S.D. Cal. 2005) ............................... 5, 20, 28-29

*Sierra Club v. Nielsen*,
    No. 1:18-cv-02877-KBJ (D.D.C.) ............................................................ 9

*Sierra Club v. Trump*,
    929 F.3d 670 (9th Cir. 2019) ..................................................................8

*Sierra Club v. Trump*,
    No. 19-892, 2019 WL 2715422 (N.D. Cal. June 28, 2019) .....................9

*Sierra Club v. Trump*,
    379 F. Supp. 3d 883 (N.D. Cal. May 24, 2019) ................................4, 9

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    990 F. Supp. 2d 9 (D.D.C. 2013) ...............................................33, 34, 42

*Smith v. Fed. Reserve Bank of N.Y.*,
    280 F. Supp. 2d 314 (S.D.N.Y. 2003) .................................................. 33

*Stark v. Wickard*,
    321 U.S. 288 (1944) ................................................................................ 11

*Switchmen's Union v. Nat'l Mediation Bd.*,
    320 U.S. 297 (1946) .......................................................................... 12, 18

*Touby v. United States*,
    500 U.S. 160 (1991) .......................................................................... 30, 31

*Trump v. Comm. on Oversight and Reform of U.S. House of Reps.*,
    No. 19-01136-APM, 2019 WL 2063207 (D.D.C. May 9, 2019) ........................... 42

*Trump v. Sierra Club*,
    No. 19A60, _ S. Ct. _, 2019 WL 3369425 (July 26, 2019) ............................. 8, 31

*TVA v. Hill*,
    437 U.S. 153 (1978) .......................................................................... 29, 43

*United States v. 1.16 Acres of Land*,
    585 F. Supp. 2d 901 (S.D. Tex. 2008) .................................................. 29

*United States v. Aguilar*,
    883 F.2d 662 (9th Cir. 1989) .................................................................44

*United States v. Arizona*,
    No. 10-1413, 2011 WL 13137062 (D. Ariz. Oct. 21, 2011) ................................. 23

*United States v. Bozarov*,
    974 F.2d 1037 (9th Cir. 1992) ............................................................... 31

*United States v. Cano-Flores*,
    796 F.3d 83 (D.C. Cir. 2015) ............................................................ 27, 28

*Va. Ry. Co. v. Sys. Fed'n No. 40*,
    300 U.S. 515 (1937) ............................................................................. 43

*Water Keeper Alliance v. DoD*,
    271 F.3d 21 (1st Cir. 2001) ............................................................. 34-35

*Watervale Marine Co., Ltd. v.*
    *DHS*, 55 F. Supp. 3d 124 (D.D.C. 2014) .............................................. 22

*Watters v. Wachovia Bank, N.A.*,
  550 U.S. 1 (2007) ............................................................................................ 31

**Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ........................................................................................ 30

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..................................................................................... 9-10, 43

*Yakus v. United States*,
  321 U.S. 414 (1944) .................................................................................... 29-30

## STATUTES & REGULATIONS

Fed. R. Civ. P. 12(a)(3) ........................................................................................8

Fed. R. Civ. P. 65(a)(2) ......................................................................................42

Immigration and Nationality Act of 1952,
  Pub. L. No. 82-414, § 103(a), 66 Stat. 163, 174 (June 27, 1952) ...........................20

National Defense Authorization Act for Fiscal Year 1991,
  Pub. L. No. 101-510, § 1004, 104 Stat. 1485 (Nov. 5, 1990) ...................................5

Omnibus Consolidated Appropriations Act, 1997,
  Pub. L. No. 104-208, Div. C., Title I § 102, 110 Stat. 3009-554 (Sept. 30, 1996)......... passim

Homeland Security Act of 2002,
  Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002)...............................................3

REAL ID Act of 2005,
  Pub. L. No. 109-13, Div. B, Title I § 102, 119 Stat. 231 (May 11, 2005).................................3

Secure Fence Act of 2006,
  Pub. L. No. 109-367, 120 Stat. 2638 (Oct. 26, 2006) ........................................ 1, 3, 24-25, 45

Dep't of Homeland Security Appropriations Act, 2008,
  Pub. L. No. 110-161, Div. E, Title V § 564, 121 Stat. 2090 (Dec. 26, 2007) .........................3

5 U.S.C. § 8347 ................................................................................................. 16

6 U.S.C. § 202 ................................................................................................... 1

8 U.S.C. § 1103................................................................................................20, 29

8 U.S.C. § 1103 note........................................................................................ passim

8 U.S.C. § 1701 note ........................................................................................................... 1

8 U.S.C. § 1357 ............................................................................................................... 29

8 U.S.C. § 1443 ............................................................................................................... 21

10 U.S.C. § 284 ........................................................................................................ passim

16 U.S.C. § 1531 ............................................................................................... 6, 21, 35

21 U.S.C. § 877 .......................................................................................................... 14-15

28 U.S.C. § 2342 ............................................................................................................. 14

33 U.S.C. § 2326 ............................................................................................................. 21

42 U.S.C. § 4321 ............................................................................................................... 6

42 U.S.C. § 18352 ........................................................................................................... 21

47 U.S.C. § 159 ........................................................................................................... 15-16

47 U.S.C. § 402 ............................................................................................................... 14

8 C.F.R. § 287.1 .............................................................................................................. 29

Determination Pursuant to IIRIRA Section 102,
    70 Fed. Reg. 55622 (Sept. 22, 2005) ...................................................................... 4

Determination Pursuant to IIRIRA Section 102,
    72 Fed. Reg. 60870 (Oct. 26, 2007) ....................................................................... 4

Determination Pursuant to IIRIRA Section 102,
    82 Fed. Reg. 35984 (Aug. 2, 2017) ........................................................................ 4

Determination Pursuant to IIRIRA Section 102,
    83 Fed. Reg. 3012-01 (Jan. 22, 2018) .................................................................... 9

Determination Pursuant to IIRIRA Section 102,
    83 Fed. Reg. 50949 (Oct. 10, 2018) ....................................................................... 9

Determination Pursuant to IIRIRA Section 102,
    83 Fed. Reg. 51472 (Oct. 11, 2018) ....................................................................... 9

Determination Pursuant to IIRIRA Section 102,
    84 Fed. Reg. 17185 (Apr. 24, 2019) ....................................................................... 9

Determination Pursuant to IIRIRA Section 102,
  84 Fed. Reg. 17187 (Apr. 24, 2019) ...................................................... 9

Determination Pursuant to IIRIRA Section 102,
  84 Fed. Reg. 21798 (May 15, 2019) ........................................... passim

Determination Pursuant to IIRIRA Section 102,
  84 Fed. Reg. 21800 (May 15, 2019) ................................................ 5, 9

Determination Pursuant to IIRIRA Section 102,
  84 Fed. Reg. 21801 (May 15, 2019) .................................................... 5

**PRESIDENTIAL ACTIONS**

Exec. Order 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017) ............................... 2

Presidential Mem., "Securing the Southern Border of the United States,"
  2018 WL 1633761 (Apr. 4, 2018) .................................................... 2, 45

Declaring a Nat'l Emergency Concerning the S. Border of the United States,
  Pres. Proc. No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019) ........................... 2, 31, 45

Veto Message for H.J. Res. 46, 2019 WL 1219481 (Mar. 15, 2019) .......................... 2

**LEGISLATIVE HISTORY**

H.R. Rep. 109-72 (May 3, 2005) (Conf. Rep.) .................................... passim

H.R. Rep. 114-840 (Nov. 30, 2016) (Conf. Rep.) .............................. 5, 45

151 Cong. Rec. H553-559 (Feb. 10, 2005) ............................................ 17

153 Cong. Rec. S9871-9981 (July 25, 2007) ......................................... 25

153 Cong. Rec. S10059-10103 (July 26, 2007) ....................................... 25

## INTRODUCTION

No preliminary injunction is warranted here because Plaintiffs cannot prevail on their legal claims—identical to those fully briefed and argued before this Court in Plaintiffs' prior lawsuit, Case No. 18-cv-00655-KBJ—and because the other injunction factors weigh heavily against granting Plaintiffs' motion.  Plaintiffs have no likelihood of success on the merits of their claims, which again seek to undermine Congress's decision to prevent environmental litigation from delaying border infrastructure construction, as expressed in the plain language of § 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") (codified at 8 U.S.C § 1103 note).  For all of the reasons previously briefed, the Court should reject Plaintiffs' invitation to violate the separation of powers by rewriting this clear statute to thwart Congress's plainly intended limitation on judicial review or to narrow the scope of the authority Congress delegated to DHS.  In addition, Plaintiffs have failed to establish irreparable harm from the construction scheduled along the international border in Arizona's Tucson Sector, especially the limited construction that will occur before October.  Finally, the governmental and public interest in addressing the flow of illegal drugs and migrants through these areas substantially outweighs any limited harm to the environmental, aesthetic, and recreational interests of Plaintiffs' members.

## BACKGROUND

## I.    STATUTORY FRAMEWORK

Among its responsibilities, DHS is responsible for border security, including the detection and prevention of illegal entry into the United States.  *See, e.g.*, 6 U.S.C. § 202(a)(1)-(2).  Congress has ordered DHS to achieve and maintain operational control of the international land border.  *See* Secure Fence Act of 2006, Public Law 109-367, § 2(a), 120 Stat. 2638 (Oct. 26, 2006) (8 U.S.C. § 1701 note).  "Operational control" means "prevention of all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics,

and other contraband." *Id.* § 2(b).  Consistent with that mandate, in January 2017, the President directed DHS to take immediate steps to prevent all unlawful entries into the United States, including the immediate construction of physical infrastructure to prevent illegal entry.  *See* Exec. Order 13767 §§ 2(a), 4(a), 82 Fed. Reg. 8793 (Jan. 25, 2017).  In April 2018, the President issued a memorandum stating that "[t]he security of the United States is imperiled by a drastic surge of illegal activity on the southern border" and pointed to the "anticipated rapid rise in illegal crossings," as well as "the combination of illegal drugs, dangerous gang activity, and extensive illegal immigration."  Presidential Mem., "Securing the Southern Border of the United States," 2018 WL 1633761, at *1 (Apr. 4, 2018).  To address this crisis, the President directed the Department of Defense (DoD) to support DHS in "securing the southern border and taking other necessary actions to stop the flow of deadly drugs and other contraband, gang members and other criminals, and illegal aliens into this country." *Id.* at *2.

In February 2019, the President issued a proclamation declaring that "a national emergency exists at the southern border of the United States."  *See* Declaring a Nat'l Emergency Concerning the S. Border of the United States, Pres. Proc. No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019).  The President determined that "[t]he current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency."  *Id.*  "Because of the gravity of the current emergency situation," the President determined that "it is necessary for the Armed Forces to provide additional support to address the crisis."  *Id.*; *see also* Veto Message for H.J. Res. 46, 2019 WL 1219481 (Mar. 15, 2019) (vetoing a joint resolution that would have terminated the President's national emergency declaration).

Among DHS's statutory authorities to carry out its border security mission is § 102 of the IIRIRA, as amended.  *See* Pub. L. No. 104-208, Div. C, Title I § 102, 110 Stat. 3009-554 (Sept.

30, 1996), *as amended by* Dep't of Homeland Security Appropriations Act, 2008, Pub. L. No. 110-161, Div. E, Title V § 564, 121 Stat. 2090 (Dec. 26, 2007); Secure Fence Act of 2006, Pub. L. No. 109-367, § 3; REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, Title I §102, 119 Stat. 231, 302, 306 (May 11, 2005) (amended text included as appendix to this memorandum).  This section of IIRIRA directs the Secretary of Homeland Security[1] to "take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States."  IIRIRA § 102(a), as amended.  In addition to this broad mandate, Congress provided certain specifications, including the following (in effect since 2007):

> In carrying out subsection (a), the Secretary of Homeland Security shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border.

Pub. L. No. 110-161, Div. E, Title V § 564 (amending § 102(b)(1)(A)).  This provision both established an aggregate minimum threshold for construction along the southwest border ("not less than 700 miles") and called for construction of the additional infrastructure needed "to gain operational control of the southwest border."  *Id.*

Section 102(c) seeks to ensure expeditious construction pursuant to the mandate laid out in § 102(a) in two ways.  First, it grants the DHS Secretary "authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section."  *Id.* § 102(c)(1); *see also* H.R. Rep. 109-72, at 171-72 (May 3, 2005) (Conf. Rep.) (explaining "Congress' intent that the . . . waiver

---

[1] The Homeland Security Act of 2002, Pub. L. No. 107-296, transferred border enforcement authority from the Attorney General to DHS.  In 2005, § 102 was amended reflect the change.  *See* REAL ID Act of 2005, § 102.

authority extends to any local, state or federal statute, regulation, or administrative order that could impede expeditious construction of border security infrastructure"). Second, § 102(c) provides for limited and streamlined judicial review of the Secretary's exercise of this waiver authority. Federal district courts have "exclusive jurisdiction" to hear such claims, and the only "cause of action or claim" that may be brought is one "alleging a violation of the Constitution of the United States" filed within sixty days of the Secretary's action. *Id.* § 102(c)(2)(A)-(B). The only appeal is a certiorari petition to the U.S. Supreme Court. *Id.* § 102(c)(2)(C). The conference report explained § 102(c) only provides "judicial review for claims alleging that the actions or decisions of the Secretary violate the United States Constitution"; the strictly limited review reflected the "Conferees' intent [] to ensure that judicial review of actions or decisions of the Secretary not delay the expeditious construction of border security infrastructure, thereby defeating the purpose of the Secretary's waiver." H.R. Rep. 109-72 at 172.

