

*Executive Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



February 25, 2019

MEMORANDUM FOR:       CAPT Hallock N. Mohler Jr.
                      Executive Secretary
                      Department of Defense (DoD)

FROM:                 Christina Bobb
                      Executive Secretary
                      Department of Homeland Security (DHS)

SUBJECT:              Request for Assistance Pursuant to 10 U.S.C. § 284

## I. Overview

As the government department tasked with border security, the Department of Homeland Security (DHS), through U.S. Customs and Border Protection (CBP), is requesting that the Department of Defense assist DHS in its efforts to secure the southern border. The Secretary has directed me to transmit this request for assistance to your attention. This memorandum supersedes the February 22, 2019 version.

In Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended (IIRIRA), 8 U.S.C. § 1103 note, Congress has directed DHS to construct border infrastructure in areas of high illegal entry to deter illegal crossing of both drugs and people into the United States. Pursuant to Section 102, DHS has identified the areas set forth in Section II below as areas of high illegal entry where CBP must take action (the Project Areas).

Within the Project Areas, DHS is experiencing large numbers of individuals and narcotics being smuggled into the country illegally. The Project Areas are also used by individuals, groups, and transnational criminal organizations as drug smuggling corridors. Mexican Cartels continue to remain dominant in these areas, influencing and controlling narcotics and human smuggling operations, within their respective strongholds.

DHS must use its authority under Section 102 of IIRIRA to install additional physical barriers and roads in the vicinity of the United States border in order to deter and prevent illegal crossings within the Project Areas. The construction of border infrastructure within the Project Areas will support DHS's ability to impede and deny illegal entry and drug smuggling activities within the Project Areas.

Subject:  Request for Assistance Pursuant to 10 U.S.C. § 284
Page 2

The Project Areas identified are adjacent to some of the most densely populated metropolitan areas of Mexico and are also home to some of the strongest and most violent drug cartels in the world.  Deterring and preventing illegal cross-border activity will help stem the flow of illegal narcotics and entries in these areas.  Similarly, the improved ability to impede, deny, and be mobile within the Project Areas creates a safer operational environment for law enforcement.

To support DHS's action under Section 102 of IIRIRA, DHS is requesting that DoD, pursuant to its authority under 10 U.S.C. § 284(b)(7), assist with the construction of fences roads, and lighting within the Project Areas to block drug-smuggling corridors across the international boundary between the United States and Mexico.

## II.  Capabilities Requested

Within the Project Areas there is existing vehicle fence and dilapidated pedestrian fencing.  Vehicle fencing is intended to stop vehicles from illegally entering the United States, but can be climbed over or under by individuals.  Pedestrian fencing is intended to prevent and deter individuals and vehicles from illegally crossing into the United States.

DHS requests that DoD assist in the execution of projects, within the Project Areas set forth below, to: (1) replace existing vehicle barriers or dilapidated pedestrian fencing with new pedestrian fencing; (2) construct roads; and (3) install lighting.

The new pedestrian fencing includes a Linear Ground Detection System, which is intended to, among other functions, alert Border Patrol agents when individuals attempt to damage, destroy or otherwise harm the barrier.  The road construction includes the construction of new roads and the improvement of existing roads.  The lighting that is requested has an imbedded camera that works in conjunction with the pedestrian fence.  The lighting must be supported by grid power.

The segments of fence within the Project Areas identified below are situated on federal property.  DHS will be responsible for securing, to the extent required, any other real estate interest or instrument that is required for project execution.  In the event a real estate interest or instrument that is needed for project execution cannot be obtained for a segment of fence within a Project Area in a time frame that is within the requirements of this request for assistance, the segment may be withdrawn from this request.  In addition, DHS will be responsible for any applicable environmental planning and compliance to include stakeholder outreach and consultation associated with the projects.

Subject:  Request for Assistance Pursuant to 10 U.S.C. § 284
Page 3

**Project Areas:**

**II.A.  El Centro Sector**

Within the United States Border Patrol El Centro Sector (El Centro Sector) DHS is requesting that DoD assist by undertaking road construction, by replacing approximately 15 miles of existing vehicle barrier with new pedestrian fencing, and by installing lighting in the specific locations identified below.

The specific Project Area identified below is located in Imperial County, California and has been identified by the Office of National Drug Control Policy (ONDCP) as a High Intensity Drug Trafficking Area (HIDTA).  Multiple local transnational criminal organizations known for smuggling drugs into Calexico from Mexico using a variety of tactics, techniques, procedures, and varying concealment methods operate in this area, including *Cartel De Jalisco Nueva Generacíon* (CJNG) as well as remnants of the *Beltran Leyva* Organization and *La Familia Michoacana* organizations.  CJNG, based in Jalisco, was previously a faction of the *Sinaloa* Cartel. CJNG broke away from the *Sinaloa* Cartel and has become an established Mexican Cartel.  The Mexican government has declared CJNG as one of the most dangerous cartels in the country.

Due to the close proximity of urban areas on both sides of the border, the El Centro Sector suffers from some of the quickest vanishing times – that is, the time it takes to illegally cross into the United States and assimilate into local, legitimate traffic.  These quick vanishing times enable the illegal activities of transnational criminal organizations, whether they are smuggling people or narcotics.

Border Patrol's own experience with apprehensions between border crossings bears this out.  In fiscal year 2018, there were over 29,000 apprehensions of illegal entrants attempting to enter the United States between border crossings in the El Centro Sector. Also in fiscal year 2018, Border Patrol had approximately 200 separate drug-related events between border crossings in the El Centro Sector, through which it seized over 620 pounds of marijuana, over 165 pounds of cocaine, over 56 pounds of heroin, and over 1,600 pounds of methamphetamine.

The specific Project Area is as follows:

- *El Centro Project 1:*

    o The project begins approximately 10 miles west of the Calexico Port of Entry continuing west 15.25 miles in Imperial County.
    o Start coordinate: 32.63273, -115.922787; End coordinate: 32.652563, -115.662399

Subject: Request for Assistance Pursuant to 10 U.S.C. § 284
Page 4

## II.B. Yuma Sector

Within the United States Border Patrol Yuma Sector (Yuma Sector) DHS is requesting that DoD assist by undertaking road construction, by replacing approximately 36 miles of existing vehicle barrier and approximately 6 miles of dilapidated pedestrian fencing with new pedestrian fencing, and by installing lighting in the specific locations identified below. The specific areas identified below are located in Yuma County, Arizona.

Yuma County has been identified by the ONDCP as a HIDTA. Of particular note is the operation of the *Sinaloa* Cartel in this area. The *Sinaloa* Cartel continues to be the most powerful cartel in the country and controls illicit networks and operations in the United States. Despite the arrest of Joaquin "El Chapo" Guzman-Loera, its narcotics business has continued uninterrupted. As a result, there have been no significant changes within the *Sinaloa* Cartel's hierarchy, or any changes in the illicit operations conducted by the *Sinaloa* Cartel.

Border Patrol's own experience with apprehensions between border crossings bears this out. In fiscal year 2018, there were over 26,000 apprehensions of illegal entrants attempting to enter the United States between border crossings in the Yuma Sector. Also during fiscal year 2018, Border Patrol had over 1,400 separate drug-related events between border crossings in the Yuma Sector, through which it seized over 8,000 pounds of marijuana, over 78 pounds of cocaine, over 102 pounds of heroin, over 1,700 pounds of methamphetamine, and over 6 pounds of fentanyl.

The replacement of ineffective pedestrian fencing in this area is necessary because the older, wire mesh design is easily breached and has been damaged to the extent that it is ineffective. Additionally, this area is notorious for border violence and narcotics smuggling. Furthermore, while the deployment of vehicle barrier in the Yuma Sector initially curtailed the volume of illegal cross-border vehicular traffic, transnational criminal organizations quickly adapted their tactics switching to foot traffic, cutting the barrier, or simply driving over it to smuggle their illicit cargo into the United States. Thus, in order to respond to these changes in tactics, DHS now requires pedestrian fencing.

The specific Project Areas are as follows:

- *Yuma Project 1:*

    o The project begins approximately 1 mile southeast of the Andrade Port of Entry continuing along the Colorado River for approximately 5 miles in Yuma County.
    o Start coordinate: 32.704197, -114.726013; End coordinate: 32.642102, -114.764632)

Subject:  Request for Assistance Pursuant to 10 U.S.C. § 284
Page 5

- *Yuma Project 2:*

  o   The project involves the replacement of two segments of primary
      pedestrian fencing in Yuma Sector for a total of approximately 6 miles.
      This includes approximately 2 miles of fencing along the Colorado River.
  o   Start coordinate: 32.37755528, -114.4268201; End coordinate:
      32.3579244, -114.3623999;
  o   The project also includes replacement of primary pedestrian fencing
      approximately 17 miles east of the San Luis Port of Entry, on the
      Barry M Goldwater Range, continuing east for approximately 4 miles.
  o   Start coordinate: 32.51419938, -114.8011175; End coordinate:
      32.49350559, -114.8116619

- *Yuma Project 3:*

  o   The project begins approximately 0.4 miles east of the
      Barry M. Goldwater Range continuing approximately 31 miles east
      through the Cabeza Prieta National Wildlife Refuge in Yuma County.
  o   Start coordinate: 32.232935, -113.955211; End coordinate: 32.039033,
      -113.33411

**III.C.  Tucson Sector**

Within the United States Border Patrol Tucson Sector (Tucson Sector) DHS is requesting
that DoD assist by undertaking road construction, by replacing approximately 86 miles of
existing vehicle barrier with new pedestrian fencing, and by installing lighting in the
specific locations identified below.  The specific areas identified below are located in
Pima, Cochise, and Santa Cruz Counties, Arizona.

Pima, Cochise and Santa Cruz Counties have been identified by the ONDCP as a
HIDTA.  The *Sinaloa* Cartel relies on their local associates to coordinate, direct, and
support the smuggling of illegal drugs and aliens from Mexico to the United States.
Since Arizona is contiguous with the U.S.-Mexico International Boundary, the Tucson
and Phoenix metropolitan areas are major trans-shipment and distribution points for
contraband smuggling. Plaza bosses operate as a *Sinaloa* Cartel leader within their
specific area of operation along the Sonora-Arizona corridor of the U.S.-Mexico
International Boundary.

Border Patrol's own experience with apprehensions between border crossings bears this
out.  In fiscal year 2018, there were over 52,000 apprehensions of illegal entrants
attempting enter the United States between the border crossings in the Tucson Sector.
Also in fiscal year 2018 Border Patrol had over 1,900 separate drug-related events
between border crossings in the Tucson Sector, through which it seized over 1,600
pounds of marijuana, over 52 pounds of cocaine, over 48 pounds of heroin, over 902
pounds of methamphetamine, and over 11 pounds of fentanyl.

Subject:  Request for Assistance Pursuant to 10 U.S.C. § 284
Page 6

In addition, the absence of adequate pedestrian fencing, either due to the presence of vehicle barrier only or ineffective pedestrian designs, in the Tucson sector continues to be particularly problematic as it pertains to the trafficking of illegal narcotics.  Rival transnational criminal organizations frequently employ "rip crews" who leverage the remote desert environment and lack of infrastructure to steal one another's illicit cargo resulting in increased border violence.

The terrain also provides high ground to scouts seeking to protect and warn smuggling loads being passed through the area.  Transnational criminal organizations have successfully utilized this advantage in furtherance of their illicit activity and for this reason the area is in need of an improved capability to impede and deny illegal crossings or people and narcotics.  In addition, the area hosts a number of tourist attractions that allow illegal activity to blend into legitimate activity; avoiding detection and evading interdiction.