## II.    THE SECRETARY'S EXERCISE OF WAIVER AUTHORITY

Since 2005, the Secretary has repeatedly issued IIRIRA waiver determinations as necessary to ensure expeditious construction of barriers and roads along the border. *See, e.g.*, 82 Fed. Reg. 35984 (Aug. 2, 2017); 72 Fed. Reg. 60870 (Oct. 26, 2007); 70 Fed. Reg. 55622 (Sept. 22, 2005). Every court to review legal challenges to such waiver determinations has upheld them. *See In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d 1092 (S.D. Cal. 2018), *aff'd*, 915 F.3d 1213 (9th Cir. 2019) (statutory claims), *cert. denied*, 139 S. Ct. 594 (Dec. 3, 2018) (constitutional claims); *Sierra Club v. Trump*, 379 F. Supp. 3d 883, 922-23 (N.D. Cal. 2019); *N. Am. Butterfly Ass'n v. Nielsen*, No. 1:17-cv-02651, 2019 WL 634596 (D.D.C. Feb. 14, 2019), *appeal pending*, No. 19-5052 (D.C. Cir.); *County of El Paso v. Chertoff*, No. 08-196, 2008 WL 4372693 (W.D. Tex. 2008), *cert. denied*, 557 U.S. 915 (2009); *Save Our Heritage v. Gonzalez*, 533 F. Supp. 2d 58 (D.D.C. 2008); *Defenders of Wildlife v. Chertoff*, 527 F. Supp. 2d 119 (D.D.C. 2007), *cert. denied*,

554 U.S. 918 (2008); *Sierra Club v. Ashcroft*, No. 04-272, 2005 WL 8153059 (S.D. Cal. 2005).

On February 25, 2019, DHS requested DoD's assistance under 10 U.S.C. § 284 in blocking 11 specific drug-smuggling corridors on federal land along certain portions of the southern border. *See* Ex. D, DHS Request for Assistance (Feb. 25, 2019).  Section 284 authorizes DoD to "provide support for the counterdrug activities . . . of any other department or agency," if "such support is requested." 10 U.S.C. § 284(a). This support includes the "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." *Id.* § 284(a), (b)(7).[2]  DHS's request here sought the replacement of existing vehicle barricades or dilapidated pedestrian fencing with new pedestrian fencing, the construction of new and the improvement of existing patrol roads, and the installation of lighting.  Ex. D at 2, 9.  In March 2019, the Acting Secretary of Defense approved three of the requested projects (which are not at issue in this lawsuit), and on May 9, 2019, he approved four additional projects which are at issue in this lawsuit—Tucson Sector Projects 1, 2, and 3 in Arizona, and El Centro Project 1 in California.  *See* Ex. E, Acting Secretary of Defense, Add'l Support to the DHS (May 9, 2019).

On May 15, 2019, DHS published three additional waiver determinations under the IIRIRA, encompassing the Tucson Sector Projects 1, 2, and 3 and El Centro Project 1 to be funded by DoD through 10 U.S.C. § 284, and an additional project in the El Centro Sector to be funded by DHS's appropriation.  *See* 84 Fed. Reg. 21798-21801 (May 15, 2019).  While Plaintiffs' lawsuit challenges all three determinations, only the first is the subject of their preliminary injunction motion.  *See* Pls.' Mem. at 6-7, ECF No. 8-1.  This "Arizona Waiver" concerns four segments of border in Arizona in the U.S. Border Patrol's Tucson Sector.  *See id.* 84 Fed. Reg. at 21799.  In

---

[2] Congress first provided DoD this authority in the 1990.  *See* Nat'l Def. Auth. Act for Fiscal Year 1991, Pub. L. No. 101-510, § 1004, 104 Stat. 1485 (1990).  After repeated renewals, in light of the threat posed by illegal drug trafficking, Congress permanently codified § 1004 at 10 U.S.C. § 284 in December 2016, directing DoD "to ensure appropriate resources are allocated to efforts to combat this threat." H.R. Rep. 114-840, 1147 (Nov. 30, 2016) (Conf. Rep.).

support of his determination, the Acting Secretary made three factual determinations:

- that the project areas "are areas of high illegal entry,"
- that there is "an acute and immediate need to construct physical barriers and roads . . . in order to prevent unlawful entries into the United States in the project areas pursuant to sections 102(a) and 102(b) of IIRIRA," and
- that exercise of waiver authority under the IIRIRA was necessary "to ensure the expeditious construction of the barriers and roads in the project areas."

*Id.* Accordingly, the Secretary announced the waiver of certain laws "with respect to the construction of roads and physical barriers . . . in the project areas," including the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq. See* 84 Fed. Reg. at 21799-800.

The projects involve construction of 30-foot bollard walls in locations where existing vehicle barriers and pedestrian fencing have proved inadequate, as evidenced by the number of illegal crossings in the Tucson Sector and the large amount of drugs seized between ports of entry. *See* 84 Fed. Reg. at 21799; DHS Request for Assistance at 5-6; Ex. B, Declaration of Paul Enriquez ("Enriquez Decl.") ¶ 17.  The current plans for construction are as follows:

Tucson Sector Project 1

- Location:  International border along the eastern portion of Cabeza Prieta National Wildlife Refuge and portions of Organ Pipe Cactus National Monument for which vehicle barriers are currently in place, totaling 38.6 miles.

- Project Description: Replacement of vehicle barriers with 30-foot tall bollard-style pedestrian fencing.

- Timetable:  Construction will not begin until early October, after initial construction in Tucson Sector Project 2 is completed.

Tucson Sector Project 2

- Location:  International border along 5.1 mile portion of Organ Pipe Cactus National Monument around the Lukeville Port of Entry for which pedestrian barriers are currently in place.

- Project Description: Replacement of outmoded pedestrian barriers with 30-

foot tall bollard-style pedestrian fencing.

- Timetable:  Construction is expected to begin on a 2-mile segment of Project 2 on August 19, 2019, with the first new bollard panels installed on August 22, 2019.  This initial segment is expected to take about 45 days, after which construction will be undertaken in additional portions of Tucson Sector Project 2 and Project 1.

Tucson Sector Project 3

- Location:  Three locations, only one of which is at issue for this motion—a 0.3 mile portion of the border along the San Pedro Riparian National Conservation Area.

- Project Description:  Filling the gap in existing fencing around the San Pedro River, including installation of a bridge over the river.

- Timetable:  Construction will not begin in this area until early October or after.  Neither the contract nor designs for this project have been finalized. DHS plans to conduct geotechnical surveys in and around the riverbed in mid-to-late September, which will be prerequisite to finalization of the contract and designs.

Enriquez Decl. ¶¶ 12, 18.  The construction footprint—and the majority of the construction activity—will be limited to the 60-foot area adjoining the border, which is already disturbed from existing fencing and the adjoining road used by U.S. Border Patrol for enforcement purposes. Id. ¶ 17.  In addition to that 60-foot area, DHS is designating certain staging areas for construction vehicles and materials. *Id.*

Even where the Secretary has waived environmental and other laws, U.S. Customs and Border Protection ("CBP") still consults with relevant stakeholders in order to "minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed."  IIRIRA § 102(b)(1)(C)(i).  Here, CBP not only relied on prior environmental analyses it had conducted, but also initiated its consultation process on May 6, 2019, by publishing a notice seeking public input and sending 100 separate consultation letters to relevant federal, state, local, and tribal

entities, along with other stakeholders, seeking comments through July 5, 2019. *See* Enriquez Decl. ¶¶ 19-24. In addition, on May 15-16, 2019, CBP conducted meetings at the project sites with representatives from the U.S. International Boundary and Water Commission, the Tohono O'odham Nation, and various federal agencies including the U.S. Fish & Wildlife Service and Bureau of Land Management. *Id.* ¶ 25. CBP also conducted biological, historical, and cultural surveys and is finalizing the results of those surveys into reports to be used for environmental planning for the project. *Id.* ¶¶ 31-33. Before construction begins for each component of the projects, best management practices and mitigation plans will be incorporated into the relevant contracts to minimize impacts on the relevant interests. *See id.* ¶¶ 33-35 & Subex. 6.

## III.    PROCEDURAL HISTORY

On July 14, 2019, the Center for Biological Diversity and two other environmental organizations filed the instant complaint. *See* Compl., ECF No. 1 (*Center for Biological Diversity III*). The U.S. Attorney's Office was served on July 23, 2019, and Defendants' response to Plaintiffs' complaint is due on September 23, 2019. *See* ECF No. 14; Fed. R. Civ. P. 12(a)(3). Plaintiffs' motion for a preliminary injunction regarding portions of the Tucson Sector projects was filed on August 6, 2019. *See* ECF No. 8.

The Tucson Sector projects that Plaintiffs seek to preliminarily enjoin here are the subject of ongoing litigation in both the Ninth Circuit and this judicial district. *See Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019); *Center for Biological Diversity, et al., v. Trump, et al.*, No. 1:19-cv-00408-TNM (D.D.C.) (*Center for Biological Diversity II*). The Supreme Court recently granted a stay of a permanent injunction issued in the Northern District of California that would have stopped all construction of these projects. *Trump v. Sierra Club*, No. 19A60, _ S. Ct. _, 2019 WL 3369425 (July 26, 2019). The Supreme Court's order stayed the injunction in full pending resolution of the

Government's appeal to the Ninth Circuit and any further review.[3]

*Center for Biological Diversity II* (brought by the same Plaintiffs as the instant complaint), challenges all border infrastructure construction funded through 10 U.S.C. § 284, implicating four waiver determinations from April and May 2019,[4] including two at issue in this case.  *See* Am. Compl. ¶¶ 135-36, 138-40, 173-77, ECF No. 16 (Apr. 15, 2019), *Center for Biological Diversity II*.  Defendants' motion to dismiss those claims is fully briefed.  *See* Pls.' Mem. in Supp. of Mot. for Prelim. Injunction ("Pls.' Mem.") at 11 n.8, ECF No. 8-1.  In that case, Plaintiffs do not advance *ultra vires* and constitutional claims against IIRIRA, instead arguing only that IIRIRA waivers are unavailable for projects funded through 10 U.S.C. § 284.  *See* Pls.' Opp'n to Defs.' Mot. to Dismiss at 42-45, ECF No. 31 (May 31, 2019), *Center for Biological Diversity II*.[5]

## LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quotation marks omitted).[6]  A preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to

---

[3] While the Northern District of California had granted preliminary and permanent injunctions against the projects funded through 10 U.S.C. § 284 based on DoD's budgetary statutes, that court specifically rejected the argument that IIRIRA waivers could not be applied to projects funded through 10 U.S.C. § 284.  *See Sierra Club v. Trump*, No. 19-892, 2019 WL 2715422, at *3 (N.D. Cal. June 28, 2019); *Sierra Club v. Trump*, 379 F. Supp. 3d 883, 922-23 (N.D. Cal. May 24, 2019).  The Government has appealed that court's grant of partial summary judgment to plaintiffs on other grounds, but no party has appealed the IIRIRA waiver issue.  *See* Defs.-Appellants Br., *Sierra Club v. Trump*, Nos. 19-16102, -16300, -16299, -16336 (9th Cir. July 31, 2019).

[4] *See* 84 Fed. Reg. 21800 (May 15, 2019); 84 Fed. Reg. 21798 (May 15, 2019); 84 Fed. Reg. 17187 (Apr. 24, 2019); 84 Fed. Reg. 17185 (Apr. 24, 2019).

[5] Plaintiffs' first case before this Court, *Center for Biological Diversity, et al., v. McAleenan, et al.*, No. 1:18-00655-KBJ (*Center for Biological Diversity I*), is a consolidated case regarding three similar waiver determinations—83 Fed. Reg. 51472 (Oct. 11, 2018); 83 Fed. Reg. 50949 (Oct. 10, 2018); 83 Fed. Reg. 3012-01 (Jan. 22, 2018)—and raises the same legal theories at issue in the instant complaint.  The parties' cross-motions for summary judgment regarding identical *ultra vires*, Non-Delegation Doctrine, Presentment Clauses, and Take Care Clause claims have been *sub judice* since February 28, 2019.  *See* ECF Nos. 30-34, *Center for Biological Diversity I* (completing supplemental briefing).  A separate case regarding the October 10 and 11, 2018 waivers has been stayed pending this Court's decision in *Center for Biological Diversity I*.  *See* Minute Order (Mar. 4, 2019), *Sierra Club v. Nielsen*, No. 1:18-cv-02877-KBJ.

[6] Hereinafter, internal quotation marks, alterations, and citations are omitted from quotations unless otherwise noted.

such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).   A party must show

that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the

absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is

in the public interest.   *Id.* at 20.   Courts emphasize that the "first and most important factor" is

whether the moving party has "established a likelihood of success on the merits."   *Aamer v.*

*Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).   "When a plaintiff has not shown a likelihood of

success on the merits, [we need not] consider the other factors."   *Greater New Orleans Fair Hous.*

*Action Ctr. v. HUD*, 639 F.3d 1078, 1088 (D.C. Cir. 2011).   The Supreme Court has also instructed

that a preliminary injunction cannot issue on the basis of speculative or possible injury.   Rather,

Plaintiffs must establish that irreparable harm is "likely in the absence of an injunction." *Winter*,

555 U.S at 22.[7]   Plaintiffs fail to carry their burden; none of these factors weigh in their favor.

## ARGUMENT

## I.   PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS

The parties have fully briefed Plaintiffs' merits claims in *Center for Biological Diversity I.*

As laid out extensively in Defendants' briefing in that case and summarized below, each of

Plaintiffs' statutory and constitutional claims is meritless.   DHS has acted within its statutory

authority, and Congress did not violate the Constitution by granting DHS authority to waive certain

legal requirements, including those in environmental laws, to ensure expeditious construction of

border infrastructure or by limiting judicial review of such waivers.