The specific Project Areas are as follows:

- *Tucson Project 1:*
  - The project includes replacement of two segments of vehicle barriers.  The first segment begins approximately 2 miles west of the Lukeville Port of Entry continuing west approximately 30 miles.
  - Start coordinate: 32.038278, -113.331716; End coordinate: 31.890032, -112.850162
  - The second segment project begins approximately 3 miles east of the Lukeville Port of Entry and continues east approximately 8 miles in Pima County, Arizona.
  - Start coordinate: 31.8648, -112.76757; End coordinate: 31.823911, -112.634298

- *Tucson Project 2:*
  - The project includes approximately 5 miles of primary pedestrian fence replacement around the Lukeville Port of Entry extending from approximately 2 miles west of the port to approximately 3 miles east of the port.
  - Start coordinate: 31.88999921, -112.850162; End coordinate: 31.8648, -112.76757

Subject: Request for Assistance Pursuant to 10 U.S.C. § 284
Page 7

- *Tucson Project 3*:

  o The project includes three segments of vehicle barrier replacement beginning approximately 18 miles west of the Naco Port of Entry and continuing to approximately 25 miles east of the Douglas Port of Entry (or approximately 5 miles west of the Arizona/New Mexico state line) for approximately 20 miles of non-contiguous vehicle barrier replacement in Cochise County, Arizona.
  o Start coordinate: 31.333754, -110.253863; End coordinate: 31.333767, -110.250286;
  o Start coordinate: 31.334154, -110.152548; End coordinate: 31.334137, -110.147464;
  o Start coordinate: 31.333995, -109.453305; End coordinate: 31.332759, -109.129344

- *Tucson Project 4:*

  o The project begins approximately 9 miles east of the Nogales Port of Entry and continues eastward for approximately 30 miles with approximately 26 miles of non-contiguous vehicle barrier replacement in Santa Cruz and Cochise Counties, Arizona.
  o Start coordinate: 31.333578, -110.79579; End coordinate: 31.333511, -110.775333;
  o start coordinate: 31.33328, -110.70545; End coordinate: 31.333602, -110.288665)
  o Note: An additional approximately 0.3 miles of new pedestrian fence could be built between the existing segmented vehicle barrier locations to fill existing gaps if appropriate real estate interest can be verified

- *Tucson Project 5:*

  o The project includes approximately 2 miles of vehicle barrier replacement beginning approximately 4.5 miles east of the Sasabe Port of Entry continuing east in six non-continuous segments for approximately 15 miles in Pima and Santa Cruz Counties, Arizona.
  o Start Coordinate: 31.460175, -111.473171; End Coordinate: 31.459673, -111.471584;
  o Start Coordinate: 31.453091, -111.450959; End Coordinate: 31.449633, -111.440132;
  o Start Coordinate: 31.440683, -111.412054; End Coordinate: 31.437351, -111.40168;
  o Start Coordinate: 31.423471, -111.358336; End Coordinate: 31.422541, -111.355444;
  o Start Coordinate: 31.42221, -111.354379; End Coordinate: 31.421321, -111.351608;

Subject: Request for Assistance Pursuant to 10 U.S.C. § 284
Page 8

- o Start Coordinate: 31.386813, -111.243966; End Coordinate: 31.385462, -111.239759)

## II.D. El Paso Sector

Within the United States Border Patrol El Paso (El Paso Sector) DHS is requesting that DoD assist by undertaking road construction, by replacing approximately 70 miles of existing vehicle barrier with new pedestrian fencing, and by installing lighting in the specific locations identified below. The specific areas identified below are located in Luna, Hidalgo and Doña Ana Counties, New Mexico. Luna, Hidalgo and Doña Ana Counties have been identified by the ONDCP as a HIDTA.

There are three specific transnational criminal organizations of interest operating in the El Paso Sector - the *Sinaloa* Cartel as well as remnants of the *Juarez* Cartel and the *Beltran Leyva* Organization. In the El Paso Sector the *Sinaloa* Cartel employs a variety of tactics, techniques and procedures depending upon the terrain and environment to move drugs across the border. While the *Sinaloa* Cartel has a strong presence and control of territories at the flanks of the Sector, it does not have full control of the territory throughout the El Paso Sector. The *Juarez* Cartel, traditionally a major trafficker of marijuana and cocaine, has become an active member in opium cultivation and heroin production.

Border Patrol's own experience with apprehensions between border crossings bears this out. In fiscal year 2018, there were over 31,000 apprehensions of illegal entrants attempting to enter the United States between border crossings in the El Paso Sector. Also in fiscal year 2018, Border Patrol had over 700 separate drug-related events between border crossings in the El Paso Sector, through which it seized over 15,000 pounds of marijuana, over 342 pounds of cocaine, over 40 pounds of heroin, and over 200 pounds of methamphetamine.

Although the deployment of vehicle barrier in the El Paso Sector initially curtailed the volume of illegal cross-border vehicular traffic, transnational criminal organizations quickly adapted their tactics switching to foot traffic, cutting the barrier, or simply driving over it to smuggle their illicit cargo into the United States.

Thus, in order to respond to these changes in tactics, CBP now requires pedestrian fencing. Successfully impeding and denying illegal activities or transnational criminal organizations in this area is further complicated by the close proximity of New Mexico Highway 9 to the border. In some cases the highway is less than a half a mile, allowing illegal cross-border traffic to evade detection and apprehension and quickly vanish from the border area.

Subject: Request for Assistance Pursuant to 10 U.S.C. § 284
Page 9

The specific Project Areas are as follows:

- *El Paso Project 1:*
    - o The project includes 46 miles of vehicle barrier replacement beginning approximately 17.5 miles west of the Columbus Port of Entry continuing east in non-contiguous segments to approximately 35 miles east of the Columbus Port of Entry within the Luna and Doña Ana Counties, New Mexico.
    - o Start Coordinate: 31.7837, -107.923151; End Coordinate: 31.783689, -107.679049;
    - o Start Coordinate: 31.783672, -107.573919; End Coordinate: 31.783741, -107.038154

- *El Paso Project 2:*
    - o The project includes 23.51 miles of Vehicle Barrier replacement in non-contiguous segments within Hidalgo and Luna Counties, New Mexico. The first segment begin approximately 5.1 miles east of the New Mexico/Arizona Border continuing east 4.55 miles.
    - o Start Coordinate: 31.332323, -108.962631; End Coordinate: 31.332292, -108.885946;
    - o The second segment begins approximately 3 miles west of the Antelope Wells Port of Entry to 3 miles east of the port of entry for 6.12 miles of Vehicle Barrier replacement.
    - o Start Coordinate: 31.333368, -108.582412; End Coordinate: 31.333407, -108.47926;
    - o The third segment begins approximately 20 miles west of the Columbus Port of Entry extending west 12.84 miles.
    - o Start Coordinate: 31.783722, -108.182442; End Coordinate: 31.783708, -107.963193;

## III.    Technical Specifications

As set forth above, DHS requires road construction, installation of lighting, and the replacement of existing vehicle barrier or dilapidated pedestrian fencing with new pedestrian fencing within the Project Areas. DHS will provide DoD with more precise technical specifications as contract and project planning moves forward.

Given DHS's experience and technical expertise, DHS plans to coordinate closely with DoD throughout project planning and execution, to include review and approval of design specifications, barrier alignment and location, and other aspects of project planning and execution.

Subject:  Request for Assistance Pursuant to 10 U.S.C. § 284
Page 10

## IV.  Sequencing

The DHS request for assistance includes approximately 218 miles in which DHS requires road construction, the installation of lighting, and the replacement of existing vehicle fencing or dilapidated pedestrian fencing with new pedestrian fencing within the Project Areas.  DHS requests that DoD's support under 10 U.S.C. § 284 address the requirements in order of priority as DoD resources allow.  The DHS order of priority is as follows:

1. Yuma Sector Project 1
2. Yuma Sector Project 2
3. El Paso Sector Project 1
4. El Centro Sector Project 1
5. Tucson Sector Project 1
6. Tucson Sector Project 2
7. Tucson Sector Project 3
8. Tucson Sector Project 4
9. Yuma Sector Project 3
10. El Paso Sector Project 2
11. Tucson Sector Project 5

## V.  Funding

DHS requests that DoD provide the above-referenced border fences, roads, and lighting on a non-reimbursable basis as support to block drug smuggling corridors.

DHS will accept custody of the completed infrastructure and account for that infrastructure in its real property records.

DHS will operate and maintain the completed infrastructure.

## VI.  Conclusion

DHS requests DoD assistance under 10 U.S.C. § 284 to construct fences, roads, and to install lighting in order to block drug smuggling corridors in the Project Areas set forth above.  The Projects Areas set forth above are also areas of high illegal entry under IIRIRA § 102(a), and the requested fences, roads, and lighting will assist in deterring illegal crossings in the Project Areas.





**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

5/9/19

MEMORANDUM FOR ACTING SECRETARY OF HOMELAND SECURITY

SUBJECT:  Additional Support to the Department of Homeland Security

The Department of Defense appreciates that the Department of Homeland Security (DHS) confronts a continuing and worsening crisis at the southern border.  As I indicated in my March 25, 2019 letter, in which I approved the undertaking of three projects to support to your Department's effort to secure the southern border by blocking drug-smuggling corridors along the border through the construction of roads and fences and the installation of lighting, the Department of Defense has continued to assess the availability of resources and other factors in order to determine how additional similar support can be provided to DHS.

10 U.S.C. § 284(b)(7) gives the Department of Defense the authority to construct roads and fences and to install lighting to block drug-smuggling corridors across international boundaries of the United States in support of counterdrug activities of Federal law enforcement agencies.  For the following reasons, I have concluded that the support requested on February 25, 2019 satisfies the statutory requirements:

- DHS/Customs and Border Protection (CBP) is a Federal law enforcement agency;

- DHS has identified each project area as a drug-smuggling corridor; and

- The work requested by DHS to block these identified drug-smuggling corridors involves construction of fences (including linear ground detection systems), construction of roads, and installation of lighting (supported by grid power and including imbedded cameras).

Accordingly, at this time I have decided to undertake 4 additional projects, namely El Centro Sector Project 1, Tucson Sector Project 1, Tucson Sector Project 2, and Tucson Sector Project 3, by constructing 78.25 miles of 30-foot pedestrian fencing, constructing and improving roads, and installing lighting as described in the February 25, 2019 request.

As the proponent of the requested action, CBP will serve as the lead agency for environmental compliance and will be responsible for providing all necessary access to land.  I request that DHS place the highest priority on completing these actions for the projects identified above.  DHS will accept custody of the completed infrastructure, account for that infrastructure in its real property records, and operate and maintain the completed infrastructure.

The Commander, U.S. Army Corps of Engineers, is authorized to coordinate directly with DHS/CBP and immediately begin planning and executing up to $1.5B in support to DHS/CBP by undertaking the projects identified above.

Patrick M. Shanahan
Acting

cc:
Secretary of the Army
Chairman of the Joint Chiefs of Staff
Under Secretary of Defense for Policy
Under Secretary of Defense (Comptroller)/Chief Financial Officer
General Counsel of the Department of Defense
Assistant Secretary of Defense for Legislative Affairs
Assistant Secretary of Defense for Homeland Defense and Global Security
Assistant to the Secretary of Defense for Public Affairs
Commander, U.S. Army Corps of Engineers



TESTIMONY OF


The Honorable Kevin McAleenan
Acting Secretary U.S. Department of Homeland Security



BEFORE


U.S. Senate
Committee on the Judiciary


ON

DHS Legislative Proposals

June 11, 2019
Washington, DC

Chairman Graham, Ranking Member Feinstein, and distinguished Members of the Committee. Thank you for inviting me to appear before you today.

It is an honor to serve as Acting Secretary and to represent the distinguished men and women of the U.S. Department of Homeland Security (DHS). DHS has one of the most compelling missions in government: to safeguard the American people, our homeland, and our values.

This is no easy mission; every day this Department must monitor and defend more than 7,000 miles of America's shared border with Mexico and Canada, while also facilitating legal trade and travel. Our officers and agents inspect hundreds of tons of cargo for illegal and dangerous substances, process thousands of individuals for admission, and monitor hundreds of miles of remote territory along the border every single day.

With a security and humanitarian crisis on America's Southern Border that is growing worse by the day, DHS cannot properly protect America's territory, enforce its immigration laws, and keep criminals from exploiting our system and taking advantage of American generosity without immediate action from Congress. While we are doing everything we can, the volume and composition of populations arriving at the Southern Border are simply unsustainable. Unless Congress acts, the situation will continue to deteriorate—with grave consequences.

First, I would like to lay out some facts about the crisis we face, and then provide you with targeted solutions that will allow DHS to gain control of our border and to end this crisis.

**BORDER CRISIS**

This crisis is unlike anything our country has ever faced.  It is due in large part to the dramatic demographic shift in the flow of illegal immigration to the United States. Historically the vast majority of arriving aliens were single-adult males from Mexico who could be quickly detained and removed.

Today, the majority are family units and unaccompanied alien children; in fact, 72 percent of all border enforcement actions in May were directed to Unaccompanied Alien Children (UAC) and family units. These populations overwhelm DHS capacity because most cannot be easily cared for, efficiently processed, and expeditiously removed due to outdated laws and misguided court decisions.