---

[7] In *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011), the Court of Appeals noted that *Winter* called into question the "sliding-scale approach" to consideration of the preliminary injunction factors that had been the law of this Circuit. The Circuit read "*Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction" such that a "movant cannot obtain a preliminary injunction without showing both a likelihood of success and a likelihood of irreparable harm."   *Id.* at 393; *see BHM Healthcare Sols., Inc. v. URAC, Inc.*, 320 F. Supp. 3d 1, 7 (D.D.C. 2018).   Noting a split among the circuits on the interpretation of *Winter*, the Court of Appeals held that it did not need to resolve the question because the movant in *Sherley* failed to establish an entitlement to a preliminary injunction under the "less demanding sliding-scale" approach.   *Id.*   This Court need not address this issue here, as Plaintiffs' claims for relief fail under either standard.

A.      **The Court Lacks Jurisdiction to Review Plaintiffs' *Ultra Vires* Claims**

The presumption of judicial review of agency action is an "interpretive guide" that is "dislodge[d]" when Congress provides "clear and convincing evidence" that it intends to preclude judicial review. *Kucana v. Holder*, 558 U.S. 233, 251 (2010); *see also Molly-Butcher v. U.S. Dep't of Commerce*, 12 F.3d 249, 252 (D.C. Cir. 1994) ("The clarity with which Congress has spoken makes it unnecessary to invoke a presumption of reviewability as petitioner urges."). *Ultra vires* review—often called the "*Kyne* exception" after *Leedom v. Kyne*, 358 U.S. 184 (1958)—is simply an application of "the 'familiar proposition' that judicial review is presumed to be available absent a clear statute to the contrary." *DCH Regional Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (quoting *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin. Inc.*, 502 U.S. 32, 44 (1991)).[8] Thus, *ultra vires* review is unavailable where "Congress has spoken clearly and directly" to preclude review. *MCorp Fin.*, 502 U.S. at 44; *see also DCH Regional Med. Ctr.*, 925 F.3d at 509 (holding that "[a]t most, such a '*Kyne* exception' applies only when . . . the statutory preclusion of review is implied rather than express").

Here, Congress has expressly withdrawn district court jurisdiction to review non-constitutional challenges to the Secretary's exercise of waiver authority:

> The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim *may only be brought* alleging a violation of the Constitution of the United States. The court *shall not have jurisdiction* to hear any claim not specified in this

---

[8] The D.C. Circuit has explained that while courts are "normally available" to correct *ultra vires* action, Congress can "preclude[] non-statutory judicial review." *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996); *see also id.* at 1327 (noting that such review is "a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction" (quoting *Stark v. Wickard*, 321 U.S. 288, 310 (1944))). For this reason, Judge Richard Leon recently erred in misinterpreting Circuit precedent stating the generality that "even where a statute precludes judicial review, judicial review is available when an agency acts *ultra vires*." *N. Am. Butterfly Ass'n v. Nielsen*, 368 F. Supp. 3d 1, 9 (D.D.C. 2019) (quoting *Sky Television, LLC v. FCC*, 589 F. App'x 541, 543 (D.C. Cir. 2014)). Courts that have used similar shorthand are referring to the rebuttable presumption of review, not establishing the availability of *ultra vires* review despite Congress' intent to prohibit it.

subparagraph.

IIRIRA § 102(c)(2)(A) (emphasis added).  This emphatic and comprehensive language presents the unusual circumstance in which Congress has barred *ultra vires* review as well as merits review of the agency's action.[9]  *See Defenders of Wildlife*, 527 F. Supp. 2d at 122 (straightforwardly interpreting § 102(c) to "allow[] the district courts to consider only those claims that allege a violation of the Constitution."); *see also Estep v. United States*, 327 U.S. 114, 120 (1946) ("[E]xcept when the Constitution requires it, judicial review of administrative action may be granted or withheld as Congress chooses.").[10]  After all, courts do not provide the only form of accountability to keep an agency within its bounds; Congress can choose to exclusively police those bounds itself.  *See Ralpho v. Bell*, 569 F.2d 607, 622 & n.101 (D.C. Cir. 1977) (observing that nothing "prevent[s] [Congress] from shielding even the most patent deviation from the statutory scheme from judicial redress where the Constitution is in no wise implicated").  The Ninth Circuit has thus recognized that § 102(c) prohibits some types of *ultra vires* review.  *See In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1213, 1221 (9th Cir. 2019) (concluding that "*ultra vires* claims alleg[ing] the waivers themselves were not authorized by the Secretary's authority under section 102(c)(1) . . . . do 'arise from' the Secretary's waiver determination, so the district court correctly found that the jurisdictional bar applies").[11]

---

[9] Indeed, one of the Plaintiffs here told the Supreme Court that § 102(c)(2)(A) "also precluded all judicial review of any claim that a waiver under Section 102 exceeded the scope of the Secretary's delegated authority."  *See* Cert. Petition at 5, *Defenders of Wildlife v. Chertoff*, No. 07-1180, 2008 WL 727967 (Mar. 17, 2008) ("[T]here is no judicial review to determine whether the Secretary's waiver decision accords with the statutory standard."); *id.* at 13 ("Section 102 . . . unequivocally precludes all judicial review[.]").

[10] *See also Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 672-73 (1986) ("Subject to constitutional constraints, Congress can, of course, make exceptions to the historic practice whereby courts review agency action."); *Switchmen's Union v. Nat'l Mediation Bd.*, 320 U.S. 297, 301 (1946) ("All constitutional questions aside, it is for Congress to determine how the rights which it creates will be enforced.").

[11] The Ninth Circuit erred in suggesting that a challenge to determinations the Secretary made *in the published waiver determination itself* somehow do not "aris[e] from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1)."  IIRIRA § 102(c)(2)(A).  The Ninth Circuit treated one of the

Plaintiffs seek to overcome Congress' plainly stated intent to strictly limit "*all* causes or claims arising from *any* action undertaken, or *any* decision made" under § 102(c)'s waiver authority, IIRIRA § 102(c)(2)(A), by arguing that inclusion of the phrase "pursuant to" inherently preserves *ultra vires* review. *See* Pls.' Mem. at 21. This argument is mistaken. Courts have repeatedly found that Congress barred judicial review for other statutes that include similar phrases. The scope of a jurisdiction-stripping provision must be assessed using traditional tools of statutory construction that situate the specific phrasing in its statutory context.

For example, the Supreme Court rejected *ultra vires* review for a jurisdiction-limiting provision that concerned a "notice or order under this section." *MCorp Fin.*, 502 U.S. at 44 (quoting 12 U.S.C. § 1818(i)(1)). The Supreme Court did not conclude that "under this section" preserved *ultra vires* review. To the contrary, it held that "the statute provides us with clear and convincing evidence that Congress intended to deny the District Court jurisdiction to review and enjoin the . . . administrative proceedings." *Id.* at 44; *see also id.* ("In [this statute] Congress has spoken clearly and directly.").[12]

Similarly, in *FCC v. ITT World Communications, Inc.*, 466 U.S. 462 (1984), the Supreme Court refused to let plaintiffs evade statutes providing for exclusive jurisdiction in the U.S. Courts of Appeals by seeking to "enjoin FCC action as ultra vires." *Id.*, 466 U.S at 468. There, the

_____

Secretary's conclusions in the waiver determination—that § 102(a) and 102(b) permitted the construction subject to the waiver—as a distinct decision subject to ordinary APA review by contorting the phrase "arising from." *See* 915 F.3d at 1221. But the jurisdictional bar applies to all claims "arising from" the Secretary's "action[s]" and "decision[s]." IIRIRA § 102(c)(1). There is no textual basis to partition the Secretary's findings that a project satisfies the relevant requirements of § 102(a) and (b) from other findings within the same waiver determination published pursuant to § 102(c)(1)'s requirements. There is only one final agency action. Indeed, Plaintiffs here are challenging the Secretary's interpretation of § 102(a) and (b) *only because* it is the basis for a waiver.

[12] While Plaintiffs have sometimes attempted to distinguish *MCorp Financial* by characterizing it as driven by the availability of a future opportunity for judicial review, that is not how the D.C. Circuit has interpreted the decision. *See, e.g.*, *DCH Regional Med. Ctr.*, 925 F.3d at 509 (explaining that *MCorp Financial* "cautioned against overreading *Kyne*'s jurisdictional holding" and "distinguished *Kyne* because the statute at issue in MCorp barred judicial review 'clearly and directly'").

jurisdictional limitation applied to litigation regarding "any order of the Commission under this chapter." 47 U.S.C. § 402(a).  The Court held that this statute vested "[e]xclusive jurisdiction for review . . . in the Court of Appeals" and that "[l]itigants may not evade these provisions by requesting the District Court to enjoin action that is the outcome of the agency's order."  466 U.S. at 468.[13]  Plaintiffs' textual argument would create precisely the type of gaping loopholes in exclusive appellate review statutes that the Court rejected.

Thus, when courts consider the scope of a jurisdiction limiting provision, they first examine the clarity of the jurisdiction-stripping provision and the statutory context.  *See, e.g.*, *Amgen Inc. v. Smith*, 357 F.3d 103, 112-13 (D.C. Cir. 2004) (carefully considering the statutory text and the impact of judicial review before concluding that Congress intended a narrow scope for the preclusion of judicial review).  Consideration of Congress's purpose in using phrases like "pursuant to" is just one aspect of that statutory analysis.  For example, another court in this district considered 21 U.S.C. § 877, which states

> All final determinations . . . of the Attorney General *under this subchapter* shall be final and conclusive decisions of the matters involved, except that any person aggrieved by a final decision of the Attorney General may obtain review of the decision in the [U.S. Courts of Appeals] . . . within thirty days after notice of the decision.

*See John Doe, Inc. v. Gonzalez*, No. 06-966, 2006 WL 1805685, at *17-23 (D.D.C. June 29, 2006) (emphasis added).  That court began by noting that a "plain reading of Section 877 indicates that jurisdiction over challenges to the DEA's determinations under the CSA [Controlled Substances Act] rests exclusively with the Court of Appeals[.]"  *Id.* at *18.  It then proceeded to apply traditional canons of interpretation to conclude that "nowhere does [§ 877] contemplate that district

---

[13] Both 47 U.S.C. § 402(a) and its cross-reference, 28 U.S.C. § 2342, use a variety of phrases for the exclusive appellate jurisdiction provisions, including "made under," issued under," or "issued pursuant to."

courts should involve themselves in adjudicating CSA-based determinations by the DEA." *Id.* at *20. And it rejected the plaintiff's proposed reading, noting that it would create a "loophole" that "would undermine what appears to be the basic intent behind Congress' enactment of Section 877—that is to allow for expedient, efficient adjudication of claims" and to "ensure[] that litigation could be resolved more quickly." *Id.* at *21.

DHS has similarly shown that the plain reading of § 102(c)(2)(A) supports the conclusion that Congress deliberately withdrew jurisdiction for all non-constitutional claims, including *ultra vires* claims. The phrase "pursuant to paragraph (1)" serves a purpose similar to "under this section" in the statute at issue in *MCorp Financial*, "under this chapter" in the statute at issue in *ITT World Communications*, and "under this subchapter" in the statute at issue in *John Doe*. In each of these statutes, the phrase merely identifies the stated basis for the agency's action. The context as a whole makes clear that Congress was narrowing jurisdiction and making a certain type or timing of review exclusive. It would be improper for a plaintiff to evade Congress's carefully crafted jurisdictional provision by seeking to challenge the underlying action on the ground that the agency had exceeded its statutory authority.[14]

Plaintiffs cannot overcome this conclusion by citing *COMSAT Corp. v. FCC*, 114 F.3d 223 (D.C. Cir. 1997), because the limited text and purpose of the provision at issue in *COMSAT* is very different from the language Congress used in § 102(c)(2). *COMSAT* interpreted 47 U.S.C. §

---

[14] The Secretary's stated basis for her exercise of authority here is sufficient to trigger the jurisdictional provision. In *Oregon v. Ashcroft*, 368 F.3d 1118 (9th Cir. 2004), the Ninth Circuit held that a jurisdiction-limiting provision applied because, among other reasons "the Attorney General *maintains* that his interpretive rule is a 'final determination.'" *Id.* at 1120 (emphasis added), *aff'd on other grounds*, 546 U.S. 243 (2006). And in *John Doe*, the court held that it lacked jurisdiction in part because "the DEA maintains that its . . . import permit denial is 'final agency action'" triggering the jurisdictional limitation. 2006 WL 1805685, at *20. This is not a situation where the agency is "[u]nable to link its assertion of authority to any statutory provision." *Railway Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (rejecting agency's assertion of "plenary authority" not tied to specific statutory provision). Here, the Secretary has exercised her § 102(c) waiver authority for construction pursuant to § 102(a)'s general mandate and § 102(b)(1)'s call for additional construction along the southwest border.

159(b)(3), which provided that "increases or decreases in fees made by amendments pursuant to this paragraph *shall not be subject to judicial review*." 114 F.3d at 227 (emphasis added). In the context of that "no-review provision," the Circuit concluded that the limitation on judicial review meant only that "courts may not review the Commission's actions where the Commission has acted within the scope of its authority." *Id.* at 227; *cf. DCH Regional Med. Ctr.*, 925 F.3d at 510 (characterizing *COMSAT* as addressing a "statutory bar [which], in the circumstances of [that] case . . . . was effectively coextensive with the merits [of the *ultra vires* claim]"). The Supreme Court has observed that "when Congress intends to bar judicial review altogether, it typically employs language far more unambiguous and comprehensive than" such finality clauses. *Lindahl v. OPM*, 470 U.S. 768, 773 (1985) (addressing 5 U.S.C. § 8347(c) which, similar to the statute at issue in COMSAT, provided that "the decisions of the Office concerning these matters are final and conclusive and *are not subject to review*").