Just two weeks ago, U.S. Border Patrol (USBP) agents apprehended the largest group of individuals ever encountered crossing the border unlawfully. Agents took custody of over 1,000 people after they illegally crossed the border in El Paso, Texas.  All members of the group were from Guatemala, Honduras, or El Salvador. The group included over 900 family unit members, over 60 unaccompanied alien children, and just under 40 single adults.

These groups contribute to the more than 675,000 aliens apprehended or encountered at ports of entry on the Southwest border so far this fiscal year. In the month of May alone, CBP

apprehended and encountered more than 144,000 inadmissible or removable aliens—almost triple the number compared to last May.

CBP total enforcement actions this May are ***623 percent higher*** than May 2017 and 206 percent higher than the May average over the past seven years. Any of our men and women on the border can tell you that DHS facilities are overflowing, and that our resources are stretched too thin. Worst of all, the magnitude of arriving and detained aliens has substantially increased the risk of life-threatening incidents and impact to public health.

While we are doing everything we can to manage the crisis, managing the volume of vulnerable populations arriving is simply unsustainable. The facilities, resources, and legal authorities that we have at DHS are not able to address the challenges we are seeing and which we anticipate will continue without abatement absent Congressional action. The increase in numbers along with changes in demographics are directly tied to the vulnerabilities in our legal framework that have become well known to smugglers and migrants.

Simply put, cartels and smugglers are well versed in our laws. They know that, under the status quo, family units and unaccompanied alien children will be released—often with little or no consequences for their illegal entry.  Recent legal developments have both codified and broadcast this practice, presenting the cartels with a lucrative business opportunity.

As a result, the numbers at the border have continued to grow, and desperate migrants are paying smugglers thousands of dollars to aid them on their illegal journey.  We also know that the drug cartels are using the migrants as human diversions by putting them into large groups and dropping them at a remote location in the middle of the night, forcing our border patrol officers to redirect their coverage to rescue these groups.  As part of their business model, smugglers and traffickers are forcing desperate inadmissible or removable aliens into inhumane conditions, demanding extraordinary sums of money, and putting lives in danger.

We have identified almost 4,800 migrants this year presenting as family units that were determined to be fraudulent. We have even uncovered "child recycling rings," whereby innocent children are being used multiple times to help different adult intending immigrants gain illegal entry and release.

We routinely observe advertisements on the radio, in the local news, on social media, and by flyers and business cards advising that:  "if you bring a child, you will not be deported," and that "free American services and assistance are available."

A recent Washington Post article from May 31 quoted a Guatemalan man named Juan Vasquez, who is considering migrating with children, as saying, "That's the thing everyone knows now. If you go, you need to bring a child."

The article goes on to say:

"Many Guatemalans say they have been told the ability to enter the United States with a child is part of an official U.S. policy that is due to expire in about a year; such rumors are often spread by smugglers trying to drum up business. "It's something that they say is going to expire," said Anselmo Torres, 58, also from La Libertad, whose two daughters migrated earlier this year with children of their own."

Every single day, smugglers and traffickers profit from human misery by exploiting people who are seeking a better life. These smugglers, many with ties to transnational criminal organizations, may deprive aliens of food and water, physically assault them, and place them in dangerous travel conditions, such as locking them in tractor-trailers while outside temperatures reach 115 degrees.

We've seen large groups of mostly family units from Guatemala traveling on buses through Mexico to the U.S. border in a much shorter smuggling cycle, making the journey in as little as four to seven days.

Still other migrants are trafficked or used as drug mules. Human traffickers have no regard for the health and safety of the migrants who pay them; as a result, many who make the journey become sick, injured, or traumatized.

The weaknesses in our laws now represent the most significant factors affecting border security and allow this cycle of misery to continue. They include:

- The asylum gap—approximately 80 percent of individuals pass the initial credible fear screening in the asylum process, yet only 10 to 15 percent are found to have valid asylum claims by an Immigration Judge;
- The disparate treatment under the Trafficking Victims Protection Reauthorization Act, which allows for children arriving from Mexico and Canada to be voluntarily repatriated, but denies the ability to return Central American children ;
- The public health risk—family units are released into our communities with unknown vaccination status and without a standard medical examination for communicable diseases of public health concern, as well as a public health risk of disease outbreak at processing facilities; and
- The inability to detain families while working to expeditiously complete their immigration proceedings. Instead, as noted above, crossing with a child is a near guarantee of a speedy release.

These loopholes have created this crisis.  Therefore, I am here to implore you to not ignore the situation which has metastasized into both an illegal migration surge and true humanitarian crisis with no end in sight.

**PROPOSED CHANGES**

I am incredibly thankful to Chairman Graham for introducing legislation aimed at solving this crisis, as well as Chairman Johnson, Senator Cornyn, and Representative Cuellar, who have all

introduced bills to fix the loopholes in our system.  I look forward to continuing to work with Chairman Graham on his legislation.

Any legislation will need to address the following:

**Family Detention**

- We desperately need the authority to keep families together in detention during their immigration proceedings while promoting a uniform standard of care and accommodation of family units, including – but not limited to – medical attention, nutrition, education, activity, and religious services.

**Safe and Prompt Return of Unaccompanied Alien Children**

- Congress should modify our legal framework to allow DHS to ensure the safe and prompt return of unaccompanied alien children so they can be safely and expeditiously returned home and reunited with their families, regardless of their country of origin.

**Special Immigrant Juvenile (SIJ) Status**

- I urge Congress to update the laws to require an applicant for SIJ status prove that reunification with both parents is not viable due to abuse, neglect, or abandonment, rather than being able to receive SIJ status despite being able to reunite with one of his or her parents in the United States.

**End Abuse of the Asylum System**

- I urge Congress to improve the "credible fear of persecution" standard to ensure that only aliens who are more likely than not to succeed on their asylum claim are promptly placed into immigration proceedings while those who are not are expeditiously removed.
- I request that Congress improve the integrity of the asylum system by providing that those who are ineligible for asylum are not found to have a credible fear of removal, but instead are placed into withholding of removal proceedings.
- I am also asking Congress to support a process that would allow certain Central Americans to seek refugee status closer to home or in a bordering country, thus obviating the need for these aliens to make the dangerous journey to the United States—and drastically reducing the opportunity for drug cartels and smugglers to profit off of human suffering.

**Properly Resource Humanitarian Care and Border Security**

- Support the Administration's requested funding levels for CBP and ICE included in the FY 2019 Emergency Supplemental Budget Request for Southern Border Humanitarian Needs and the FY 2020 President's Budget request.

**CONCLUSION**

We will continue to take aggressive action—and marshal resources from across DHS—to mitigate the crisis, and protect vulnerable people in our custody by expanding medical care, creating temporary facilities, improving transportation.  However, the current state of affairs is not sustainable.  Without key fixes and reforms, the American people will spend increasing sums of money on a worsening crisis.

In order for us to solve this crisis and to create lasting change at the border, we ***must*** address the vulnerabilities in our legal framework.  I am asking for narrow and targeted changes to our laws that will restore integrity to our immigration system and remove the incentives for families and children to cross our border illegally.  I believe that, once implemented, these changes will represent a huge step forward in addressing this crisis and preventing further abuse of vulnerable populations by criminals.

Thank you for your support of our vital efforts to secure the border, and of the men and women of DHS. I look forward to the Committee's questions.

ORIGINAL

EXHIBIT
G

C5 NOV 17 PM 2:20

DEPUTY

1  MATTHEW LEPORE
   California Bar No. 201205
2  Trial Attorney
   United States Department of Justice
3  Civil Division, Federal Programs Branch
   P.O. Box 883
4  Washington, D.C. 20044
   Tel: (202) 514-3770; Fax: (202) 318-7601
5  Email: Matthew.Lepore@usdoj.gov

6  DONNA S. FITZGERALD
   Connecticut Bar No. 411810
7  Trial Attorney
   United States Department of Justice
8  Environment & Natural Resources Division
   Natural Resources Section
9  P.O. Box 663
   Washington D.C. 20044-0663
10 Tel: (202) 305-0476; Fax: (202) 353-7763
   E-mail: Donna.Fitzgerald@usdoj.gov

11
12 (See signature page for complete DOJ attorney list)

13 Attorneys for Defendants John Ashcroft, Tom
   Ridge, Asa Hutchinson, Robert C. Bonner,
   Michael J. Garcia, and Eduardo Aguirre, Jr.
14

15              UNITED STATES DISTRICT COURT
16
             SOUTHERN DISTRICT OF CALIFORNIA
17
   SIERRA CLUB, et al.,                  )   Case No. 04cv0272 LAB (LDA)
18                                       )
                       Plaintiffs,       )   Action Filed:  February 10, 2004
19        v.                             )
                                         )   Hearing Date: December 12, 2005
20 JOHN ASHCROFT, et al.,                )   Hearing Time:10:30 a.m.
                                         )   Courtroom:    9 (Hon. Larry A. Burns)
21                     Defendants.       )
                                         )   ORAL ARGUMENT SCHEDULED
22 _____)

23

24

     DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN
25 RESPONSE TO PLAINTIFFS' OPENING BRIEF RESPONDING TO THE COURT'S
     ORDER TO SHOW CAUSE WHY THIS CASE SHOULD NOT BE DISMISSED
26

27

28

                            36

1

**TABLE OF CONTENTS**

2                                                                                                    Page

3    INTRODUCTION                                                                                      1

4    FACTUAL AND STATUTORY BACKGROUND                                                                  2

5        1.    The Illegal Immigration Reform And Immigrant Responsibility Act of 1996                 2

6        2.    Construction Of The BIS And Environmental Analyses                                       3

7        3.    The Homeland Security Act Of 2002                                                        3

8        4.    The Waiver Legislation And September 2005 Waiver                                         4

9        5.    Plaintiffs' Lawsuit And NEPA                                                             4

10   ARGUMENT                                                                                           6

11       1.    The Waiver Legislation Does Not Violate The Non-Delegation Doctrine                      6

12       2.    Application Of The Waiver Legislation Is Not Impermissibly Retroactive                  12

13             A.    Plaintiffs' retroactivity claim is not premised upon a constitutional theory     12

14             B.    Plaintiffs' retroactivity claim nonetheless fails both
                     prongs of the Landgraf test                                                       13

15                   i.    Congress intended the Waiver to apply to this suit                          14

16                   ii.   The Waiver Legislation has no impermissible retroactive effect              16

17       3.    The Waiver Does Not Violate Article III, Section 1                                       18

18   CONCLUSION                                                                                         23

19

20

21

22

23

24

25

26

27

28

i

1

**TABLE OF AUTHORITIES**

2

Cases                                                                                      Page

3  Acree v. Republic of Iraq
      370 F.3d 41 (D.C. Cir. 2004)                                                          13,21,22
4

   A.L.A. Schechter Poultry Corp. v. United States
5     295 U.S. 495 (1935)                                                                   9,10,11

6  American Power & Light Co. v. Securities and Exchange Comm'n
      329 U.S. 90 (1946)                                                                    6
7

   Baltimore Gas & Electric Co. v. NRDC
8     462 U.S. 87 (1983)                                                                    5

9  Bruner v. United States
      343 U.S. 112 (1952)                                                                   18
10

   Cisneros v. Alpine Ridge Group
11    508 U.S. 10 (1993)                                                                    14

12 City of Olmsted Falls, Ohio v. Federal Aviation Admin.
      292 F.3d 261 (D.C. Cir. 2002)                                                         5
13

   Clinton v. New York
14    524 U.S. 417 (1998)                                                                   22

15 Dames & Moore v. Regan
      453 U.S. 654 (1981)                                                                   22
16

   Department of the Navy v. Egan
17    484 U.S. 518 (1988)                                                                   8

18 Freedom to Travel Campaign v. Newcomb
      82 F.3d 1431 (9th Cir. 1996)                                                          8
19

   Ground Zero Ctr for Non-Violent Action v. Department of Navy
20    383 F.3d 1083 (9th Cir. 2004)                                                         16

21 Hughes Aircraft Co. v. United States ex rel. Schumer
      510 U.S. 939 (1997)                                                                   17
22

   INS v. Aguirre-Aguirre
23    526 U.S. 415, 425 (1999)                                                              8

24 INS v. St. Cyr
      533 U.S. 289 (2001)                                                                   13,17
25

   Jones v. United States
26    137 U.S. 202 (1890)                                                                   21