In the IIRIRA, Congress has used "far more unambiguous and comprehensive" language. First, Congress made clear the review provision encompasses "all causes or claims *arising from any action undertaken, or any decision made, by the Secretary*" pursuant to § 102(c)(1). Second, it expressly limits claims that may be brought to "*only* [those] . . . alleging a violation of the Constitution." Third, it expressly prohibits district courts from exercising any other jurisdiction: "The court *shall not have jurisdiction* to hear any claim *not specified* in this subparagraph." These differences make clear that Congress's intent goes far beyond preventing merits or APA review of a decision. *See also id.* § 102(c)(2)(B), (C) (strictly limiting time for filing a claim and limiting appellate review to certiorari petition to the Supreme Court). Accordingly, § 102(c) is like *ITT World Communications* and *John Doe*, where the comprehensive nature of the judicial review process Congress set up makes clear that Congress did not intend to preserve *ultra vires* review as

an exception to that limited process.  *See ITT World Communications, Inc.*, 466 U.S. at 468; *John Doe*, 2006 WL 1805685, at *20-21.[15]  Indeed, Plaintiffs' reading would upend this comprehensive structure, permitting unlimited challenges in district and appellate courts regarding whether the Secretary's action complied with the statute.[16]

Here, the legislative history further emphasizes that Congress was concerned not merely with delay caused by review of the merits of a Secretary's waiver decision, but all forms of litigation delay orchestrated by plaintiffs to prevent construction.  *See* H.R. Rep. No. 109-72 at 172 (May 3, 2005) (Conf. Rep.) (stating "the Conferees' intent . . . to ensure that judicial review of actions or decisions of the Secretary not delay the expeditious construction of border security infrastructure, thereby defeating the purpose of the Secretary's waiver").[17]  Accordingly, the interference imposed by judicial review of *ultra vires* claims would be no less than that caused by judicial review of the merits of a waiver determination.  *Cf. NLRB v. United Food & Commercial Workers Union*, 484 U.S. 112, 130-133 (1988) (concluding that certain agency decisions are not subject to judicial review, in part because review "would involve lengthy judicial proceedings in

---

[15] By contrast, cases construing a statutory bar narrowly to permit *ultra vires* review generally find evidence in the statutory text and context that Congress merely wanted to prohibit review of individual merits claims.  *See, e.g.*, *Lindahl*, 470 U.S. at 779 (noting that, because a statute's provided merely that that certain decisions "are final and conclusive," it "reinforces the possibility that the finality bar may extend only to OPM's *factual* determinations"); *Amgen*, 357 F.3d at 113 (concluding that "case-by-case review of the reasonableness or procedural propriety of the Secretary's individual applications" would cause far more "interference with the administration of the . . . program" than judicial review of "the overall scope of the Secretary's statutory adjustment authority").

[16] Plaintiffs' reading would mean that wide-ranging *ultra vires claims* could be filed long after § 102(c)(2)'s 60-day window for constitutional claims, and cause further delay by being appealed to the Court of Appeals rather than proceeding to a certiorari petition.  In the Southern District of California, for example, the plaintiffs, including some of these Plaintiffs, raised many different issues through the *ultra vires* prism, such as (i) whether locations selected fell below a threshold for "high illegal entry," (ii) whether construction of replacement infrastructure qualified as "additional barriers and roads," and (iii) whether certain construction was actually intended to "deter illegal crossings." *See In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d at 1119-22.  Such delay tactics are limited only by the creativity of would-be plaintiffs.

[17] *See also id.* at 171 ("Continued delays caused by litigation have demonstrated the need for additional waiver authority with respect to other laws that might impede the expeditious construction of security infrastructure along the border[.]"); 151 Cong. Rec. H554 (Feb. 10, 2005) (statement of Cong. Sensenbrenner) (referencing "endless litigation" and noting that "[w]e were able to win World War II quicker than we were able to complete this fence [in San Diego]").

precisely the area where Congress was convinced that speed of resolution is most necessary").

For these reasons, the Court must give full effect to the statutory text and exercise jurisdiction only over Plaintiffs' constitutional claims.

**B.     Plaintiffs' Ultra Vires Claims Fail As a Matter of Law**

To the extent the Court determines that—despite the plain meaning of the statute and Congress' clear intent—courts retain jurisdiction to determine whether a waiver determination is *ultra vires*, the Secretary's decision must be upheld.  The extraordinarily deferential *ultra vires* review standard requires Plaintiffs to show both that the challenged action is "contrary to a specific [statutory] prohibition which is clear and mandatory" and "that barring review by the district court would wholly deprive [the party] of a meaningful and adequate means of vindicating its statutory rights."  *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1263 (D.C. Cir. 2006).  Plaintiffs have made neither showing.

**1.     Plaintiffs Have Not Established That They Have Statutory Rights to Vindicate Through Litigation**

Beginning with *Switchmen's Union*, courts have emphasized that non-statutory *ultra vires* review is appropriate only as a last resort to protect statutory rights.  *See MCorp Fin.*, 502 U.S. at 43 (explaining that the fact that the plaintiff would have been "wholly deprive[d] . . . of a . . . means of *vindicating its statutory rights*" was "central to our decision in *Kyne*" (emphasis added)).  Thus, the vindication prong requires plaintiffs to identify more than a "statutory obligation" for the agency, but instead requires them to identify a "statutory right" by which Plaintiffs are entitled to vindication.  *See Calif. Sportfishing Protection Alliance v. U.S. Bureau of Reclamation*, No. 15-912, 2015 WL 6167521, at *11 & n.8 (E.D. Cal. Oct. 20, 2015).  Analyzing whether a statute creates individual rights is familiar from several contexts, including § 1983 cases and private right of action cases. *See, e.g.*, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002).  It is well established

that for a statutory right to exist, the statute itself must direct its benefits to individuals, not merely to the aggregated public. *See id.* at 287 (holding that "the provisions entirely lack the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights" because "they have an aggregate, not individual, focus, and they serve primarily to direct the Secretary of Education's distribution of public funds"). Because Plaintiffs here have identified no statutory right in the text of § 102, it would be an unwarranted extension of *ultra vires* review to apply it to the circumstances here.

### 2.      DHS Has Not Violated A Clear Statutory Prohibition

Plaintiffs have failed to show that the Secretary's waiver determination is "contrary to a specific prohibition in the statute that is clear and mandatory." *DCH Regional Med. Ctr.*, 925 F.3d at 509.  The D.C. Circuit has instructed that Plaintiffs must show "extreme error," which is a "very stringent standard" under which a claim "rarely succeeds." *Nyunt v. Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).  Here, the Acting Secretary concluded that both § 102(a) and § 102(b)(1)(A) apply to the infrastructure construction in the Tucson Sector for which he issued a waiver determination. *See* 84 Fed. Reg. 21799 (finding "an acute and immediate need to construct physical barriers and roads . . . in order to prevent unlawful entries into the United States in the project areas pursuant to sections 102(a) and 102(b) of IIRIRA"); s*ee also id.* at 21798 ("In section 102(b) of IIRIRA, Congress mandated the installation of additional fencing, barriers, roads, lighting, cameras, and sensors on the southwest border.").  Plaintiffs cannot show that it was unlawful to rely on either provision for the waiver determination at issue here.

### a.      Section 102(a) is a mandate not a general purpose clause.

Plaintiffs cannot show, as a matter of "clear and mandatory" statutory interpretation, *DCH Regional Med. Ctr.*, 925 F.3d at 509, that § 102(a) is a "general statement of purpose," Pls.' Mem. at 15 n.11, rather than a specific grant of authority to DHS.  For Plaintiffs to prevail on *ultra vires*

review, they must show that their interpretation is the "only possible interpretation of the statutory language." *Griffith v. FLRA*, 842 F.2d 487, 494 (D.C. Cir. 1988).  This they cannot do, as evidenced by the fact that two courts have adopted DHS's interpretation of the statute.  *See In re Border Infrastructure Environmental Litig.*, 915 F.3d at 1225 ("[S]ection 102(a) is most plausibly read as a broad grant of authority to build border infrastructure, while section 102(b) merely denotes certain priority projects Congress intended DHS to complete first."); *Save Our Heritage Org.*, 533 F. Supp. 2d at 61 (holding "that section 102(a), on its face, authorizes construction of barriers such as the San Diego Barrier in areas that the Secretary determines are areas of high illegal entry" and that the "statute's explicit languages does not support" the interpretation that "amendment to section 102(b) . . . narrow[ed] the Secretary's [§ 102(a)] authority").[18]

In § 102(a), Congress directs that the DHS Secretary "shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States."  While the Immigration and Nationality Act of 1952 (INA) had *permitted* DHS's predecessors to construct border infrastructure,[19] through the IIRIRA in 1996, Congress was now *directing* DHS to undertake construction where § 102(a)'s

---

[18] Plaintiffs incorrectly argue that this statutory interpretation is a "disingenuous" innovation of the current administration.  *See* Pls.' Mem. at 14-15.  In fact, DHS has consistently interpreted § 102(a) to provide independent authority.  For example, in the first legal challenge to § 102, DHS explained that § 102(b) simply provides "a *required method* of achieving [§ 102(a)'s] important goal *in one geographic area*: the construction of fencing and road improvements in the border area near San Diego."  Ex. G, Defs.' Motion to Dismiss at 6-7, Doc. No. 36, *Sierra Club, et al. v. Ashcroft, et al.*, No. 04-0272 (S.D. Cal. Nov. 11, 2005) (emphasis added).

[19] *See* Pub. L. No. 82-414, § 103(a), 66 Stat. 163, 174 (June 27, 1952) (giving the Attorney General the "power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens") (now codified at 8 U.S.C. § 1103(a)(5)).  A 2003 Customs and Border Protection environmental document, misquoted by Plaintiffs, did not characterize the INA as the primary authority for "CBP's border construction," *see* Pls.' Mem. at 14, but instead generally characterized the INA as the "primary source" of U.S. Border Patrol officers' authority along with "other statutes relating to the immigration and naturalization of aliens."  Finding of No Significant Impact (Nov. 19, 2003), ECF No. 21-5, *Center for Biological Diversity I*.  DHS had included that document to show that DHS relied on § 102 even for projects not specified in § 102(b) and projects for which waivers were not necessary.  *Id.* (explained that "the proposed border infrastructure system has been planned in compliance with the IIRIRA.").

requirements were met.  This reading is supported by the contrast between this broad language and the specific details in § 102(b) which are to be applied "in carrying out" the general mandate.  *Id.* § 102(b)(1)(A).  In effect, Congress said to DHS: "However else you apply this mandate, make sure you complete the projects we have identified in § 102(b)(1)(A)."  Indeed, Congress, with some regularity, has organized statutes with a similar fashion—a general mandate followed by specific guidance "in carrying out" that grant of authority.  *See, e.g.*, 33 U.S.C. § 2326(a)(1)(A), (f) (giving Secretary of the Interior general responsibility to "develop . . . regional sediment management plans" and specifying that "[i]n carrying out this section, the Secretary shall give priority to [projects] in the vicinity of [eleven specific locations]").[20]  And where Congress identifies certain specific applications of a general grant of authority, those specific requirements cannot generally be understood to prohibit all other applications of the general authority.  *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) ("We do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it."); *cf. FTC v. Tarriff*, 584 F.3d 1088, 1091 (D.C. Cir. 2009) (rejecting argument "that the term 'shall' is a mandate not only to do one thing but to cease and refrain from doing all others" as a claim that "borders on sophistry").[21]

Moreover, the specific terms of § 102(b)(1) in effect from IIRIRA's enactment in 1996 until the 2006 amendments cannot be reconciled with Plaintiffs' reading of § 102(a).  Under

---

[20] *See also* 8 U.S.C. § 1443 (requiring Attorney General to "broadly distribute information concerning the benefits of [naturalization]" and specifying that "[i]n carrying out this subsection, the Attorney General shall seek the assistance of . . . relevant organizations"); 42 U.S.C. § 18352 (giving NASA general responsibility to "maximize the productivity and use of the [International Space Station]" and specifying that "[i]n carrying out subsection (a), NASA shall, at a minimum, undertake the following [three specific tasks]").

[21] Contrary to Plaintiffs' assertion, Pls.' Mem. at 15 n.11, § 102(a) is unlike the policy statements appearing at the beginning of the Endangered Species Act, which are not only expressly "declared to be the policy of Congress," 16 U.S.C. § 1531(c), but also were accompanied by legislative history stating that they were "not intended to and do[] not change the substantive or procedural requirements of the Act."  *Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 987 (9th Cir. 2015) (quoting S. Rep. 97-418 at 25-26 (May 26, 1982)).

Plaintiffs' reading, Congress had specified the only location for which the entirety of § 102 could be employed: constructing "second and third fences" "along the 14 miles of the international land border . . . starting at the Pacific Ocean."  Pub. L. No. 104-208, Div. C, Title I § 102(b)(1); *cf.* Pls.' Mem. at 14 (claiming that IIRIRA was enacted to ensure that "DHS fulfilled Congress's specific border priorities" in § 102(b)).  If that is all Congress sought to accomplish for ten years, then § 102(a)'s call for "additional physical barriers and roads . . . in *areas* of high illegal entry" would be both superfluous and misleading.  *See Watervale Marine Co., Ltd. v. DHS*, 55 F. Supp. 3d 124, 145 (D.D.C. 2014) (relying on "one of the most basic interpretive canons," that "a statute be construed so that no provision is rendered inoperative or superfluous, void or insignificant").