27 J.W. Hampton, Jr. & Co. v. United States
      276 U.S. 394 (1928)                                                                   6
28

| | | |
|---|---|---|
| Knauff v. Shaughnessy | | |
| 338 U.S. 537 (1950) | | 8,9 |
| Landgraf v. USI Film Prods. | | |
| 511 U.S. 244 (1994) | | PASSIM |
| Lindh v. Murphy | | |
| 521 U.S. 320 (1997) | | 13 |
| Loving v. United States | | |
| 517 U.S. 748, 772 (1996) | | 2,6,8,11 |
| Lyon v. Agusta S.P.A. | | |
| 252 F.3d 1078 (9th Cir. 2001) | | 14,16 |
| Matimak Trading Co. v. Khalily | | |
| 118 F.3d 76 (2nd Cir. 1997), cert. denied 522 U.S. 1091 (1998) | | 21 |
| Miller v. Federal Communications Comm'n | | |
| 66 F.3d 1140 (11th Cir. 1995) | | 20 |
| Mistretta v. United States | | |
| 488 U.S. 361 (1989) | | 6,7,11 |
| National Broadcasting Co. v. United States | | |
| 319 U.S. 190 (1943) | | 1,11 |
| Neves v. Kolaski | | |
| 602 F. Supp. 645 (D.R.I. 1985) | | 21 |
| New York Central Securities Corp. v. United States | | |
| 287 U.S. 12 (1932) | | 11 |
| Panama Refining Co. v. Ryan | | |
| 293 U.S. 388 (1935) | | 9,10,11 |
| People's Mojahedin Org. of Iran v. U.S. Department of State | | |
| 182 F.3d 17 (D.C. Cir. 1999), cert. denied, 529 U.S. 1104 (2000) | | 8 |
| Rein v. Socialist People's Libyan Arab Jamahiriya | | |
| 162 F.3d 748 (2nd Cir. 1998) | | 20,21 |
| Robertson v. Methow Valley Citizens Council | | |
| 490 U.S. 332 (1989) | | 5,16 |
| Seals v. United States | | |
| 319 F. Supp.2d 741 (W.D. Tx. 2004) | | 21 |
| Sierra Club v. Slater | | |
| 120 F.3d 623 (6th Cir. 1997) | | 18 |
| Skinner v. Mid-America Pipeline Co. | | |
| 109 S. Ct. 1726 (1989) | | 19 |
| Strycker's Bay Neighborhood Council, Inc. v. Karlen | | |
| 444 U.S. 223 (1980) | | 16 |

04cv0272

Sunshine Anthracite Coal Co. v. Adkins
310 U.S. 381 (1940)                                             11

Touby v. United States
500 U.S. 160 (1991)                                            1,7

United States v. Curtiss-Wright Export Corp.
299 U.S. 304 (1936)                                             8

United States v. Mitchell
18 F.3d 1355 (7th Cir. 1994)                                    21

Whitman v. American Trucking Ass'ns, Inc.
531 U.S. 457 (2001)                                        1,7,9,10

Zemel v. Rusk
381 U.S. 1 (1965)                                               8

Statutes, Public Laws, Federal Regulations, and Other

6 U.S.C. § 251                                                   3

6 U.S.C. § 256                                                   4

6 U.S.C. § 291                                                   3

8 U.S.C. §1103                                                   4

16 U.S.C. § 1531                                                 3

16 U.S.C. § 1536                                                 3

Administrative Procedure Act, 5 U.S.C. § 551, et. seq.          4

Coastal Zone Management Act, 16 U.S.C. § 1451, et. seq.         3

Endangered Species Act of 1973                                  3

Federal Water Pollution Control Act, 33 U.S.C. § 1251, et. seq. 4

Homeland Security Act of 2002
Pub. L. 107-296, 116 Stat. 2195                                3,7

Illegal Immigration Reform and Immigrant Responsibility Act of 1996
Pub. L. No. 104-208, 8 U.S.C. § 1103                         2,3,17

Migratory Bird Treaty Act, 16 U.S.C. § 703, et. seq.           4

National Environmental Policy Act of 1969                  PASSIM

National Historic Preservation Act, 16 U.S.C. § 470 et. seq.   4

Pub. L. No. 109-13, 119 Stat. 231, 8 U.S.C. § 1103 Note    PASSIM

04cv0272

| | | |
|---|---|---|
| 1 | Pub. L. No. 108-7, Division L, § 105 | 3 |
| 2 | 70 Fed. Reg. 55,622-55,623 | PASSIM |
| 3 | H. Rep. No. 109-72, 2005 U.S.C.C.A.N. 240 (May 3, 2005) | 3,15,16,19 |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

On September 13, 2005, pursuant to authority expressly granted to him by Pub. L. No. 109-13, § 102(c) (the "Waiver Legislation" or "§ 102(c)"), the Secretary of Homeland Security waived the applicability of the National Environmental Policy Act of 1969 ("NEPA"), as well as other statutes, with respect to the construction of the 14-mile Border Infrastructure System ("BIS") along the U.S. border with Mexico. 70 Fed. Reg. 55,622-623. Because Plaintiffs' lawsuit is based solely upon claims that the Secretary has not complied with NEPA in constructing the BIS, the Secretary's exercise of his waiver authority has eliminated the only cause of action that Plaintiffs have asserted. Dismissal of this action is thus required.

Seeking to avoid this outcome, Plaintiffs challenge the constitutionality of the Waiver Legislation itself (as well as the Secretary's exercise of the Waiver here), which contains an express grant of power by Congress to the Secretary to waive "all legal requirements" that he determines to be "necessary to ensure expeditious construction" of the BIS. § 102(c). Secretary Chertoff has determined that NEPA was one such legal requirement, 70 Fed. Reg. 55,623, and Plaintiffs do not challenge this specific determination. Rather, Plaintiffs allege that the Waiver Legislation constitutes an unconstitutional delegation of legislative power, is unconstitutionally retroactive as applied to Plaintiffs' pending suit, and is an unconstitutional delegation of Congress's Article III power to set the jurisdiction of the federal judiciary. These three claims are without merit.

Because Congress could not function without the ability to delegate in broad directives, it is now well-established by decades of Supreme Court precedent that Congress need only state a mere "intelligible principle" in delegating powers to the Executive Branch. The Supreme Court has thus upheld as sufficiently "intelligible" such sweeping delegations as to take action in the general "public interest, convenience, or necessity," National Broadcasting Co. v. United States, 319 U.S. 190 (1943), or that is "requisite to protect public health," Whitman v. American Trucking Ass'ns, Inc., 531 U.S. 457 (2001), or "necessary to avoid an imminent hazard to the public safety," Touby v. United States, 500 U.S. 160 (1991). Certainly, then, the standard that Congress has established here – the Secretary may waive laws when he determines it "necessary to ensure the

1

1 | expeditious construction" of the BIS, § 102(c) – is more than constitutionally sufficient. Indeed,

2 | the Court has instructed that where the area to which the legislation pertains is one where the

3 | Executive Branch already maintains significant independent constitutional authority, delegations

4 | may be *even broader*. <u>Loving v. United States</u>, 517 U.S. 748, 772 (1996). Here, the waiver exists

5 | in a statutory scheme addressing matters of immigration, national security, and foreign affairs, all

6 | of which fall within the Executive Branch's independent constitutional domain. Plaintiffs' attempt

7 | to require Congress to have included more specificity in the Waiver Legislation is baseless.

8 |     Nor is the application of the Secretary's Waiver to this pending suit impermissibly

9 | retroactive, as the Waiver Legislation satisfies *both* prongs (only one if which must be met) of the

10 | two-part test set out by the Supreme Court in <u>Landgraf v. USI Film Prods.</u>, 511 U.S. 244 (1994).

11 | First, it is clear from the text, purpose, and legislative history of the Waiver Legislation that

12 | Congress intended the statute to apply to this lawsuit. Furthermore, in light of such factors as

13 | NEPA's procedural nature, the prospective nature of the relief that Plaintiffs seek, and Plaintiffs'

14 | reasonable "rights" and expectations in bringing this NEPA action, it is apparent that the

15 | Secretary's actions have had no truly retroactive effect upon this suit.

16 |     Finally, Plaintiffs seek to mount a third challenge to the waiver, claiming that Congress

17 | impermissibly has delegated to the Secretary its power to set federal court jurisdiction. But there

18 | is little, if any, support for such a doctrine independent of the non-delegation doctrine. As set forth

19 | below, no heightened or different standards apply to a Congressional delegation merely because it

20 | provides authority to the Executive to take actions that may relate to the types of actions a court

21 | may hear. The delegation must state no more than an "intelligible principle," a standard easily

22 | satisfied here.

23 |     **FACTUAL AND STATUTORY BACKGROUND**

24 | **1.    The Illegal Immigration Reform And Immigrant Responsibility Act of 1996**

25 |     The underlying suit challenges the ongoing construction of the BIS, which was authorized

26 | in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L.

27 | No. 104-208, 8 U.S.C. § 1103 Note, in an effort by Congress to increase control over illegal

28 | immigration. Section 102 of IIRIRA required "the Attorney General . . . [to] take such actions as

1   may be necessary to install additional physical barriers and roads (including the removal of

2   obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal

3   crossings in areas of high illegal entry into the United States," including specifically the

4   construction, "along the 14 miles of the international land border of the United States, starting at

5   the Pacific Ocean and extending eastward, of second and third fences, in addition to the existing

6   reinforced fence, and for roads between the fences." IIRIRA at § 102(b)(1). Regarding this

7   construction, Section 102(c) provided that the Endangered Species Act of 1973 ("ESA") and

8   NEPA were "waived to the extent the Attorney General determine[d] necessary to ensure

9   expeditious construction" of barriers and roads under Section 102.

10   **2.**     **Construction Of The BIS And Environmental Analyses**

11          Pursuant to IIRIRA, the United States Border Patrol, a sub-agency within the Immigration

12   and Naturalization Service ("INS"), began constructing the BIS and prepared a series of NEPA

13   analyses of the environmental impact, including a 2003 environmental impact statement ("EIS")

14   analyzing the impact of the entire BIS. (Compl. at ¶ 21; Ans. at ¶21.) Moreover, in compliance

15   with Section 7 of ESA, 16 U.S.C. §§ 1531, 1536, Border Patrol consulted with the U.S. Fish and

16   Wildlife Service ("FWS"), which issued a Biological Opinion that the fence would cause "no

17   jeopardy" to a listed species. (Ans. at ¶ 44.) Border Patrol also prepared a statement for the

18   California Coastal Commission pursuant to the Coastal Zone Management Act ("CZMA"), 16

19   U.S.C. § 1451 et. seq., determining that the portion of the BIS that would extend through

20   California's coastal zone would be consistent with the state's coastal plan to the maximum extent

21   practicable."[1]  H. Rep. No. 109-72  at 171, 2005 U.S.C.C.A.N. 240, 296 (2005).

22   **3.**     **The Homeland Security Act Of 2002**

23          Responsibility for the BIS transferred from the Attorney General to the Department of

24   Homeland Security ("DHS") with passage of the Homeland Security Act of 2002, Pub. L. No. 107-

25   296; see also Pub. L. No. 108-7, Division L, § 105. The Act essentially created DHS from other

26   departments, abolished INS, and transferred Border Patrol functions to the Under Secretary for

27   Border and Transportation Security at DHS. See 6 U.S.C. §§ 251, 291. The Act also amended

28

---

[1]  The Commission rejected this determination. Id.

1   IIRIRA to state that the Secretary of DHS has the power and duty to control and guard U.S.

2   borders against illegal entry. 8 U.S.C. §1103(a)(5). Finally, the Act specifically identified the BIS

3   and expressed "the sense of the Congress that completing the 14-mile border fence project

4   required to be carried out under section 102(b) of [IIRIRA] *should be a priority for the Secretary.*"

5   6 U.S.C. § 256 (emphasis added).

6   **4.    The Waiver Legislation And September 2005 Waiver**

7        In 2005, as part of the REAL ID Act, Congress amended the IIRIRA waiver provision

8   discussed above (Section 102(c)) to provide the Secretary of DHS authority to "waive all legal

9   requirements" that he determines, in his "sole discretion," are "necessary to ensure expeditious

10   construction" of the barriers and roads authorized under Section 102(c) of IIRIRA. See §

11   102(c)(1) of Pub. L. No. 109-13, 119 Stat. 231, 8 U.S.C. § 1103 Note. The Waiver Legislation

12   makes waivers effective upon publication in the Federal Register and limits challenges to alleged

13   violations of the Constitution (if brought within 60 days). § 102(c)(1), (2). District courts have

14   exclusive jurisdiction over such challenges, and only the Supreme Court may hear appeals (upon

15   petition for a writ of certiorari). Id.