Finally, Plaintiffs misuse the legislative history.  While the 2005 expansion of the waiver authority was catalyzed by, and intended to address, the delay in completion of the San Diego fence, such a catalyst for Congressional action often does not define the outer limits of that action. *See Acree v. Republic of Iraq*, 370 F.3d 41, 64 (D.C. Cir. 2004) (Roberts, concurring) ("The fact that Congress may have been focused primarily on removing barriers to the flow of aid to Iraq does not mean that the statute refers exclusively to such barriers").  Indeed, the very conference report to which Plaintiffs cite, *see* Pls.' Mem. at 16, construes § 102 more expansively than the San Diego project then specified in § 102(b).  *See* H.R. Rep. No. 109-72 at 170 (referring expansively to construction "along U.S. land borders"); *see also id.* at 171 (describing both the original and amended waiver authority as "ensur[ing] expeditious construction of barriers and roads" and "the expeditious construction of security infrastructure along the border").  The triggering events for passage of the waiver provision—litigation delaying San Diego border infrastructure construction—cannot be interpreted to limit the otherwise plain text of the Act. *See AFL-CIO, Local 3669 v. Shinseki*, 709 F.3d 29, 35 (D.C. Cir. 2013) ("Legislative history cannot

create ambiguity in a clear statutory text.").

    **b.**    **Section 102(b)(1)(A) encompasses new infrastructure construction "to gain operational control of the southwest border."**

Plaintiffs ask the Court to construe § 102(b)(1) "as a 700-mile mandate, which has since been completed." Pls.' Mem. at 21. But their request is contrary to the plain text, which calls for "not less than 700 miles" and "additional physical barriers, roads, [and other infrastructure] to gain operational control of the southwest border." IIRIRA § 102(b)(1)(A). They advance no textual argument by which the Court could conclude that this text excludes "anything *greater* than 700 miles," Pls.' Mem. at 21, relying instead selective excerpts from the legislative history. This argument fails because Plaintiffs counter-textual interpretation is not plausible, let alone, the "only possible interpretation of the statutory language." *See Griffith*, 842 F.2d at 494.

Recourse to legislative history is unnecessary where, as here, the text is unambiguous. *See Public Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 816 (D.C. Cir. 2008) ("[Courts] must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-254 (1992))). The provision for construction of "reinforced fencing along *not less than* 700 miles of the southwest border," coupled with the call to "provide for the installation of additional [infrastructure] . . . to *gain operational control* of the southwest border," § 102(b)(1) (emphasis added), unambiguously gives DHS authority to continue constructing the border infrastructure necessary for operational control. *Cf. United States v. Arizona*, No. 10-1413, 2011 WL 13137062, at *8 (D. Ariz. Oct. 21, 2011) (concluding that, for § 102(b)(1), "no deadline mandates completion of the fencing and infrastructure developments or any required discrete action by a specific time"). Given the

dynamic nature of migration patterns and illegal entries,[22] Congress did not anticipate or require operational control to be maintained exclusively on the basis of locations selected in 2008.  *See, e.g.*, Pub. L. No. 109-367, § 2(c) (requiring annual reports on "the progress made toward achieving and maintaining operational control over the entire international land and maritime borders of the United States in accordance with this section").  Here, the challenged projects are along the southwest border, involve additional barriers and other infrastructure called for by Congress, and are being conducted to gain further operational control of the border.  *See* 84 Fed. Reg. 21798 (May 15, 2019).[23]  The projects thus come within the plain meaning of the statutory text, and DHS's reliance on this provision is not *ultra vires*.

Moreover, to the extent legislative history is relevant, it does not support Plaintiffs' conclusion that Congress intended to authorize only "700 miles of border barrier construction." Pls.' Mem. at 17.  Plaintiffs' approach to the legislative history depends on their assumption that § 102(b)(1) identifies the totality of what DHS is permitted to construct under § 102.  Viewed through the lens that Congress uses § 102(b)(1) primarily to set minimum requirements, none of the discussion in the legislative history undermines the plain import of the statutory text.  As discussed in greater detail in the parallel litigation, the language that ultimately became the current version of § 102(b)(1) originated in an amendment that was not adopted by the Senate or Congress as a whole.  *See* Defs.' Suppl. Br. at 9-11, ECF No. 33, *Center for Biological Diversity I*. Amendment 2412, in addition to amending § 102(b)(1), would have required the President to

---

[22] *See, e.g.*, DHS Annual Performance Review 2017-2019 at 14 (Feb. 8, 2018) (link) ("The U.S. border . . . . is a dynamic environment where the means and tactics used by transnational criminal organizations and others to illegally cross and transport people, drugs, and illegal items is always shifting.").

[23] Plaintiffs' claim that "language of explicit reliance on § 102(b) is entirely absent from the Arizona Waiver," Pls.' Mem. at 18, is incorrect.  The Acting Secretary characterized § 102(b)(1)(A) as "mandat[ing] the installation of additional fencing, barriers, roads, lighting, cameras, and sensors on the southwest border," and explained that there was a need for additional construction "pursuant to sections 102(a) and 102(b) of IIRIRA."  84 Fed. Reg. 21798-99.

ensure that "[n]ot less than two years after the date of the enactment" DHS must "establish and demonstrate operational control of 100 percent of the international land border between the United States and Mexico" and install "*at least*—(i) 300 miles of vehicle barriers; (ii) 700 linear miles of fencing as required by the Secure Fence Act of 2006 (Public Law 109-367), as amended by this Act." *See* 153 Cong. Rec. S9948-49 (daily ed. July 25, 2007) (emphasis added). Both this language that did not become enacted and § 102(b)(1) plainly establish minimum requirements, not maximums. Moreover, both provisions call for DHS to do more than this minimum, including whatever is required to "establish" or "gain" "operational control." *See id.* at S9948-49. Thus, individual senators' reference to "700 miles" should, at most, be seen as shorthand for this dual instruction rather than an implicit narrowing of it.[24] *Cf. id.* S10063 (daily ed., July 26, 2007) (Sen. Sessions) (speaking of "fund[ing] 700 miles at the border" as "really progress . . . but . . . not the final installment" because "[w]e are going to have to do more in the years to come").[25]

In sum, the legislative history is consistent with DHS's interpretation of the plain text of § 102(b)(1), and any latent ambiguity from that history is inadequate to alter the plain meaning of

---

[24] Indeed, Plaintiffs' citations do not directly refer to § 102(b)(1) at all. Instead, they refer to proposed appropriations for the "700 linear miles" specified in the un-adopted amendments. *See* 153 Cong. Rec. S9871 (daily ed., Jul. 25, 2007) (Sen. Graham) (stating that the "goal of this amendment [No. 2412] is to provide complete operational control of the U.S.-Mexican border. It will allow us to appropriate . . . 300 miles of vehicle barriers, 700 miles of border fencing[.]"); *id.* at S9890 (Sen. Sessions) (describing his own separate amendment, No. 2452 as "fully fund[ing] the 700 linear miles of border fencing required" by the Secure Fence Act); 153 Cong. Rec. S10059 (daily ed., Jul. 26, 2007) (Sen. Graham) ("[T]his [amendment No. 2480, which replaced No. 2412] would actually completely fund 700 miles of fencing.").

[25] Regardless, one cannot give significant weight to the proposals of individual senators where Congress did not adopt those proposals wholesale. The entire Senate debate on July 25 and 26, 2007, upon which Plaintiffs rely, occurred in the context of this language in Amendment 2412 and its successor Amendment 2480 (which did not include language regarding § 102(b)), neither of which were included in the consolidated appropriations act. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 (1980) (stating that "ordinarily even the contemporaneous remarks of a single legislator who sponsors a bill are not controlling in analyzing legislative history" and concluding that statement by representative who "authored another bill . . . that contained much less restrictive . . . requirements than those ultimately adopted" does not "provide[] a reliable indication as to congressional intention"); *Johnson v. Quander*, 370 F. Supp. 2d 79, 97 (D.D.C. 2005) (giving "little weight" to statement of legislator speaking in favor of amendment was ultimately not adopted).

the text.  *See Milner v. U.S. Dep't of Navy*, 562 U.S. 562, 574 (2011) ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it."); *Ardestani v. INS*, 502 U.S. 129, 135-36 (1991) ("The strong presumption that the plain language of the statute expresses congressional intent is rebutted only in rare and exceptional circumstances when a contrary legislative intent is clearly expressed."); *AFL-CIO, Local 3669*, 709 F.3d at 35 ("Legislative history cannot create ambiguity in a clear statutory text.").[26]

c.　　**Section 102(c)(1) permits waivers to expedite construction of any "barriers and roads under this section."**

Plaintiffs argue that § 102(c) waiver authority is "restricted to the border projects that Congress specified in § 102(b)."  Pls.' Mem. at 13.  But their argument is contrary to the plain text of § 102(c), which applies broadly to "construction of the barriers and roads *under this section*." § 102(c)(1) (emphasis added).  Courts have repeatedly cautioned against narrow readings of such clear statutory designations.  *See Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 823 (2018) (explaining that the "natural reading" of a statutory reference to "this section" is that it refers to the section "as a whole"); *NLRB v. SW General, Inc.*, 137 S. Ct. 929, 938-39 (2017) (stating that when Congress directs that a particular provision applies to actions "under this section," the import is that the provision applies to the entire section rather than just "a particular subsection or paragraph").  Indeed, Plaintiffs, in their constitutional avoidance section, ask the Court to essentially rewrite this provision to refer to barriers and roads "*encompassed by § 102(b)*."  Pls.' Mem. at 21.  This should make plain that their argument cannot pass muster under the "clear and

---

[26] DHS did not "embrace[]" Plaintiffs' "reading of § 102(b) as [no more than] a 700-mile mandate" prior to the current administration.  Pls.' Mem. at 18.  The mere fact that DHS invoked § 102(b) in waiver determinations between 2005 and 2008 does not mean that DHS considered § 102(a) or § 102(b)(1)(A) to have no application beyond the projects for which they were invoked.  As explained in parallel briefing, there is no "tacit recognition that DHS is not relying on § 102(b)" for current waivers, Pls.' Mem. at 18; instead, DHS has consistently invoked § 102(b) in its recent waivers.  *See* Defs.' Suppl. Br. at 11-15 & App'x A, ECF No. 33, *Center for Biological Diversity I.*

26

mandatory" standard applied on *ultra vires* review.

In addition, Plaintiffs relegate to a footnote their argument that the waivers at issue here are *ultra vires* because DHS violated an alleged "mandate of consulting with stakeholders prior to the Waiver's issuance." Pls.' Mem. at 19 n.15. Section 102(b)(1)(C) calls for DHS to consult with relevant stakeholders "[i]n carrying out this section" to "minimize the impact on the environment, culture, commerce, and quality of life . . . near the sites at which fencing is to be constructed." Nothing in that statutory text requires consultation regarding *whether* to issue a waiver, let alone that consultation occur *before* the waiver is issued. Indeed, Congress provided for waivers to be issued in the DHS Secretary's "sole discretion"; consultation with the listed entities would be unlikely to inform the decision whether waiver of a given legal requirement is necessary. Thus, DHS reasonably seeks to conduct consultation before construction begins so that mitigation efforts can be incorporated into the construction process. *See* Enriquez Decl. ¶¶ 23-35 (explaining DHS's consultation which began on May 6, before the May 15, 2019 waiver was published). For these reasons, Plaintiffs cannot prevail on their claim; indeed, two courts have agreed that § 102 does not mandate pre-waiver consultation. *See N. Am. Butterfly Ass'n*, 368 F. Supp. 3d at 10 ("Pre-waiver consultation may be wise policy, but it is not a statutory requirement [under § 102]."); *In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d at 1126 (holding that § 102 lacks "a 'clear and mandatory' mandate regarding the timing of consultation").

For these reasons, Plaintiffs are unlikely to succeed on any of their *ultra vires* theories.

## C. Plaintiffs' Constitutional Claims Are Meritless

Plaintiffs' constitutional claims are meritless, and there is no basis for recourse to the canon of constitutional avoidance. This doctrine applies only where a plausible interpretation of the statute "raises serious constitutional problems." *United States v. Cano-Flores*, 796 F.3d 83, 94 (D.C. Cir. 2015). Section 102(c) does not come close to that standard, as both of Plaintiffs'

constitutional claims easily fail.  Indeed, as discussed below, both of these challenges to § 102(c) has been rejected by several courts.  And there can be no justification for accepting Plaintiffs' invitation to adopt a reading of § 102 that is contrary to its plain text.  *See* Pls.' Mem. at 20-21; *Cano-Flores*, 796 F.3d at 94 (courts may only choose among "linguistically permissible interpretations" that are not "plainly contrary to the intent of Congress").

### 1.      The Statute Does Not Violate the Non-Delegation Doctrine

Plaintiffs' Non-Delegation Doctrine claim fails because the intelligible principle that Congress provided to guide DHS's exercise of delegated discretion is well within the bounds provided by existing precedent.  This has been repeatedly recognized by courts in this district and elsewhere.  *See In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d at 1130-37; *County of El Paso*, 2008 WL 4372693, at *2-4; *Save Our Heritage*, 533 F. Supp. 2d at 63-64; *Defs. of Wildlife*, 527 F. Supp. 2d at 126-29; *Sierra Club*, 2005 WL 8153059, at *4-7.