16        On September 13, 2005, Secretary Chertoff exercised his discretion under the Waiver

17   Legislation and waived the application of eight statutes – including NEPA,[2/] the basis for Plaintiffs'

18   suit – that he deemed to be an impediment to the "expeditious construction" of the BIS (the

19   "Waiver"). 70 Fed. Reg. 55,622-23. In the Waiver, the Secretary highlights Congress's desires

20   that the BIS be a priority for the Secretary, and notes that nine years passed since IIRIRA was

21   enacted, and the project "remains incomplete." Id. at 55,623.

22   **5.    Plaintiffs' Lawsuit And NEPA**

23        The underlying suit was filed in February 2004 and challenges the construction of the BIS

24

25

26

---

27        [2/] The other statutes that the Secretary waived are the ESA, CZMA, the Federal Water Pollution
28   Control Act, 33 U.S.C. § 1251 et. seq., the National Historic Preservation Act, 16 U.S.C. § 470 et. seq.,
     the Migratory Bird Treaty Act, 16 U.S.C. § 703 et. seq., the Clean Air Act, 42 U.S.C. § 7401 et. seq.,
     and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et. seq.

under a variety of NEPA arguments.[3/]  Plaintiffs seek a declaration that, among other things, "starting and continuing any construction" of the BIS would be unlawful, and an injunction on "any and all construction activities on the [BIS] until Defendants fully comply with NEPA."[4/] (Compl., Relief Requested.)

NEPA requires federal agencies to examine the environmental effects of proposed federal actions and inform the public of the environmental concerns that went into the agency's decision-making.  Baltimore Gas & Electric Co. v. NRDC, 462 U.S. 87, 97 (1983).  Under NEPA, agencies must prepare EIS's on all proposals for "major federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  The long-established twin purposes of NEPA ensure:

> that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts . . . [and] that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989).  NEPA is merely procedural and does not require an agency to reach a particular result based on the information it collects and analyzes.  Id. at 350-351.  "When reviewing [a NEPA document], it does not matter whether [the Court] agree[s] with the agency's conclusions."  City of Olmsted Falls, Ohio v. Federal Aviation Admin., 292 F.3d 261, 273 (D.C. Cir. 2002).

On September 20, 2005, the Court issued an Order to Show Cause as to why this case should not be dismissed in light of the Waiver.  Because Plaintiffs cannot maintain a NEPA suit now that NEPA has been waived as to construction of the BIS, this case must be dismissed.

---

[3/]  Specifically, Plaintiffs allege that the agency illegally segmented and fragmented the BIS and unlawfully failed to 1) prepare an EIS for construction in the first three areas of the BIS; 2) consider cumulative impacts of the BIS; 3) consider reasonable alternatives to the BIS; 4) discuss federal, state, and local legal inconsistencies of the BIS; and 5) prepare a proper EIS for the last three areas of the BIS. (See Compl.)

[4/]  Defendants answered in May 2004, denying Plaintiffs' claims and raising the affirmative defenses of statute of limitations, laches, and ripeness as to certain claims.  (See Ans.)

1       **ARGUMENT**

2    **1.    The Waiver Legislation Does Not Violate The Non-Delegation Doctrine**

3           Plaintiffs claim that the Waiver Legislation violates the non-delegation doctrine by

4    impermissibly "delegating a legislative function to the Secretary of Homeland Security." (Pls'

5    Memo. at 3-4.)  Even a cursory examination of the Waiver Legislation, however, demonstrates that

6    it is not an improper delegation.

7           The non-delegation doctrine requires that Congress "lay down by legislative act an

8    *intelligible principle* to which the person or body authorized [to exercise the delegated authority]

9    is directed to conform." Mistretta v. United States, 488 U.S. 361, 372 (1989) (emphasis added)

10   (citing J.W. Hampton, Jr. & Co. v. United States, 276 U.S. 394, 409 (1928)).  Rooted in "common

11   sense and the inherent necessities of the government co-ordination," this minimal requirement

12   stems from the "practical understanding that in our increasingly complex society, replete with ever

13   changing and more technical problems, Congress simply cannot do its job absent an ability to

14   *delegate power under broad general directives.*" Mistretta, 488 U.S. at 372 (citations omitted); see

15   also Loving v. United States, 517 U.S. 748, 773 (1996) ("Separation-of-powers principles are

16   vindicated, not disserved, by measured cooperation between the two political branches of the

17   Government, each contributing to a lawful objective through its own processes.").  To set forth a

18   constitutionally permissible "intelligible principle" while delegating authority to one of its

19   coordinate Branches, Congress needs only to "'clearly delineate[] the general policy, the public

20   agency which is to apply it, and the boundaries of this delegated authority.'" Mistretta, 488 U.S. at

21   372-73 (quoting American Power & Light Co. v. Securities and Exchange Comm'n, 329 U.S. 90,

22   105 (1946)).

23          The Waiver Legislation meets these requirements and is thus constitutionally sufficient.

24   As an initial matter, the Waiver is expressly vested in the Secretary of DHS.  See § 102(c)(1).  The

25   Waiver further contains a "clearly delineate[d] general policy" of improving U.S. border

26   protection, § 102(a) (actions to be taken are those "as may be necessary to install additional

27   physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in

28   the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into

                                        6

                                                                                    04cv0272

1 the United States"), as well as a required method of achieving this important goal in one

2 geographic area: the "construction of fencing and road improvements in the border area near San

3 Diego, California," § 102(b).[5] In furtherance of the general homeland security policy and the

4 specific Congressional requirement to construct the fence at this issue in this case, the Waiver

5 Legislation permits the Secretary to "waive all legal requirements [that he] determines *necessary*

6 *to ensure expeditious construction of the barriers and roads* under this section." § 102(c)

7 (emphasis added). Not only does this clause (and the surrounding statutory framework) establish a

8 policy to guide the Secretary (i.e., that improved border protection is a high Congressional

9 priority), but it also marks the "boundaries of this delegated authority." See Mistretta, 488 U.S. at

10 372-73. The Waiver may be exercised *only* when the Secretary makes a *determination of*

11 *necessity*.[6]

12      Indeed, in American Trucking, the Supreme Court found constitutionally permissible a

13 delegation to EPA of authority "to set air quality standards at the level that is 'requisite,' that is, *not*

14 *lower or higher than is necessary* – to protect the public health." 531 U.S. at 474-76 (emphasis

15 added); see also Touby, 500 U.S. at 163 (approving delegation to Attorney General to designate

16 drug as controlled substance for purposes of criminal drug enforcement if doing so was "necessary

17 to avoid an imminent hazard to the public safety"). Accordingly, the Supreme Court already has

18 determined that a standard of "necessity" – exactly the standard set out in the Waiver Legislation –

19 "fits comfortably within the scope of discretion permitted by [its] precedent." 531 U.S. at 475-76.

20 There is no reason to look any further.

21      Moreover, the legislation relates to matters of both foreign affairs and national security,

22 areas over which the Executive Branch independently maintain significant constitutional authority.

23

24      [5] See also the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2195, § 446 ("It is
the sense of the Congress that completing the 14-mile border fence project required to be carried out

25 under section 102(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8
U.S.C. 1103 note) should be a priority for the Secretary [of Homeland Security].").

26

27      [6] It is important to note that the Waiver Legislation does not authorize the Secretary to repeal
laws; it only permits him to waive them under certain circumstances. NEPA and the other statutory

28 provisions made inapplicable by the Waiver on September 22, 2005 thus remain law and are fully
applicable outside of the context of the "construction of barriers and roads along the international land
border of the United States in California." 70 Fed. Reg. 55,622.

1   See, e.g., United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319-20 (1936) (discussing

2   "the very delicate, plenary and exclusive power of the President as the sole organ of the federal

3   government in the field of international relations"); Department of the Navy v. Egan, 484 U.S.

4   518, 527 (1988) (President's constitutional duties and responsibilities as Commander in Chief

5   include broad authority to classify and control access to information bearing on national security);

6   People's Mojahedin Org. of Iran v. U.S. Department of State, 182 F.3d 17 (D.C. Cir. 1999)

7   (declining to review determinations regarding national security made by the Executive), cert.

8   denied, 529 U.S. 1104 (2000).  Immigration policy falls squarely within these areas.  See Knauff v.

9   Shaughnessy, 338 U.S. 537, 542-43 (1950) ("The exclusion of aliens is a fundamental act of

10   sovereignty . . . [and] is inherent in the executive power to control the foreign affairs of the

11   nation.") (citations omitted); see also INS v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999) ("we have

12   recognized that judicial deference to the Executive Branch is especially appropriate in the

13   immigration context where officials 'exercise especially sensitive political functions that implicate

14   questions of foreign relations.'") (citation omitted).

15       Because the Waiver Legislation delegates power to the Executive Branch to take action in

16   an area over which it already maintains significant independent control, Congress may delegate in

17   even broader terms than generally used.  See Loving, 517 U.S. at 772 ("same limitations on

18   delegation do not apply 'where the entity exercising the delegated authority itself possesses

19   independent authority over the subject matter'") (quotation and citations omitted); Freedom to

20   Travel Campaign v. Newcomb, 82 F.3d 1431, 1438 (9th Cir. 1996) ("It is well settled that

21   'Congress – in giving the Executive authority over matters of foreign affairs – must of necessity

22   paint with a brush broader than it customarily wields in domestic areas.'") (quoting Zemel v. Rusk,

23   381 U.S. 1, 17 (1965)).  Addressing the precise issue raised by the Waiver here – Congressional

24   delegation to the Executive Branch in the area of immigration policy – the Supreme Court

25   explained clearly in Knauff the interrelated concepts of delegation and deference in foreign affairs

26   matters like immigration policy:

27                    When Congress prescribes a procedure concerning
                        the admissibility of aliens, it is not dealing alone with

28                    a legislative power. *It is implementing an inherent*
                   *executive power*. . . . Normally Congress supplies the

8

conditions of the privilege entry into the United States. *But because the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power . . . for the best interests of the country . . .*

338 U.S. at 542-43 (citations omitted) (emphasis added). Accordingly, not only does the Waiver Legislation satisfy the "intelligible principle" test established by decades of Supreme Court jurisprudence, but when viewed through the required deferential lens relating to matters of national security and foreign affairs, i.e., immigration, it can only be concluded that Congress appropriately delegated authority to the Secretary to take necessary actions to protect U.S. borders.

Plaintiffs, however, ignore an entire history of Supreme Court precedent to conclude the opposite. Instead relying exclusively on what appear to be the only two instances "[i]n the history of the Court [where it has] found the requisite 'intelligible principle' lacking," Whitman v. American Trucking Ass'ns, Inc., 531 U.S. 457, 474 (2001), and referring to those cases as "The controlling authorities," Plaintiffs contend that the Waiver Legislation constitutes an unconstitutional delegation of authority to the Executive Branch. But both cases, Panama Refining Co. v. Ryan, 293 U.S. 388 (1935) and A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935), are wholly inapposite and do not support (let alone compel) a determination that the Waiver Legislation is an unconstitutional delegation.

In Panama Refining, the Supreme Court found no intelligible principle – indeed, no principle at all – in Congress's delegation to the President of authority "to prohibit the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any State law," regulation or order. 293 U.S. at 406 (quoting § 9(c) of title 1 of the National Industrial Recovery Act of June 16, 1933, 48 Stat. 195, 200). Because the delegation did "not state whether or in what circumstances or under what conditions the President [wa]s to prohibit the transportation of the amount of petroleum or petroleum products produced in excess of the state's permission," and because it failed to "require any finding by the President as a condition

9

04cv0272

1    of his action," the Court found it unconstitutional.[2/] Id. at 415. As the Court would later describe

2    its decision, Congress had "provided *literally no guidance* for the exercise of discretion."