To provide a constitutionally permissible "intelligible principle," Congress need only "clearly delineate[] the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Mistretta v. United States*, 488 U.S. 361, 372-73 (1989).  Section 102 delineates a "general policy" that improving border protection by expediting the construction of necessary barriers and roads is a critical congressional priority.  *See, e.g.*, *Defs. of Wildlife*, 527 F. Supp. 2d at 127 (finding a clearly delineated general policy "to expeditiously 'install additional physical barriers and roads . . . to deter illegal crossings in areas of high illegal entry'"); *Sierra Club*, 2005 WL 8153059, at *6 (concluding that § 102's clearly delineated general policy is "improvement of U.S. border protection" as "a high congressional priority").  Congress also articulated specific boundaries to constrain the waiver authority it delegated to the Secretary— both a geographic boundary (only in connection with construction "in the vicinity of the United

States border," IIRIRA § 102(a), and along the "southwest border," *id.* § 102(b)(1)(A)),[27] and the boundary of temporal necessity (only where "necessary to ensure expeditious construction" at those locations, *id.* § 102(c)(1)).  *See also Defs. of Wildlife*, 527 F. Supp. 2d at 127-28 (finding a sufficient boundary because "the Secretary's discretion is expressly limited" to "the narrow purpose prescribed by Congress: 'expeditious construction' of the border fences authorized by IIRIRA in areas of high illegal entry").[28]

Plaintiffs' primary objection is that Congress "did not legislate [a] blanket prioritization here."  Pls.' Mem. at 24.  By contrast, the 2005 House provision would have "require[d] the Secretary . . . to waive all laws that he or she determines . . . are necessary to ensure the expeditious construction of the border barriers."  H.R. Rep. 109-72 at 171.  So Plaintiffs are claiming that the law became unconstitutional when the conference committee revised the provision to "authorize[] but . . . not require the Secretary of DHS to waive any legal requirements."  *Id.*  But such a small change does not undermine the fact that Congress exercised its prerogative to "decide[] the order of priorities in a given area."  *TVA v. Hill*, 437 U.S. 153, 194 (1978).  Giving DHS flexibility to not always displace other laws does not abdicate Congress' duty.  After all "Congress is not confined to that method of executing its policy which involves the least possible delegation of discretion to administrative officers."  *Yakus v. United States*, 321 U.S. 414, 425-26 (1944).[29]

---

[27] Plaintiffs attempt to cast doubt on the meaning of "vicinity of the border," Pls.' Mem. at 20, by comparing it to CBP's interpretation of its statutory authority to board ships and vehicles "within a reasonable distance from any external boundary of the United States."  8 U.S.C. § 1357(a)(3); 8 C.F.R. § 287.1.  That is a different term with a different purpose, and all of the construction at issue here—and in every other waiver—indisputably comes within the meaning of § 102's geographic limits.  *Cf. United States v. 1.16 Acres of Land*, 585 F. Supp. 2d 901, 907 (S.D. Tex. 2008) (interpreting parallel "in the vicinity of" language in another IIRIRA provision, codified at 8 U.S.C. 1103(b)(1)).

[28] Plaintiffs carefully elide this quote from *Defenders of Wildlife*, Pls.' Mem. at 28, to conceal the fact that *Defenders of Wildlife* did not follow *Sierra Club* in construing the "narrow purpose" of § 102(c) to be construction in San Diego fence or other projects mandated in § 102(b).  Thus, any error by the *Sierra Club* court in construing the scope of § 102 authority was not carried over into later decisions in this district.

[29] While Plaintiffs complain that DHS's interpretation of § 102 is "impermissibly unbounded," Pls.' Mem. at 19, details about construction type, location, and project timing are well within the scope of what Congress frequently and

While Plaintiffs argue that the term "necessary" in § 102(a) and 102(c)(1) "lacks meaning" and "do[es] not guide the Secretary in his choicemaking," Pls.' Mem. at 25, 26 n.22, the Supreme Court has repeatedly accepted the targeted flexibility inherent in such criteria. *See, e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475-76 (2001) (holding that "necessity" standard "fits comfortably within the scope of discretion permitted by our precedent"); *Touby v. United States*, 500 U.S. 160, 163 (1991) (approving delegation of authority to designate controlled substance for criminal drug enforcement where "necessary to avoid an imminent hazard to the public safety").

Plaintiffs' efforts to link § 102(c) to the two statutes invalidated in 1935 fall flat. The Supreme Court has explained the fundamental problem in those statutes was that "one . . . provided literally no guidance for the exercise of discretion, and the other . . . conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman*, 531 U.S. at 474. Here, Plaintiffs disregard the narrowly confined scope of the Secretary's discretion—only infrastructure construction in the vicinity of the border, and only waiver of laws that impede expeditious completion of that construction. *See* IIRIRA § 102(c)(1). This is not nearly as broad as even the discretion involved in *Whitman*— "setting air standards that affect the entire national economy." 531 U.S. at 475 (not requiring "the statute to decree . . . how 'necessary' was necessary enough"). And because the discretion here is far narrower in scope, there is less need for detailed criteria to guide exercise of that discretion. *See id.* at 474 ("[T]he degree of agency discretion that is acceptable varies according to the scope

---

permissibly delegates. *See, e.g.*, *Yakus*, 321 U.S. at 426 (upholding delegation to Price Administrator to fix commodity prices that would be fair and equitable, and would effectuate purposes of Emergency Price Control Act of 1942); *Nat'l Broadcasting Co. v. United States*, 319 U.S. 190, 225-26 (1943) (upholding delegation to FCC to regulate broadcast licensing "as public interest, convenience, or necessity" require). Nor is it outside DHS's expertise to identify what sorts of laws may cause litigation delays that would prevent expeditious construction at the border. *Cf.* H.R. Rep. 109-72 at 171 (describing DHS's experience with litigation delays). Nor are limited waivers "beyond the traditional authority of the President," *Loving v. United States*, 517 U.S. 748, 772 (1996), because the Executive Branch is routinely granted waiver authority and exercises prosecutorial discretion about how to enforce laws.

of the power congressionally conferred.").[30]

Lastly, it simply is not the law that judicial review is essential for delegations of authority. Plaintiffs cite nothing for this proposition beyond Justice Thurgood Marshall's concurrence in *Touby*, 500 U.S. at 170. The Ninth Circuit considered and rejected this specific claim, *see United States v. Bozarov*, 974 F.2d 1037, 1041 (9th Cir. 1992) (agreeing with government that the Non-Delegation Doctrine does not require judicial review because "the purpose of the intelligible principle is simply to channel the discretion of the executive and to permit Congress to determine whether its will is being obeyed"); and the Supreme Court has twice denied certiorari petitions pressing Plaintiffs' theory.[31] Indeed, such an approach is not reconcilable with the courts' repeated observations that judicial review of non-constitutional challenges to agency action is not required. *See, e.g.*, *Estep*, 327 U.S. at 120 (1946) ("[E]xcept when the Constitution requires it, judicial review of administrative action may be granted or withheld as Congress chooses.").[32]

---

[30] Plaintiffs err in claiming that the Court cast a "particularly skeptical eye" on § 102(c)(1) because the statutory text "hardly constitutes a clear delegation of the authority to waive state and local law." Pls.' Mem. at 23 n.19. In fact, there can be no doubt that Congress intended "all legal requirements" to encompass such laws. *See* H.R. Rep. 109-72 at 171 (May 3, 2005) (Conf. Rep.) (noting that the California Coastal Commission had "prevented completion of the San Diego border security infrastructure" on the ground that the plans were inconsistent with a "state program," and explaining Congress' intent "extends to any local, state or federal statute, regulation, or administrative order that could impede expeditious construction of border security infrastructure"). Moreover, Plaintiffs' sole citation does not support their contention. In *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1 (2007), Justice John Paul Stevens dissented on the ground that "Congress knows how to authorize executive agencies to pre-empt state laws" but simply "has not done so here." *Id.* at 38. Thus, Justice Stevens' concerns have nothing to do with § 102.

[31] *See* Cert. Petition at 29-31, *Animal Legal Defense Fund v. DHS*, No. 18-247, 2018 WL 4105818 (Aug. 23, 2018), *cert. denied*, 139 S. Ct. 594 (Dec. 4, 2018); Cert. Petition at 12-19, *Defenders of Wildlife v. Chertoff*, No. 07-1180, 2008 WL 727967 (Mar. 17, 2008), *cert. denied*, 554 U.S. 918 (2008).

[32] It is not true that Congress's ability to police § 102 through its appropriations power has been "annihilated" by the President's Emergency Declaration. Pls.' Mem. at 31. The Emergency Declaration was issued pursuant to statutory authority and triggered other statutory authorities such as 10 U.S.C. § 2808. *See* 84 Fed. Reg. 4949 (Feb. 15, 2019). The Emergency Declaration has no direct application here because such a declaration is not required for DoD to use its own appropriations to assist DHS with border infrastructure construction under 10 U.S.C. 284(b)(7). And Congress, which enacted both § 102 and § 284, is perfectly capable of policing both DoD's and DHS's appropriations. Moreover, doubt about whether *private parties* have standing to challenge DoD's statutory authority to transfer funds within its own appropriation, *Trump v. Sierra Club*, No. 19A60, 2019 WL 3369425 (July 26, 2019), does not undermine the power of the Legislative Branch.

### 2. The Statute Does Not Violate the Presentment Clauses

Plaintiffs cite no authority for the proposition that Congress, in providing authority for a statute to be waived by the Executive Branch in certain circumstances, violates the Presentment Clauses. In fact, numerous courts have rejected similar arguments. *See Republic of Iraq v. Beaty*, 556 U.S. 848, 861 (2009) ("The [statutory] proviso expressly allow[ing] President to render certain statutes inapplicable . . . . did not repeal anything, but merely granted the President authority to waive the application of particular statutes to a single foreign nation."); *Acree*, 370 F.3d at 64 n.3 (Roberts, J., concurring) (dismissing constitutional challenge to statute permitting President to make inapplicable to Iraq "any other provision of law that applies to countries that have supported terrorism," because the authorized actions "are a far cry from the line-item veto at issue in *Clinton*, and are instead akin to the waivers that the President is routinely empowered to make in other areas, particularly in the realm of foreign policy"); *In re NSA Telecomm. Records Litig.*, 671 F.3d 881, 895 (9th Cir. 2011) (rejecting Presentment Clause challenge to an "executive grant of immunity or waiver of claim," on the ground that it "has never been recognized as a form of legislative repeal").

These cases show that a waiver is not an improper amendment or repeal of a statute. The waivers at issue here do not prevent any part of the law "from having legal force or effect." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998); *see also id.* at 447 (holding it improper to give the President "unilateral power to change the text of duly enacted statutes"). Plaintiffs attempt to distinguish the waiver authority here based on the "cumulative effect" of the individual waivers issued since 2005. *See* Pls.' Mem. at 29. But the breadth and subject matter of § 102(c)'s waiver authority do not alter the fact that:

> [t]he Secretary has no authority to alter the text of any statute, repeal any law, or cancel any statutory provision, in whole or in part. Each of the [] laws waived by the Secretary . . . retains the same legal force and effect as it had when it was passed

by both houses of Congress and presented to the President.

*Defenders of Wildlife*, 527 F. Supp. 2d at 124; *see also In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d 1092, 1141 (S.D. Cal. 2018) (quoting same).  No amount of exercise of this waiver authority will reach more than a tiny fraction of the universe of cases to which NEPA and similar statutes apply.  Indeed, the waiver at issue here applies to only a 60-foot wide swath land along 44 miles of the border, as compared to the more than 1,800 square miles encompassed by the federally-protected lands in which Plaintiffs claim an interest.  *See* Enriquez Decl. ¶¶ 12, 65.  And no provision of any statute will be deprived of its legal force and effect.  This stands in marked contrast to the Line Item Veto Act, under which specific statutory provisions would no longer have any effect, anywhere.  *See* 524 U.S. at 438.[33]

In sum, Plaintiffs' repeatedly-rejected claims under the Nondelegation Doctrine and Presentment Clauses, like their *ultra vires* claims, are not likely to succeed on the merits.  Therefore, Plaintiffs motion must be denied and the Court "there is no need to consider the remaining [injunction] factors."  *Greater New Orleans Fair Hous. Action Ctr.*, 639 F.3d at 1088.

## II.    PLAINTIFFS HAVE FAILED TO ESTABLISH IRREPARABLE HARM

"The irreparable injury requirement erects a very high bar for a movant."  *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 38 (D.D.C. 2013); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("This court has set a high standard for irreparable injury."); *Save Jobs USA v. DHS*, 105 F. Supp. 3d 108, 113 (D.D.C. 2015) ("The standard for irreparable harm is particularly high in the D.C. Circuit.").  "The party

---

[33] Here, unlike the Line Item Veto Act, § 102(c) waivers do not upend the policy choices Congress made in a budget submitted to the President days or weeks earlier.  *See id.* at 443 n.35.  Instead, DHS is implementing Congress' own policy choices regarding the high priority of border infrastructure construction as compared to environmental laws enacted decades earlier.  *Cf. Smith v. Fed. Reserve Bank of N.Y.*, 280 F. Supp. 2d 314, 324 (S.D.N.Y. 2003) (upholding waiver where "[u]nlike in *Clinton*" the President "is carrying out, not rejecting, a policy made by Congress").

seeking injunctive relief must demonstrate that the claimed injury is 'both certain and great' and that the alleged harm is 'actual and not theoretical.'" *Sierra Club*, 990 F. Supp. 2d at 38-39 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Moreover, "the injury complained of [must be] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm," and any injury must be "beyond remediation." *Chaplaincy*, 454 F.3d at 297. Plaintiffs maintain that construction of bollard fencing on a limited section of the border—in an already disturbed law enforcement zone containing vehicle barriers, roads, and other infrastructure—will harm certain ESA-listed species, other wildlife, and hydrologic systems in which their members have aesthetic and recreational interests. As discussed below, Plaintiffs' allegations do not clear the high bar required to establish certain, great, actual, and imminent irreparable injury to Plaintiffs' asserted interests.

As to alleged impacts on ESA-listed species and other border wildlife, Plaintiffs fail to demonstrate that installation of bollard fencing in the section of the border for which they seek an injunction is certain or even likely to cause actual and great harm to any species at the population level. As the D.C. Circuit and the majority of courts have recognized, Plaintiffs have no legally cognizable interest in individual members of a species. Accordingly, the "loss of only one [animal] is [not a] sufficient injury to warrant a preliminary injunction"; a plaintiff "must demonstrate 'a substantial likelihood of . . . irreparable harm' " to his own interests resulting from some form of "irretrievabl[e] damage [to] the Species." *Fund for Animals v. Frizzell*, 530 F.2d 982, 986-987 (D.C. Cir. 1975); *see also New Mexico Dept. of Game & Fish v. U.S. Dept. of Interior*, 854 F.3d 1236, 1254 (10th Cir. 2017) (denying an injunction where state could not show that "anticipated releases and importations will impact the State's ungulate herds, as opposed to individual members of those herds"); *Water Keeper Alliance v. DoD*, 271 F.3d 21, 34

(1st Cir. 2001) (death of a "single member of an endangered species" does not qualify as irreparable harm absent showing of how "probable deaths . . . may impact the species").