3    American Trucking Ass'ns, 531 U.S. at 474 (discussing Panama Refining) (emphasis added).

4         While Plaintiffs strain to characterize the Waiver Legislation as analogous to the National

5    Industrial Recovery Act, it is not, as demonstrated by the simple fact that the Secretary must make

6    a finding of necessity before utilizing the waiver. Only if the Secretary determines it "necessary to

7    ensure expeditious construction of the barriers and roads" under section 102(c) may he utilize the

8    Waiver to waive legal requirements that present an obstacle to achieving the Act's important goals.

9    The various ways that Plaintiffs say Congress could have provided more details are irrelevant –

10   and seriously impractical given Congress's clear intent that the stalled fence project be completed

11   at once, in the interest of national security (see, e.g., Pls' Memo. at 10 (alleging that Congress did

12   not require the Secretary to "compare the pace of construction on roads and barriers to comparable

13   federal projects in order to determine whether any particular law is in fact actually holding up

14   construction of the roads and barriers")) – as all that is required is an "intelligible" standard for the

15   agency to follow. Such a standard is present here, see American Trucking, 531 U.S. at 475-76,

16   and when the broad and significant homeland security policies and requirements set out in the Act

17   are considered – not to mention deference to the Executive Branch over matters relating to

18   national security and foreign affairs – the disparity between this case and Panama Refining is

19   readily apparent.

20        The Supreme Court's decision in A.L.A. Schechter is similarly inapposite. There, the

21   Court struck down a delegation that had "conferred authority to regulate *the entire economy* on the

22   basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'"

23   American Trucking, 531 U.S. at 474 (emphasis added). The Court found the delegation so broad

24   as to be "without precedent" – "suppl[ying] no standards for any trade, industry, or activity." 295

25   U.S. at 541. Indeed, the Court found the "delegation" to be far more than the mere delegation of a

26   limited authority to take certain measures to facilitate a Congressional dictate; instead, the Court

27

28

---

[2/] The Court also was particularly concerned that "disobedience to [the President's] order [wa]s made a crime punishable by fine and imprisonment." 293 U.S. at 415.

1  held that Congress had authorized the President to take "unfettered" action to essentially "enact[]

2  laws for the government of trade and industry throughout the country." Id. at 541-42. The limited

3  delegation to the Secretary of DHS here – solely to facilitate the speedy construction of certain

4  barriers and roads to improve U.S. border security – simply does not compare.

5      Panama Refining and A.L.A. Schechter are poor models for the application of the

6  "intelligible principle" theory today (and for the last 70 years).[8/] As the Supreme Court explained,

7  decades after the two cases were decided, "[t]hough in 1935 we struck down two delegations for

8  lack of an intelligible principle, [Panama Refining and A.L.A. Schechter], we have since upheld,

9  without exception, delegations under standards phrased in *sweeping terms*." Loving, 517 U.S. at

10  771 (citation omitted) (emphasis added). And Justice Scalia has stated, on the same subject:

11

12  > As the Court points out, we have invoked the doctrine
> or unconstitutional delegation to invalidate a law only
> twice in our history, over half a century ago.

13  > [Panama Refining; A.L.A. Schechter] *What legislated
> standard, one must wonder, can possibly be too*

14  > *vague to survive judicial scrutiny, when we have
> repeatedly upheld, in various contexts, a 'public*

15  > *interest' standard?*

16  Mistretta, 488 U.S. at 416 (Scalia, J., dissenting) (emphasis added) (citing National Broadcasting

17  Co., 319 U.S. at 216-217 (upholding delegation to FCC to regulate radio broadcasting according to

18  "public interest, convenience, or necessity"); New York Central Securities Corp. v. United States,

19  287 U.S. 12, 24-25 (1932) (upholding delegation to Interstate Commerce Commission to authorize

20  mergers of railroad companies if it finds them "in the public interest")).

21      If the general "public interest, convenience, or necessity" was "not to be interpreted as

22  setting up a standard so indefinite as to confer an unlimited power," National Broadcasting Co.,

23  319 U.S. at 216 (citation omitted), it is difficult to see how the standard set forth in the Waiver

24  Legislation – "necessary to ensure expeditious construction of the barriers and roads," § 102(c) –

25

26      [8/] Similarly, Plaintiffs' examples of cases on the opposite of the end of the spectrum – where
the Supreme Court has upheld delegations as constitutional – hardly set the norm. For example, in

27  Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 915 (1940), the Court found the delegation
"standards which Congress has provided [to] far exceed in specificity others which have been

28  sustained." "To require more would be to insist on a degree of exactitude which not only lacks legal
necessity but which does not comport with the requirements of the administrative process." Id.

1   should be so interpreted.  Indeed, Plaintiffs make an important concession in their brief, agreeing

2   that this *exact standard* was in fact constitutional under the original Waiver provision:

> Lastly, the unconstitutionality of the Waiver
> Legislation is evident from a comparison of Section
> 102(c)'s original and current versions. *There was no*
> *unlawful delegation of the legislative function under*
> *the original version because Congress itself decided*
> *to waive NEPA, subject only to the Attorney*
> *General's determination that the waiver was*
> *'necessary to ensure expeditious construction of the*
> *roads and barriers under this section.'*

8   (Pls' Memo. at 11 (emphasis added).)  But the precondition to waiver – a determination that certain

9   laws are impeding "expeditious construction of the roads and barriers" – is identical in the two

10  Waiver provisions.  The sole difference is that Congress identified two laws in the earlier

11  provision (NEPA and ESA), and did not in the current provision.  In simply broadening the

12  Secretary's waiver authority beyond those two statutory schemes, while still leaving in place what

13  Plaintiffs concede is a constitutional "intelligible principle" that requires the Secretary to make a

14  finding of necessity, the amended Waiver Legislation does not offend the Constitution.[9]

15  **2.  Application Of The Waiver Legislation Is Not Impermissibly Retroactive**

16      Plaintiffs' also claim that application of the Waiver Legislation to this suit is impermissibly

17  retroactive.  This assertion fails for several reasons.

18      **A.  Plaintiffs' retroactivity claim is not premised upon a constitutional theory**

19      As a preliminary matter, it is not apparent that Plaintiffs' argument is premised on the

20  Constitution, and under the Waiver Legislation, this Court may *only* hear claims "alleging a

21  violation of the Constitution of the United States."  Act at § 102(c)(2)(A).  While the

22  "antiretroactivity principle finds expression in several provisions of our Constitution" – <u>e.g.</u>, the

23  <u>Ex Post Facto</u> clause, the prohibition on "bills of attainder," etc., <u>see</u> <u>Landgraf</u>, 511 U.S. at 266 –

24  Plaintiffs fail to identify any of these constitutional provisions in support of their claim.  The only

25

---

26  [9]  Plaintiffs' unequivocal concession undercuts most of their factual challenges to the current
    Waiver.  For example, they claim it to be "impossible to discern what was meant by the phrase
27  'necessary to ensure expeditious construction' because the Waiver Legislation contains no deadlines, no
    model schedule for construction, no hint as to what Congress considered to be a *reasonable* delay." (Pls'
28  Memo. at 10 (emphasis in original).)  Nor did the original Waiver contain such details, and Plaintiffs
    admit it was constitutionally permissible.

1   "constitutional concerns" that Plaintiffs raise regarding retroactivity are "separation-of-powers

2   concerns over matters of delegation and federal-court jurisdiction, as discussed earlier in th[eir]

3   brief." (Pls' Memo. at 23-24.) Thus, Plaintiffs do not state a distinct constitutional challenge

4   based upon retroactivity, and this Court thus lacks jurisdiction to consider the claim. See §

5   102(c)(2)(A).

6          Moreover, "[a]bsent a violation of one of th[e] specific [constitutional] provisions [related

7   to retroactivity], the potential unfairness of retroactive civil legislation is not a sufficient reason for

8   a court to fail to give a statute its intended scope." Landgraf, 511 U.S. at 267. Accordingly,

9   Plaintiffs' failure to assert a valid retroactivity constitutional theory defeats this Court's jurisdiction

10  under the Waiver Legislation and defeats any retroactivity claim they could bring even absent the

11  Waiver.

12         **B.    Plaintiffs' retroactivity claim nonetheless fails both prongs of the Landgraf test**

13         When a case implicates a statute enacted (or amended) after the events in suit, such as here,

14  the doctrine of non-retroactivity precludes application of the statutory provision only if Congress

15  has not clearly prescribed the statute's reach *and* the statute would have a genuinely retroactive

16  effect. Landgraf, 511 U.S. at 280; Lindh v. Murphy, 521 U.S. 320, 324 (1997). A statute,

17  however, is not deemed to have retroactive effect "merely because it is applied in a case arising

18  from conduct antedating the statute's enactment, or upsets expectations based on prior law."

19  Landgraf, 511 U.S. at 269 (citation omitted). Rather, a statute has a true retroactive effect only

20  "when it takes away or impairs vested rights acquired under existing laws, or creates a new

21  obligation, imposes a new duty, or attaches a new disability, in respect to transactions or

22  considerations already past." INS v. St. Cyr, 533 U.S. 289, 321 (2001) (internal quotation marks

23  omitted); see also Acree v. Republic of Iraq, 370 F.3d 41, 64 (D.C. Cir. 2004) (Roberts, J.,

24  concurring) ("the pertinent question – assuming Congress had not explicitly addressed

25  retroactivity – was whether the statute spoke to the power of the court or instead to the substantive

26  rights of the parties"). Moreover, "the judgment whether a particular statute acts retroactively

27  should be informed and guided by familiar considerations of fair notice, reasonable reliance, and

28  settled expectations." Id. (internal quotation marks omitted).

04cv0272

1    Under these well-established principles, the Waiver Legislation must be held applicable to

2    this NEPA action. Not only is Congress's intent clear in this regard, but as the relevant case law

3    demonstrates, the statutory provision is not impermissibly retroactive in effect. This Court

4    therefore should uphold the Secretary's Waiver of NEPA (and other laws) and dismiss this suit.

5    **i.    Congress intended the Waiver to apply to this suit**

6    A court "must first 'determine whether Congress has expressly prescribed the statute's

7    proper reach. If Congress has done so, of course, there is no need to resort to judicial default

8    rules.'" Lyon v. Agusta S.P.A., 252 F.3d 1078, 1084-85 (9th Cir. 2001) (quoting Landgraf, 511

9    U.S. at 280). While the Waiver Legislation does not speak of "retroactivity," its text, purpose, and

10   legislative history – the same things examined by the Supreme Court in Landgraf, 511 U.S. at 262-

11   63[10] – demonstrate Congress's intent to allow the Secretary to waive laws that were currently the

12   subject of litigation.

13   The provision begins with the unequivocal clause, "Notwithstanding any other provision of

14   law," which alone sends a strong Congressional message. The Supreme Court has held that the

15   "use of such a 'notwithstanding' clause signals the drafter's intention that the provisions of the

16   'notwithstanding' section override conflicting provisions of any other section" and observed that

17   "[l]ikewise, the Courts of Appeals generally have interpreted similar 'notwithstanding' language . .

18   . to supersede all other laws, stating that [a] clearer statement is difficult to imagine." Cisneros v.

19   Alpine Ridge Group, 508 U.S. 10, 18 (1993) (citations and internal quotation omitted).

20   Furthermore, the Secretary is authorized to waive "*all legal requirements*" that he

21   "determines necessary to ensure expeditious construction of the barriers and roads." Act at §

22   102(c)(1). It is difficult to imagine that Congress, by its use of the phrase "*all* legal requirements,"

23   meant to encompass only those laws that were not at the time the subject of litigation. "All legal

24   requirements" means just that – *all* laws and other legal demands that pose an obstacle to the

25   expeditious construction of the San Diego fence project. In the Secretary's determination, this

26

27   [10] While Justice Scalia took issue with the Court's reliance on legislative history under the first
     prong of Landgraf, see 511 U.S. at 286-88 (Scalia, J., concurring in judgment), the majority opinion

28   expanded the analysis beyond the statute's text, see 511 U.S. at 262-63 ("[t]he relevant legislative history
     of the 1991 Act reinforces our conclusion . . ."). Even Plaintiffs recognize that legislative history is
     relevant to a court's analysis of the first prong in Landgraf. (See Pls' Memo. at 17.)