Focus on species-level harms is also proper because the ESA itself protects "species," not individuals. 16 U.S.C. §§ 1531(b), 1536(a)(2). Indeed, the ESA allows for the "take" of listed species, such that considering any take of a listed species as constituting irreparable harm "would produce an irrational result." *Defenders of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1209 (D. Mont. 2009). The same applies with even greater force to more common and non-imperiled species. *Idaho Rivers United v. U.S. Army Corps of Eng'rs*, 156 F. Supp. 3d 1252, 1262 (W.D. Wash. 2015) (requiring a showing that harm to a non-ESA-listed species is significant "vis-a-vis the overall population," and "not just that individual animals are likely to be injured"). Any finding of irreparable injury to Plaintiffs therefore must rest upon a high likelihood of a harm to the species as a whole that is "permanent or at least of long duration, *i.e.*, irreparable," *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987), and that would materially diminish the ability of Plaintiffs' members to observe the species in question.

Plaintiffs' allegations of harms to wildlife fall short of this high standard. First, Plaintiffs rely almost entirely on indirect effects from border infrastructure—the theoretical cessation or reduction in cross-border wildlife movements—rather than any direct injury from the deliberate killing of wildlife or destruction of occupied habitat. Pls.' Mem. at 8-10, 34-36. Plaintiffs' reliance on cases involving the direct killing of species is thus misplaced. Pls.' Mem. at 38-39 (citing *Fund for Animals v. Espy*, 814 F. Supp. 142, 151 (D.D.C. 1993) (killing of bison); *Fund for Animals v. Norton*, 281 F. Supp. 2d 209 (D.D.C. 2003) (killing of mute swans); *Humane Soc'y of the United States v. Kempthorne*, 481 F. Supp. 2d 53, 69-70 (D.D.C. 2006), *vacated as moot*, 527 F.3d 181 (D.C. Cir. 2008) (killing of endangered wolves)). And Plaintiffs' allegations

that species will be harmed by reduced cross-border movements are qualified or speculative, contradicted by other information, and fail to account for the limited portion of the border at issue—outside of which there remain large areas that have either vehicle barrier, which allows for the passage of wildlife—or no barrier at all.  Enriquez Decl. ¶ 54.

For example, with respect to the cactus ferruginous pygmy-owl, Plaintiffs argue that "[i]f the border wall is constructed, the U.S. population of pygmy-owl will be separated from the more numerous Mexican population.'"  Pls.' Mem. at 35-36, n.6 (citing Flesch Decl. ¶¶ 13-14). But the pygmy-owl is a relatively common bird in Mexico, and USFWS has twice found that the limited number of owls in Arizona are not significant to the species as a whole and therefore do not qualify the species or the portion in Arizona for listing under the ESA.  Enriquez Decl. ¶ 51.[34]  Thus, Plaintiffs cannot show that population-level impacts to the species as whole, *i.e.*, throughout the U.S. and Mexico, are likely to occur.  And contrary to Plaintiffs' suggestion that owls in Arizona will be separated from the larger population, the range of the pygmy owl in Arizona extends well to the east of the proposed barriers at issue, and includes substantial areas along the border where only vehicular barriers or no barrier remain.  *Id.*  Plaintiffs also acknowledge that uncertainties exist regarding any impact on owls and admit that pygmy-owls may fly over even tall fencing if sufficient visibility and vegetation are present.  Flesch Decl. ¶ 13, ECF No. 8-10 (claiming only that "owls *may not* readily cross a . . . border fence with *solid impermeable* walls that are *disassociated with vegetation cover*.") (emphasis added); *id.* at ¶ 7 ("changes in . . . connectivity . . . *can* trigger declines"; "habitat connectivity *can* have substantial and even greater importance") (emphasis added).  Plaintiffs' speculative claims are

---

[34] Plaintiffs point out that USFWS' most recent decision not to list the species was vacated, *see* Pls.' Mem. at 35 n.29, but that ruling turned on a question of statutory interpretation and did not find any fault in USFWS' scientific finding twice now that pygmy owls in Arizona or within the Sonoran Desert are not significant to the conservation of the species as a whole.  Enriquez Decl. ¶ 51.

insufficient to show a likely species-level harm imperiling their members' ability to enjoy the pygmy owl, in Arizona or elsewhere.

The evidence also does not support plaintiffs' suggestion that the proposed fencing will threaten the survival of Sonoran pronghorn.  Pls.' Mem. at 8-9, 36 (citing Flesch Decl. ¶ 15).  According to USFWS, recovery of the pronghorn does not depend on natural cross-border migration, Enriquez Decl. ¶ 42, and the Sonoran pronghorn in the United States are already "effectively geographically separated from Sonoran pronghorn populations in Mexico due to the physical barriers of Mexican Highway 2 and associated fencing."  *Id.*  The proposed fencing will not eliminate whatever opportunity for cross-border movement exists between the separate U.S. and Mexican populations.  At bottom, USFW's recovery plan for the pronghorn states that "*within population* habitat connectivity"—not cross-border connectivity—is critical to recovery.  *Id.* ¶ 43 (emphasis added).  Here, the proposed fencing will not affect vast areas of habitat available to the U.S. population within federally-protected lands.  *Id.*  Within that habitat, there is no evidence of insufficient connectivity between local areas occupied by the U.S. population, as its numbers have increased even with increased border enforcement.  *Id.* ¶ 44.[35]

Plaintiffs also ignore planned mitigation in speculating that the proposed fencing will harm the Sonoyta mud turtle.  Pls.' Mem. at 8, 36 (citing Rosen Decl. ¶¶ 7-9).  Contrary to Plaintiffs' assumption that construction will "likely destroy the habitat and nests" of the turtle, Pls.' Mem. at 8, CBP has committed to measures to avoid and minimize any impacts from

---

[35] While not mentioned in their motion, Plaintiffs' declarations also contain scattered and speculative allegations that "border wall" will reduce cross-border migrations of other ESA-listed species, including jaguar, ocelot and the Mexican wolf.  *See*, *e.g.*, Luce Decl. ¶ 11 ("endangered jaguar and ocelot . . . *may* choose to use this corridor in the near future") (emphasis added); McKinnon Decl. ¶ 21 (claiming a wall crossing all of Arizona would affect jaguar, ocelot and Mexican wolf); Pulliam Decl. ¶ 12 (apparently claiming that "completion" of a hypothetical border wall crossing multiple mountain ranges would prevent migration of jaguar and ocelot).  But these allegations fail to show that the fencing segments at issue here is likely to have any significant impact on migration necessary for these species.

construction to turtle habitat near the construction area.  Based on its discussions with USFWS

and the National Park Service ("NPS"), CBP understands that the main concern for the mud

turtle is maintaining the hydrological integrity of the Quitobaquito springs north of the

construction site.  Enriquez Decl. ¶¶ 50, 61.   At USFWS and NPS' request, CBP has committed

to avoid blasting and to use a foundation depth of 7 feet, which CBP understands will address

this concern.  *Id.*  And while most turtle habitat is not located directly adjacent to the

construction area, CBP has committed to use biological monitors to avoid and minimize any

construction-related impacts.  *Id.* ¶¶ 34, 48, 61.  Among the best management practices

("BMPs") for the challenged projects is a requirement that construction activities cease if a

federally-listed species is found within the project limits.  *Id.* ¶¶ 33, 48 & Subex. 6.  Work may

only resume after a government biologist has removed the individual federally-listed species or it

moves away on its own.  *Id.*  The BMPs also require that, where work is occurring in habitat for

federally-listed species, the removal of vegetation is limited to the smallest amount needed to

meet the contract requirements.  *Id.*  CBP understands that the above mitigation measures also

will protect the ESA-listed desert pupfish located in this area.  *Id.* ¶ 50.

For similar reasons, Plaintiffs cannot show irreparable harm based on allegedly reduced

cross-border movement of more numerous and non-imperiled wildlife such as bighorn sheep,[36]

mule deer, javelina, bobcats, mountain lions, and black bears.  Pls.' Mem. at 8-9, 36; *see also*,

*e.g.*, Flesch Decl. ¶ 15; Jordahl Decl. ¶ 21; McKinnon Decl. ¶ 12; Pulliam Decl. ¶¶ 10-13.

Plaintiffs make no showing that the new fencing segments at issue would eliminate any

significant portion of cross-border migration for these more common species.  Plaintiffs'

---

[36] While peninsular bighorn sheep in California are ESA-listed, bighorn sheep occurring in Arizona are not.  Enriquez Decl. ¶ 52 n.1.

declarants instead repeatedly claim harms from a vague "border wall" in other or unidentified locations.[37]  Even if some of Plaintiffs' ambiguous allegations pertain to this segment of the border, Plaintiffs fail to address the substantial adjoining portions that remain unfenced or as vehicular barrier that Plaintiffs admit are passable by large animals.  Enriquez Decl. ¶ 54.  And while Plaintiffs stress the need for connections between localized populations for genetic interchange and recolonization, Pls.' Mem. at 8, 10, 36-37, they make no showing that connectivity within the United States—and cross-border migration unaffected by the proposed and existing fencing—is so insufficient as to imperil their members' ability to view and enjoy these species.  In sum, Plaintiffs' speculative and vague allegations do not show a likelihood of population-level impacts.

For example, as to bighorn sheep, Plaintiffs assert that "[w]ithout movements from adjacent populations, many of which are often across the international boundary, to recolonize vacant patches, entire population networks *can be* compromised."  Flesch Decl.  ¶ 15 (emphasis added).  Setting aside the insufficiency of the mere possibility of harm, Plaintiffs provide no data regarding the numbers and locations of bighorn sheep, or how much connectivity occurs in the United States versus across the border.  As Plaintiffs concede, for common wildlife species that are broadly distributed, the potential impact of more limited migration at the species level is not well known.  Pls.' Mem at 36, n. 30; Luce Decl. ¶ 15.  However, CBP's analysis of similar border projects did not reveal any significant impacts from reduced cross-border migration for more common species with larger populations.  Enriquez Decl. ¶ 53.  Plaintiffs nevertheless ask

---

[37] *See, e.g.*, Pulliam Decl. (discussing species along an 80-mile portion of the border, much larger than the segment at issue here, and claiming harm to various species from "completion of the border wall"); Gerard Decl. ¶ 23 (after discussing another location not at issue for the requested injunction, asserting the "border wall" would prevent movement of large mammals); Jordahl Decl. ¶ 21 (generally discussing the proposed fencing near OPCNM, but then claiming that unspecified "border wall construction" would reduce genetic interchange); McKinnon Decl. ¶ 12 (seemingly referring to a border wall "bifurcating" the whole of Arizona from Sonora, Mexico).

the Court to assume that species-level impacts will occur to non-imperiled species, without

providing any supporting detail and despite the admittedly uncertain nature of the harms.

Plaintiffs next claim that constructing a 0.3-mile barrier over the San Pedro River will

irreparably harm their interests in enjoying the ESA-listed Huachuca water umbel and will cause

other ecological harm in the area.  Pls.' Mem. at 40-41.  But Plaintiffs' asserted harm is

conclusory, speculative, and divorced from the design of the infrastructure that will actually be

constructed.  First, as a part of CBP's coordination with USFWS concerning the challenged

projects, USFWS advised it is not aware of any individual Huachuca water umbel occurring

within the San Pedro project area.  Enriquez Decl. ¶ 46.   In fact, the nearest designated critical

habitat for Huachuca water umbel is situated well north of the project area.  *Id.*  Further, as

explained in the Enriquez declaration, although the specific design for the barrier that will cross

the San Pedro River has not been finalized, "there is no question that the final design will allow

for continued flow of the San Pedro River."  Enriquez Decl. ¶ 46, 60. [38]  USFWS has advised

that if mechanisms are in place to allow stream flows through grates or under bridges, it does not

expect population-level impacts to Huachuca water umbel.  *Id.*  Plaintiffs' assumption that seed

dispersal for the umbel could be impeded is thus unfounded.

Plaintiffs' speculation that the yet-to-be-designed barrier will inevitably cause other harm

to the San Pedro River and its associated riparian ecosystem by creating an "impenetrable"

barrier is also misplaced.  *See* Luce Decl. ¶ 15; *see also* Misztal Decl. ¶ 9; Stromberg Decl. ¶¶ 4-

9; Silver Decl. ¶ 22.  Plaintiffs' alleged harm is largely based on the asserted effects and eventual

---

[38] The final design will be subject to hydrologic modeling and review by numerous federal agencies, including the relevant land management agencies.  Enriquez Decl. ¶ 60.  Plaintiffs rely on a letter from the Bureau of Land Management (BLM) addressing the potential effects of a barrier over the San Pedro River.  *See* Pls.' Mem. at 40 n.31. But as that letter acknowledged, BLM had not yet seen a proposed design for the barrier and, as a result, limited its comments to a "general discussion related to potential impacts from alteration of the river's hydrology that could result from replacement of the existing vehicle barrier with a new pedestrian barrier."  ECF No. 8-44 at 3.

failure of a pedestrian barrier over a riparian area on the OPCNM.  *See* Girard Decl. ¶¶ 8-18.

But that barrier employed "mesh-style" fencing that will not be installed in the river.  Enriquez

Decl. ¶ 60.  Similarly, Plaintiffs' concern about hydrological impacts along the OPCNM, *see*

Girard Decl. ¶ 19, are ameliorated by the fact that the new bollard wall design is "much better

equipped to handle the flow of water" than older "mesh-style" fencing.  Enriquez Decl. ¶ 58.