1   includes NEPA, and to remove this statute from the Secretary's reach because Plaintiffs had earlier

2   brought suit is to ignore Congress's intent to permit the waiver of "all" legal requirements.[11]

3       On a practical level, should this Court agree with Plaintiffs that the Waiver Legislation

4   may not be used to waive NEPA because it is the subject of pending litigation, then the sole

5   purpose for the Waiver would be frustrated. Congress enacted (and amended) the Waiver

6   Legislation to permit the Secretary to *expedite* construction *of this fence* by removing certain legal

7   impediments that presented an obstacle (thereby defeating Congress's homeland security directive

8   to improve border security). The Secretary has determined that one such impediment is NEPA;

9   Plaintiffs' position would, if credited, directly contradict the will of Congress by requiring the

10  continued compliance with a statute that the Secretary has determined is impeding the expedited

11  construction of the fence

12      The legislative history lends clear support to these principles. In explaining Congress's

13  intent in using the phrase "all legal requirements," a House Conference Report states:

15  [T]he provision clarifies the intent of the conference
    report by substituting a reference to waiver of 'all
    legal requirements' for the prior reference to waiver
16  of 'all laws,' clarifying Congress' intent that the
    Secretary's discretionary waiver authority extends to
17  *any* local, state or *federal statute*, regulation, or
    administrative order that *could impede expeditious*
18  *construction of border security infrastructure.*

19  H.R. No. 109-72, 2005 U.S.C.C.A.N. 240, 296 (May 3, 2005). Certainly, NEPA falls within this

20  expression of Congressional intent, whether or not it also forms the basis of a pending lawsuit.

21      And to the extent there is any remaining doubt about the Waiver Legislation's application

22  to this suit, Congress directly answered the question in the House report: "Continued delays

23  *caused by litigation* have demonstrated the need for additional waiver authority with respect to

24  other laws that might impede the expeditious construction of security infrastructure along the

25  border." Id. Importantly, this action is the only litigation that has been filed regarding the San

26

27      [11] It also would set a worrisome precedent to the extent that Congress enacts other statutes that
    contain similar waiver provisions. Plaintiffs should not be permitted to limit Congress's intentions – and
28  thus a statute's reach – merely by filing suit before an agency makes the necessary determinations prior
    to issuing a waiver.

1  Diego border fence.  Thus, Congress's direct reference to the delays caused by litigation

2  demonstrates its intent to permit the Secretary to take necessary actions to waive all laws even

3  where the result would be to affect this pending suit.[12]  The Waiver Legislation's text, legislative

4  history, and clear purpose warrant its application to this pending suit.

### ii.   The Waiver Legislation has no impermissible retroactive effect

6  "Even absent specific legislative authorization" – should this Court find the Waiver

7  Legislation to be unclear as to Congress's intent regarding retroactivity – "application of new

8  statutes passed after the events in suit is unquestionably proper in many situations."  Landgraf, 511

9  U.S. at 273.  The test is whether the new or amended statute would have an impermissible

10  retroactive effect.  Lyon, 252 F.3d at 1085 (quoting Landgraf, 511 U.S. at 280).

11  Changes in procedural rules, as opposed to substantive ones, are not deemed to have such

12  an effect – and thus are often applied in suits arising before their enactment without raising

13  concerns about retroactivity – because of the "diminished reliance interests in matters of

14  procedure."  Landgraf, 511 U.S. at 275 (citation omitted).  NEPA is a procedural statute that does

15  not even require an agency to reach a particular result based on the information it collects and

16  analyzes.  Robertson, 490 U.S. at 350-51; see also Strycker's Bay Neighborhood Council, Inc. v.

17  Karlen, 444 U.S. 223, 227 (1980) (NEPA, "while establishing 'significant substantive goals for the

18  Nation,' imposes upon agencies duties that are 'essentially procedural.'") (citation omitted); Ground

19  Zero Ctr for Non-Violent Action v. Department of Navy, 383 F.3d 1083, 1087 (9th Cir. 2004)

20  ("Because NEPA is an 'essentially procedural' statute, it does not mandate 'that agencies achieve

21  particular substantive results.'") (citations omitted).  Because Plaintiffs' sole basis of challenge in

22  the underlying suit is NEPA, that statute's procedural nature warrants the retroactive application of

23

_____

24  [12]  The report also discusses the Waiver Legislation's 60-day limitations period for bringing
constitutional claims, as well as its provision for direct review in the Supreme Court, see Act at §
25  102(c)(2)(A), stating that these provisions establish "[t]he Conferees' intent [] to ensure that judicial
review of actions or decisions of the Secretary not delay the expeditious construction of border security
26  infrastructure, thereby defeating the purpose of the Secretary's waiver."  2005 U.S.C.C.A.N. at 297.
While this statement is not referring to the Waiver itself, but instead to judicial review of Waiver
27  decisions that the Secretary has and may in the future make, it further demonstrates Congress's intent
that legal requirements not impede Congress's desire that the fence be quickly completed.  To not apply
28  the Waiver Legislation to this suit undoubtedly upsets that intent (as would permitting a protracted
lawsuit challenging an exercise of the Waiver, hence, the provisions limiting judicial review).

1 the Waiver Legislation.

2   In addition, the Waiver Legislation should not be deemed impermissibly retroactive

3 because it unequivocally has not "impair[ed] rights a party possessed *when he acted*, increase[d] a

4 party's liability for past conduct, or impose[d] new duties with respect to transactions already

5 completed." Landgraf, 511 U.S. at 280 (emphasis added). No duty, liability, or burden upon the

6 plaintiffs based on anything they have done in the past has been imposed, increased, or in any way

7 affected by the Waiver. Indeed, the Waiver has nothing at all to do with the actions or obligations

8 of Plaintiffs.

9   In contrast, many of the cases cited by Plaintiffs involved statutes that imposed significant

10 legal burdens on the plaintiffs after the fact. See, e.g., St. Cyr, 533 U.S. at 321–25 (elimination of

11 alien's eligibility for a waiver of deportation had retroactive effect because alien reasonably relied

12 on the availability of such relief when he agreed to plead guilty); Hughes Aircraft Co. v. United

13 States ex rel. Schumer, 510 U.S. 939, 948–50 (1997) (1986 amendment to False Claims Act had

14 retroactive effect when applied to pre-1986 case because it created a new cause of action and

15 thereby imposed new duties and increased liabilities on past conduct); Landgraf, 511 U.S. at

16 281–84 (1991 Civil Rights Act provisions allowing compensatory and punitive damages for Title

17 VII violations could not be applied in pre-1991 case absent clear statement because it attached new

18 legal burdens by directly increasing a party's liability). Such cases are vastly different from the

19 situation here, where no legal duties or obligations have been retroactively imposed on Plaintiffs.

20 Instead, the Waiver merely operates to permit the fence project to proceed expeditiously. And

21 while Plaintiffs struggle to create "rights" to maintain this suit under NEPA despite the Waiver, a

22 statute is not deemed to have retroactive effect "merely because it . . . upsets expectations based in

23 prior law."[13] Id. at 269.

24   Another important factor to consider in determining retroactivity is the relief requested.

25 Here, Plaintiffs primarily seek prospective relief. While they seek a declaration that past and

---

26

27   [13] Regarding Plaintiffs' expectations, *it is noteworthy that a prior version of the Waiver* permitted the waiver of NEPA specifically, see Pub. L. 104-208, 110 Stat. 3009, and this version pre-

28 dated Plaintiffs' suit by several years. (See Pls' Memo. at 1-2.) Accordingly, Plaintiffs' "long-held *expectations*" (see id. at 23 and declarations attached to Pls' Memo.) must be viewed with skepticism because NEPA was subject to Waiver since before inception of this suit.

1  continuing construction is unlawful, their requested injunctive relief is against only current and

2  future construction, as they seek an injunction on "any and all construction activities on the [BIS]

3  until Defendants fully comply with NEPA." (See Compl., Relief Requested). When, as here, "the

4  intervening statute authorizes or affects the propriety of prospective relief, application of the new

5  provision is not retroactive."[14] Landgraf, 511 U.S. at 273 ("'relief by injunction operates *in*

6  *futuro*'") (emphasis in original) (citations omitted); see also 511 U.S. at 293 (Scalia, J. concurring)

7  ("Since the purpose of prospective relief is to affect the future rather than remedy the past, the

8  *relevant time for judging its retroactivity is the very moment at which it is ordered.*") The Waiver

9  Legislation does not have an impermissible retroactive effect and must be deemed applicable to

10  this suit.[15]

11  **3.    The Waiver Does Not Violate Article III, Section 1**

12          Finally, in a throwaway argument, Plaintiffs invoke the "doubts" and dicta of lower courts

13  to advance an argument that the Secretary's exercise of *the Waiver itself* – as opposed to the

14  Waiver Legislation – has impermissibly intruded into Congress's power to establish the

15  jurisdiction of the federal judiciary. Plaintiffs argue that because their case is based wholly on

16  NEPA, and the Secretary has waived the applicability of NEPA, the Waiver impermissibly

17  exercises Congressional powers over Article III.

18          Plaintiffs' argument is merely a version of Plaintiffs' other two arguments and must be

19

20      [14]    Likewise, Plaintiffs' claims that challenge Areas I, V, and VI of the BIS are not ripe for
21  review because Defendants have not yet issued a record of decision under NEPA and, accordingly, no
    final agency action has occurred. See Sierra Club v. Slater, 120 F.3d 623, 631 (6th Cir. 1997) (until
22  agency issues ROD, no final agency action has taken place). Defendants raised ripeness as an
    affirmative defense in the Answer.

23      [15]    Depending on the Court's analysis of the next argument, there may be yet another reason to
    determine that the Waiver Legislation is not impermissibly retroactive in effect. "[I]ntervening statutes
24  conferring or ousting jurisdiction" may be applied retroactively. See Landgraf, 511 U.S. at 274
    (discussing prior case where Court ordered action dismissed because jurisdictional statute on which it
25  was filed was subsequently repealed) (citing Bruner v. United States, 343 U.S. 112, 116-17 (1952)); see
    also Landgraf, 511 U.S. at 292 (Scalia, J., concurring) (Court has "consistent practice of giving
26  immediate effect to statutes that alter a court's jurisdiction") (citations omitted). Thus, if this Court
    deems the Waiver Legislation to be jurisdictional, it should be applied to this suit. Plaintiffs' attempt
27  to avoid this doctrine – claiming that the Waiver Legislation is not jurisdictional because "it does not
    transfer Plaintiffs' case to another forum; if applied, there will be *no* forum" (Pls' Memo. at 23 (emphasis
28  in original)) – is meritless. "A jurisdictional rule can deny a litigant a forum for his claim entirely."
    Landgraf, 511 U.S. at 292 (Scalia, J. concurring) (citations omitted).

04cv0272

1  rejected for the reasons that doom them.  The Secretary received the Waiver authority from

2  Congress, and whether Congress may constitutionally delegate authority to the Secretary must be

3  judged under "intelligible principle" standards, not under any separate jurisdictional test that

4  Plaintiffs seek to apply to the Waiver itself.  Cf. Skinner v. Mid-America Pipeline Co., 109 S. Ct.

5  1726, 1733 (1989) ("We find no support . . . for Mid-America's contention that the text of the

6  Constitution or the practices of Congress require the application of a different and stricter

7  nondelegation doctrine in cases where Congress delegates discretionary authority to the Executive

8  under its taxing power.").  Likewise, whether legislation applies to pending litigation must be

9  judged under the law related to retroactivity.  There is no need, nor basis, to subject the Waiver

10  itself to an additional Article III standard – especially one so poorly defined (if not nonexistent).

11  But even if this Court were to analyze the Waiver under Plaintiffs' proposed standard, Plaintiffs'

12  argument fails.

13  As a threshold matter, Congress has not even delegated away its constitutional power to

14  establish the jurisdiction of the federal courts, as Plaintiffs maintain.  Rather, Congress has

15  delegated to the Secretary of Homeland Security a power to waive "legal requirements" in order to

16  accomplish a specific Congressional priority.[16/]  To be sure, the Secretary's exercise of that power

17  here through the Waiver has the effect of eliminating the only cause of action advanced by

18  Plaintiffs.  But all United States district courts have not been deprived of all jurisdiction over all

19  potential causes of action related to United States border security measures; Plaintiffs remain free

20  to assert claims based on legal requirements other than those identified in the Waiver itself.