Moreover, a variety of design changes have been used in other areas along the border and may be

used here, including spacing the bollards differently and installing barriers "with swing or lift

gates that can be utilized during significant monsoon or other rain events."  *Id.*  DHS's

maintenance program for regular removal of debris at low water crossings further reduces

hydrological concerns.  *Id.*  In short, Plaintiffs' alleged injury is based on the faulty assumption

that the barrier will confine the flow of water in such a way as to harm the riparian ecosystem

over time.  This speculation, based on a misconception of the type of barrier that will actually be

constructed, falls far short of establishing a certain, great, actual, and imminent harm.

Plaintiffs also claim that the proposed fencing will injure their specific interests in

recreating in, enjoying, and photographing the OPCNM and CPNWR and enjoying the San

Pedro River.  Pls.' Mem. at 42-43.  For the reasons discussed above, Plaintiffs' assertions of

irreparable harm are misplaced as to the San Pedro River.  Further, the asserted injury to one

member of CBD in photographing the OPCNM and CPNWR without the visual effects of a

barrier is not certain or great.  As an initial matter, the area along the border is already disturbed

with a vehicular fence and clearing of vegetation.  Enriquez Decl. ¶¶ 17, 64.  Moreover,

OPCNM, CPNWR, and the surrounding area contain vast expanses of undeveloped country that

can be enjoyed and photographed unimpeded by a barrier along the border or other development.

*Id.* ¶ 65.  This simply is not the type of certain and great injury that clears the high bar of

establishing irreparable injury.  *See Sierra Club*, 990 F. Supp. 2d at 39 ("Plaintiffs have offered little proof of the type of permanent, devastating impact on the environment that has convinced other courts to enjoin construction projects.").

For these reasons, Plaintiffs have failed to show the likely irreparable injury to their interests in the environment required for this Court to issue a preliminary injunction.  Moreover, here, where the merits have been fully briefed in *Center for Biological Diversity I*, and where the only construction that will proceed before October 1, 2019, is replacement of two miles of pedestrian fencing with taller bollard walls, *see* Enriquez Decl. ¶ 18, Plaintiffs cannot show that any of their alleged harms are sufficiently imminent.  Their alleged injuries depend on replacement of vehicle barriers with pedestrian barriers, and there is sufficient opportunity for the Court to resolve this case on the merits before any substantial replacement of vehicle barriers with pedestrian barriers occurs.  *See, e.g.*, Fed. R. Civ. P. 65(a)(2) (permitting court to "advance the trial on the merits and consolidate it with the [preliminary injunction] hearing"); *Trump v. Comm. on Oversight and Reform of U.S. House of Reps.*, No. 19-01136-APM, 2019 WL 2063207 (D.D.C. May 9, 2019) (consolidating merits with injunction hearing under Rule 65(a)(2) where legal issue was "fully briefed," there was no need for "development of the factual record," and court could "discern no benefit from an additional round of legal arguments"); *cf. Canal Authority of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974) ("There should not be a preliminary injunction to protect [the status quo] unless the court's ability to render a meaningful decision on the merits would otherwise be in jeopardy.").  In light of the opportunity for the Court to shortly decide the merits, Plaintiffs cannot show irreparable harm to justify a preliminary injunction here.

## III.   THE BALANCE OF EQUITIES WEIGHS STRONGLY AGAINST AN INJUNCTION

The final two preliminary injunction factors, the public interest and the balance of the

equities, also weigh against granting Plaintiffs' motion.   These factors merge when the Government is a party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Plaintiffs wrongly suggest that any balancing of the equities is preordained in their favor because they assert harm to protected wildlife and the natural environment.   They rely on oft-quoted statements that these factors "usually favor the issuance of an injunction to protect the environment" and that Congress has "spoken in the 'plainest of words'" that "protection and preservation of endangered species is one of the nation's highest priorities."  Pls.' Mem. at 43 (quoting *Amoco Prod. Co.*, 480 U.S. at 545; *TVA*, 437 U.S. at 194; and *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 238 (D.D.C. 2003)).  But none of these cases involved the exercise of a congressionally-provided waiver of environmental laws in favor of other compelling national interests.  Where Congress itself has concluded that other interests take priority over those protected by environmental statutes like NEPA and the ESA, there is no basis for tipping the scale toward environmental interests.  *See Winter*, 555 U.S. at 15, 18, 32-33 (similarly involving the exercise of congressionally-provided exemptions from the Marine Mammal Protection Act and Coastal Zone Management Act for national defense purposes and finding that regardless of a showing of irreparable harm or likelihood of success on a NEPA claim, plaintiffs' ecological, scientific and recreational interests in marine mammals were "plainly outweighed" by national security considerations).

Through IIRIRA § 102, Congress has spoken in the plainest of words that "expeditious construction" of additional border infrastructure in areas of high illegal entry takes precedence over protection of the very NEPA- and ESA-protected interests that Plaintiffs assert.  *See Va. Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 551-52 (1937) (courts "cannot ignore the judgment of Congress, deliberately expressed in legislation," which is "a declaration of public interest and policy which should be persuasive").  There can be no doubt that the southwest border remains an

area of "high illegal entry," § 102(a), requiring additional DHS action.  *See, e.g.*, Ex. C, Declaration

of Jerry Martin ¶¶ 9-10 (more than 54,000 apprehensions in Tucson Sector this fiscal year); Ex. G,

McAleenan Testimony (June 11, 2019) (explaining magnitude of migrant crisis at the southwest

border).[39]   Thus, even if Plaintiffs had demonstrated irreparable harm to those interests and a

likelihood of success, the Court should deny the preliminary injunction sought here.  Enjoining the

construction of border barriers would harm the Government's "weighty" interest in border security

and enforcement of immigration laws.  *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982) ("The

government's interest in efficient administration of the immigration laws at the border . . . is

weighty."); *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 672 (1989) (the

Government has "compelling interests in safety and in the integrity of our borders"); *United States

v. Aguilar*, 883 F.2d 662, 695 (9th Cir. 1989) ("The proposition that the government has a

compelling interest in regulating its border hardly needs testimonial documentation.");

*Commonwealth of the N. Mariana Islands v. United States*, 670 F. Supp. 2d 65, 87-88 (D.D.C.

2009) (recognizing "weighty and legitimate" federal interests in "ensur[ing] effective border

control procedures" because "a sovereign's interests in foreign affairs and security are served by

controlling the borders over which it possesses sovereignty"); *cf. Defenders of Wildlife*, 527 F.

Supp. 2d at 129 (concluding that "construction of the border fence pertains to both foreign affairs

and immigration control" which are "areas over which the Executive Branch traditionally exercises

independent constitutional authority").

---

[39] Plaintiffs ask the Court to reject arguments that "border wall construction serves the public interest" or "improv[es] border security," alleging a lack of "objective evidence."  Pls.' Mem. at 45.  In so doing, they are rejecting Congress' judgment.  Congress called for addition border infrastructure in § 102 and has continued to provide funding for construction.  While CBP may not have developed metrics to specifically "measure the contribution of fencing to border security operations," GAO Report 19-538R (link), that does not undermine, let alone negate, the judgment of the Legislative and Executive Branches that significant public and national interests are at stake.  *See also* Martin Decl. ¶¶ 4-14 (explaining DHS's observation that border walls serve an important role in stopping drugs and migrants from unlawfully crossing the southern border).

Congress has recognized that additional border infrastructure can help curtail the flow of "narcotics, and other contraband," that are a menace to public safety.  Public Law No. 109-367, § 2(b) (defining "operational control" of the border); *see also* H.R. Rep. 114-840, 1147 (Nov. 30, 2016) (Conf. Rep.) (calling for additional use of § 284 because Congress is "concerned about the threat posed by the production and trafficking of heroin, fentanyl (and precursor chemicals), and other illicit drugs").  As the President recently explained in declaring the national emergency, tens of thousands of pounds of illegal drugs are smuggled across the southern border each year and the border is a "major entry point" for "illegal narcotics."  *See* Presidential Proclamation, 84 Fed. Reg. 4949; *see also* Presidential Mem., 2018 WL 1633761, at *1 (Apr. 4, 2018) (directing the Secretary of Defense to support DHS in taking action "stop the flow of deadly drugs and other contraband").  DHS identified the need for the barrier projects at issue because of the high rates of drug smuggling between ports of entry in the Tucson Sectors.  DHS Request for Assistance at 5-6.  Indeed, the evidence establishes that thousands of pounds of illegal drugs are entering the country between ports of entry in the Tucson Sector and that existing barriers in these areas have proved ineffective because transnational drug organizations have changed their tactics.  *See id.*; Martin Decl. ¶ 10 (DHS seized over 49,000 lb. of marijuana, over 2,450 lb. of methamphetamine, over 100 lb. of cocaine, and over 63 lb. of heroin in Tucson Sector this fiscal year).  In these circumstances, a preliminary injunction prohibiting the construction of additional border infrastructure would harm the public's interest in border security and public safety.[40]

---

[40] Plaintiffs cannot press an alleged "public interest" in "meticulous compliance" with statutes governing transfers of appropriated funds within DoD, Pls.' Mem. at 44-45, where they raise no claim regarding such statutes in this lawsuit. They cannot ask this Court to weigh such an interest without comprehensive briefing of those issues. *See, e.g.*, Def.' Mot. to Dismiss, ECF No. 22, *Center for Biological Diversity II* (addressing these statutory arguments in briefing before Judge McFadden).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied.


Dated:  August 13, 2019                          Respectfully submitted,

                                                 JOSEPH H. HUNT
                                                 Assistant Attorney General

                                                 JOHN R. TYLER
                                                 Assistant Director
                                                 Civil Division, Federal Programs Branch

                                                 */s/ Galen N. Thorp*_____
                                                 GALEN N. THORP (Virginia Bar # 75517)
                                                 Senior Counsel
                                                 United States Department of Justice
                                                 Civil Division, Federal Programs Branch
                                                 1100 L Street NW
                                                 Washington, D.C. 20530
                                                 Tel: (202) 514-4781 / Fax: (202) 616-8470
                                                 galen.thorp@usdoj.gov

                                                 *Counsel for Defendants*

## APPENDIX: 8 U.S.C. § 1103 NOTE
### (excerpt codifying IIRIRA § 102, as amended)

### IMPROVEMENT OF BARRIERS AT BORDER

Pub. L. 104–208, div. C, title I, § 102(a)–(c), Sept. 30, 1996, 110 Stat. 3009–554, 3009–555, as amended by Pub. L. 109–13, div. B, title I, § 102, May 11, 2005, 119 Stat. 306; Pub. L. 109–367, § 3, Oct. 26, 2006, 120 Stat. 2638; Pub. L. 110–161, div. E, title V, § 564(a), Decl. 26, 2007, 121 Stat. 2090, provided that:

**"(a) IN GENERAL.**—The Secretary of Homeland Security shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States.

**"(b) CONSTRUCTION OF FENCING AND ROAD IMPROVEMENTS ALONG THE BORDER.**—

   **"(1) ADDITIONAL FENCING ALONG SOUTHWEST BORDER.**—

   **"(A) REINFORCED FENCING.**—In carrying out subsection (a), the Secretary of Homeland Security shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border.

   **"(B) PRIORITY AREAS.**—In carrying out this section [amending this section],[*] the Secretary of Homeland Security shall—

   "(i)   identify the 370 miles, or other mileage determined by the Secretary, whose authority to determine other mileage shall expire on December 31, 2008, along the southwest border where fencing would be most practical and effective in deterring smugglers and aliens attempting to gain illegal entry into the United States; and

   "(ii)   not later than December 31, 2008, complete construction of reinforced fencing along the miles identified under clause (i).

   **"(C) CONSULTATION.**—

   **"(i) IN GENERAL.**—In carrying out this section, the Secretary of Homeland Security shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed.

---

[*] The brackets in the text reflect editorial notes by Office of Law Revision Counsel in preparing the text for publication in the U.S. Code.  *See* Office of Law Revision Counsel, Detailed Guide to the United States Code Content and Features, § II(A) (link) (describing "inserting bracketed citation information in the text following a cross reference").

"**(ii)** SAVINGS PROVISION.—Nothing in this subparagraph may be construed to—

"(I)   create or negate any right of action for a State, local government, or other person or entity affected by this subsection; or

"(II)   affect the eminent domain laws of the United States or of any State.

"**(D)** LIMITATION ON REQUIREMENTS.—Notwithstanding subparagraph (A), nothing in this paragraph shall require the Secretary of Homeland Security to install fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location along an international border of the United States, if the Secretary determines that the use or placement of such resources is not the most appropriate means to achieve and maintain operational control over the international border at such location.

"**(2)** PROMPT ACQUISITION OF NECESSARY EASEMENTS.—The Attorney General, acting under the authority conferred in section 103(b) of the Immigration and Nationality Act [8 U.S.C. 1103(b)] (as inserted by subsection (d)), shall promptly acquire such easements as may be necessary to carry out this subsection and shall commence construction of fences immediately following such acquisition (or conclusion of portions thereof).

"**(3)** SAFETY FEATURES.—The Attorney General, while constructing the additional fencing under this subsection, shall incorporate such safety features into the design of the fence system as are necessary to ensure the well-being of border patrol agents deployed within or in near proximity to the system.

"**(4)** AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as may be necessary to carry out this subsection. Amounts appropriated under this paragraph are authorized to remain available until expended.

"**(c)** WAIVER.—

"**(1)** IN GENERAL.—Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section [amending this section]. Any such decision by the Secretary shall be effective upon being published in the Federal Register.

"**(2)** FEDERAL COURT REVIEW.—

"**(A)** IN GENERAL.—The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

"**(B)** TIME FOR FILING OF COMPLAINT.—Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security. A claim shall be barred unless it is filed within the time specified.

"**(C)** ABILITY TO SEEK APPELLATE REVIEW.—An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States."