21  Indeed, that Congress expressly has vested in this Court (and in all district courts in the United

22  States) "exclusive jurisdiction to hear all causes or claims arising from" the Waiver that "alleg[e] a

23  violation of the Constitution of the United States," Act at § 102(c)(2)(A), demonstrates the flaw in

24  Plaintiffs' argument.  Congress has not authorized the Secretary to abolish the jurisdiction of the

25

26      [16/]  In a House Conference Report, Congress's intent behind using the term "legal requirements"
is described, not in terms of delegating away Congress's powers over the jurisdiction of the federal

27  judiciary, but instead as ensuring that the "Secretary's discretionary waiver authority extends to any
local, state or federal statute, regulation, or administrative order that could impede expeditious

28  construction of border security infrastructure."  H.R. No. 109-72, 2005 U.S.C.C.A.N. 240, 296 (May
3, 2005).

04cv0272

1    federal courts to hear all disputes related to border policy and/or immigration, and the Secretary

2    has not done so.

3         This distinction is illustrated by one of the cases on which Plaintiffs rely, <u>Miller v. Federal</u>

4    <u>Communications Comm'n</u>, 66 F.3d 1140 (11th Cir. 1995). In <u>Miller</u>, the court voiced a concern in

5    dicta[17] because the agency had issued a declaratory ruling stating that *all* state causes of action

6    regarding a particular issue were preempted by federal law, and further that "[t]he *sole forum* for

7    adjudicating such matters shall be this [agency]." 66 F.3d at 1143 (emphasis added). Moreover,

8    the agency was making these sweeping pronouncements based on an ambiguous Congressional

9    grant of authority, as well as on its general rulemaking authority. <u>See id.</u> In contrast, the Waiver

10    is unambiguous in its direction to the Secretary and is limited in scope, and the Secretary has taken

11    only the steps he deems necessary to implement Congress's desires. He has not asserted that only

12    the Department of Homeland Security has jurisdiction to hear challenges to the fence project;

13    indeed, he has asserted nothing at all about what entity has jurisdiction to hear any legal

14    challenges. Rather, the Secretary has waived certain specific "legal requirements"(not every

15    conceivable existing legal requirement that may exist) such as NEPA in order to ensure the

16    expeditious construction of an important Congressional priority. To look merely at the

17    jurisdictional effect of the Waiver upon one lawsuit is to ignore the scope of the delegated power

18    and the limited invocation of that power here to achieve a specific goal. When those things are

19    considered, it is clear that Congress has not impermissibly delegated away its Article III power

20    over the jurisdiction of the federal judiciary.

21         Should, however, this Court deem the Waiver Legislation to be a delegation of Congress's

22    authority to establish the jurisdiction of the federal courts, the Waiver is nonetheless permissible.

23    Plaintiffs cite not one case – and Defendants are aware of none – that has ever held a statute or

24    agency action unconstitutional on the grounds proposed by Plaintiffs. Rather, the limited existing

25    authority undercuts Plaintiffs' assertions. <u>See Rein v. Socialist People's Libyan Arab Jamahiriya</u>,

26    162 F.3d 748, 762-64 (2nd Cir. 1998) (noting that "how far Congress may go in delegating

27

28      [17] While the court did express a general concern about Congressional delegation of powers over jurisdiction, it did not decide the case on that ground. Rather, the court dismissed the petition under Article III as seeking an impermissible advisory opinion. 66 F.3d at 1145-46.

1    authority to designate or limit the jurisdiction of the federal courts is a complex question that has

2    not yet received a definitive answer," but proceeding to discuss two cases (discussed next) where

3    the courts permitted jurisdiction that depended on a factual determination that had been delegated

4    to the Executive Branch).

5       In Jones v. United States, 137 U.S. 202 (1890), for example, the plaintiff was indicted for a

6    murder that took place on a Caribbean island. Jurisdiction to try him in a U.S. court depended on

7    whether the island was an American territory and, pursuant to a statutory delegation, the Secretary

8    of State recently had determined that it was. 137 U.S. at 217. The Supreme Court upheld the

9    delegation as constitutional despite its ultimate effect on the court's jurisdiction. Id. at 223-34.

10   And in Matimak Trading Co. v. Khalily, 118 F.3d 76 (2nd Cir. 1997), cert. denied 522 U.S. 1091

11   (1998), the plaintiff was a corporation in Hong Kong that sought to bring suit against New York

12   defendants by invoking "alienage" jurisdiction. Whether such jurisdiction applied turned on

13   whether Hong Kong qualified as a foreign state, and the court held that such a determination could

14   constitutionally be made by the Executive Branch despite the jurisdictional nature of such a

15   determination.[18] 118 F.3d at 82-84.

16       The concurrence filed by now-Chief Justice Roberts in Acree also is illustrative on this

17   issue. In Acree, the plaintiffs filed suit under an exception to FSIA that waived a foreign state's

18   immunity from civil suit where the state was responsible for injury or death from torture or

19   terrorism. 370 F.3d at 44. While the suit was pending, and after the Iraqi conflict commenced,

20   Congress enacted legislation (the Emergency Wartime Supplemental Appropriations Act

21   ("EWSAA")) that contained a provision that, among other things, "authorized the President to

22   'make inapplicable with respect to Iraq . . . any other provision of law that applies to countries that

23   have supported terrorism.'" Id. at 46. Soon after, the President exercised this authority and made

24

---

25       [18] In contrast to the holdings in Jones and Matimak, many of the citations relied on by Plaintiffs
are more like judicial ponderings, and in none of those cases did the court find a delegation
26   unconstitutional. For example, in United States v. Mitchell, 18 F.3d 1355, 1360 n.7 (7th Cir. 1994), the
court merely noted in a footnote the "potential constitutional concern" with jurisdictional delegation,
27   and in Neves v. Kolaski, 602 F. Supp. 645 (D.R.I. 1985), the district court embarked on a similar
reflection, with no citation or substantive discussion, 602 F. Supp. at 651 ("it is dubious that it may . .
28   . [a]nd even if Congress could delegate such authority . . .). The court in Seals v. United States, 319 F.
Supp.2d 741, 745 (W.D. Tx. 2004), merely cites these other cases in noting its concerns as well.

1    inapplicable the specific FSIA exception upon which Plaintiffs had relied to bring suit. Id. The

2    Government intervened in the litigation, and the court upheld the President's exercise of this

3    authority, applying a detailed statutory construction to conclude that the lower court had retained

4    jurisdiction (despite the waiver), yet the plaintiffs could state no cause of action against a foreign

5    state such as Iraq. Id. at 48-49.

6      While Chief Justice Roberts agreed that the case was rightly dismissed, he disagreed with

7    the court's analysis of jurisdiction:

8       Section 1503 of the EWSAA includes the authority to
   make Section 1605(a)(7) of the FSIA – on its face a

9       'provision of law that applies to countries that have
   supported terrorism' – inapplicable to Iraq, and *the*

10      *Presidential Determination of May 7, 2003 therefore*
   *ousted the federal courts of jurisdiction in cases that*

11      *relied on that exception to Iraq's sovereign immunity.*
   *I also conclude that this ouster of jurisdiction is*

12      *properly applied to pending cases, and that the*
   *district court's judgment should thus be vacated and*

13      *the case dismissed for want of jurisdiction.*

14   370 F.3d at 60 (Roberts, J., concurring) (emphasis added); see also Dames & Moore v. Regan, 453

15   U.S. 654, 688 (1981) (upholding President's authority to take action that divested court of

16   jurisdiction: "where, as here, the settlement of claims has been determined to be a necessary

17   incident to the resolution of a major foreign policy dispute between our country and another, and

18   where, as here, we can conclude that Congress acquiesced in the President's action, we are not

19   prepared to say that the President lacks the power to settle such claims."). In expressly sanctioning

20   a Congressional delegation to the Executive of authority to "oust" the judiciary's power to entertain

21   certain actions, nowhere in his lengthy and detailed discussion did now-Chief Justice Roberts

22   express any constitutional concerns of the type advanced by Plaintiffs here.[19]

23     Plaintiffs' attempt at creating a new standard for judging Congressional delegations of

24   _____

25    [19]  Chief Justice Roberts did, however, note an argument that had been advanced by the plaintiffs that the delegation was unconstitutional in light of Clinton v. New York, 524 U.S. 417 (1998)

26   because it empowered the President to either revise or repeal a statute as related to Iraq. 370 F.3d at 64 n.3. Chief Justice Roberts rejected this claim, finding the actions authorized by the EWSAA "a far cry

27   from the line-item veto at issue in Clinton." Id. Rather, he wrote, the delegation is "akin to the waivers that the President is routinely empowered to make in other areas, particularly in the realm of foreign

28   affairs." Id. (citing 22 U.S.C. § 7207(a)(3) (authorizing President to waive statutory prohibition in assistance to certain countries if he determines that waiver is in national security interest)). Plaintiffs here do not raise a challenge under Clinton v. New York, nor could they reasonably do so.

04cv0272

1  authority to take actions that may affect the claims a court may or may not hear is without merit,

2  and Plaintiffs' action must be dismissed.

3                                   **CONCLUSION**

4          For these many reasons, the Court should dismiss Plaintiffs' action.

5          DATED: November 17, 2005                    CAROL C. LAM
                                                       United States Attorney
6
                                                       PETER D. KEISLER
7                                                      Assistant Attorney Genera

8                                                      KELLY A. JOHNSON
                                                       Acting Assistant Attorney General
9
                                                       CARL NICHOLS
10                                                     Deputy Assistant Attorney General

11                                                     SANDRA M. SCHRAIBMAN
                                                       Assistant Director
12

13                                                     _Matthew Lepore_____

14                                                     MATTHEW LEPORE
                                                       California Bar. No. 201205
15                                                     Trial Attorney
                                                       United States Department of Justice
                                                       Civil Division, Federal Programs Branch
16                                                     P.O. Box 883
                                                       Washington, D.C. 20044
17                                                     Tel: (202) 514-3770; Fax: (202) 318-7601
                                                       Email: Matthew.Lepore@usdoj.gov
18
                                                       DONNA S. FITZGERALD
19                                                     Connecticut Bar No. 411810
                                                       Trial Attorney
20                                                     United States Department of Justice
                                                       Environment & Natural Resources Division
21                                                     Natural Resources Section
                                                       P.O. Box 663
22                                                     Washington D.C. 20044-0663
                                                       Tel: (202) 305-0476; Fax: (202) 353-7763
23                                                     E-mail: Donna.Fitzgerald@usdoj.gov

24  OF COUNSEL:

25  Albert Kundrat
    Melissa Erny
26  Office of the Assistant Chief Counsel
    United States Customs and Border Protection
27  United States Department of Homeland Security
    P.O. Box 68914
28  Indianapolis, IN 46268-0914
                                                       Attorneys for Defendants

04cv0272

<table>
<tr><td>1</td><td colspan="2" align="center">UNITED STATES DISTRICT COURT</td></tr>
<tr><td>2</td><td colspan="2" align="center">SOUTHERN DISTRICT OF CALIFORNIA</td></tr>
</table>

1                 UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3  SIERRA CLUB, et al.,         )    Case No. 04cv0272 LAB (LDA)

4           Plaintiffs,   )

5     v.               )    ***CERTIFICATE OF SERVICE BY MAIL***

6  JOHN ASHCROFT, et al.,     )

7          Defendants.   )

8  _____)

9     I certify that I served by mail (and by email as well to cory@briggslawcorp.com.) a copy of

10 DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN RESPONSE TO

11 PLAINTIFFS' OPENING BRIEF RESPONDING TO THE COURT'S ORDER TO SHOW

12 CAUSE WHY THIS CASE SHOULD NOT BE DISMISSED on these individuals:

13                 CORY J. BRIGGS, ESQ.
                   BRIGGS LAW CORPORATION

14                 5663 Balboa Ave., No. 376
                   San Diego, CA 92111-2705

15

16                 Adam Keats,
                   CENTER FOR BIOLOGICAL
                   DIVERSITY

17                 1095 Market St., Suite 511
                   San Francisco, CA 94103

18

19                 Everett L. Delano, III
                   Law Offices of Everett L. Delano, III
                   220 West Grand Ave.

20                 Escondido, CA 92025

21                 Gabriel Solmer
                   San Diego Baykeeper

22                 2924 Emerson St., Suite 220
                   San Diego CA 92106

23

24 I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 17, 2005.

25                                 *Matthew LePore*
                          _____

26                                 MATTHEW LEPORE
                                California Bar. No. 201205
                                Trial Attorney

27                                 United States Department of Justice
                                Civil Division, Federal Programs Branch

28                                 P.O. Box 883
                                Washington, D.C. 20044
                                Tel: (202) 514-3770; Fax: (202) 318-7601
                                Email: Matthew.Lepore@usdoj.gov